## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------x
                                            :
**In re**                                   :       **Chapter 11**
                                            :
**SIMMONS BEDDING COMPANY,** *et al.,*      :       **Case No. _____ (____)**
                                            :
                 **Debtors.**               :       **Joint Administration**
                                            :       **Requested**
                                            :
---------------------------------------------------------------------x

## MOTION OF THE DEBTORS FOR AN ORDER (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS, (C) CONTINUE INTERCOMPANY ARRANGEMENTS, AND (II) GRANTING AN EXTENSION OF TIME TO COMPLY WITH THE REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY CODE

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Simmons Bedding Company ("Simmons Bedding") and certain of its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"),[1] respectfully represent:

### Background

1.      On the date hereof (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Simmons Company (6221); Bedding Holdco Incorporated (5929); Simmons Bedding Company (5743); The Simmons Manufacturing Co., LLC (0960); Windsor Bedding Co., LLC (8616); World of Sleep Outlets, LLC (0957); Simmons Contract Sales, LLC (2016); Dreamwell, Ltd. (2419); Simmons Capital Management, LLC (2470); and Simmons Export Co. (1370).  Each of the Debtors maintains its principal corporate office at One Concourse Parkway, Atlanta, Georgia 30328.

## Jurisdiction and Venue

2.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Business

3.     The Debtors are one of the world's largest manufacturers and marketers of bedding products. Together with their non-debtor foreign affiliates, the Debtors operate 20 bedding manufacturing facilities across the United States, Canada, and Puerto Rico. Founded in 1870, the Debtors and their predecessors have been developing innovative products and technologies that provide their consumers a better night's sleep since 1876. The Debtors' headquarters are located in Atlanta, Georgia.

4.     The Debtors manufacture, sell and distribute their bedding products to individual end-users through a diverse base of customers which, in 2009, include over 2,100 retailers in the United States with approximately 13,500 store locations, including furniture stores, specialty sleep shops, department stores, furniture rental stores, mass merchandisers and juvenile specialty stores. The Debtors also sell their products to hospitality customers, such as hotels, casinos and resort properties through Simmons Contract Sales, LLC, a debtor herein, and sell overstock and discontinued models through retail outlets operated by World of Sleep Outlets, LLC, a debtor herein. Additionally, the Debtors license their intellectual property through Dreamwell, Ltd., a debtor herein, to both international companies that manufacture and sell Simmons branded bedding products throughout the world and to U.S. manufacturers and distributors of bedding accessories, furniture, airbeds and other products.

5.     As of the Commencement Date, the Debtors had approximately 2,300 employees in U.S. For the fiscal quarter ended September 26, 2009, the Debtors' unaudited consolidated

financial statements reflected assets totaling approximately $900 million, liabilities totaling approximately $1 billion, and net sales for the trailing twelve months ended September 26, 2009 of approximately $782 million.

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 filings are contained in the Declaration of William S. Creekmuir in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief (the "Creekmuir Declaration"), filed contemporaneously herewith.

### The Proposed Prepackaged Plan

7.      The Debtors' proposed joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code (the "Plan") is proposed pursuant to the Plan Sponsor Agreement, dated September 24, 2009 (as has been or may be further amended, restated, supplemented, or otherwise modified from time to time, the "Plan Sponsor Agreement"), among the Debtors and AOT Bedding Super Holdings, LLC and AOT Bedding Intermediate Holdings, LLC (collectively, the "Purchasers"). The Plan Sponsor Agreement contemplates that Bedding Holdco Incorporated ("Bedding Holdco"), Simmons Bedding and its subsidiaries will be acquired by the Purchasers upon consummation of the Plan. The Debtors and the Purchasers entered into the Plan Sponsor Agreement after the Debtors conducted a comprehensive review of various strategic alternatives, which included considering a wholesale restructuring of their capital structure or a third party sale. The Debtors believe the transactions contemplated by the Plan Sponsor Agreement are in the best interests of the Debtors and their creditors.

8.      The Debtors expect to file shortly a motion seeking approval of the Plan Sponsor Agreement. The Plan Sponsor Agreement includes certain covenants relating to the conduct of the Debtors' business, including, without limitation, a general requirement that the Debtors continue operating in the ordinary course of business. The Debtors' compliance with this and

3

other covenants is a condition to the Purchasers' obligations under the Plan Sponsor Agreement, subject to certain qualifications and exceptions. In order to be able to satisfy these covenants if the Plan is approved by the Court, the Debtors intend to operate their business in accordance with the Plan Sponsor Agreement prior to the Court's approval thereof to the extent that such actions are consistent with the Bankruptcy Code and any applicable rules and orders of this Court.

9.      Under the Plan, secured creditors, unsecured trade creditors, and administrative and priority creditors are being paid in full or reinstated. Further, under the Plan, the Debtors will reinstate approximately $12.5 million of claims arising in connection with certain industrial revenue bonds and assume obligations aggregating approximately $10 million under certain letters of credit. In addition, holders of the SBC Notes (as defined in the Plan) and the Holdco Notes (as defined in the Plan) are receiving cash recoveries. The Debtors are financing those payments from an equity investment by the Purchasers of approximately $310 million (some portion of which may be funded by certain holders of the Holdco Notes in accordance with the terms of that certain equity commitment letter dated as of September 24, 2009), and the proceeds of the issuance of $425 million senior secured term notes. Certain holders of the SBC Notes, Holdco Notes and SBC Credit Agreement Claims (as defined in the Plan), as well as an affiliate of one of the Purchasers, have committed to purchase such senior secured term notes.

10.      On October 13, 2009, the Debtors commenced solicitation of votes on the Plan via a disclosure statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code. As set forth in the Epiq Bankruptcy Solutions LLC affidavit filed on this date, the proposed Plan has been accepted in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy

4

Code by all classes entitled to vote. Specifically, each of the voting classes, both by number and by amount that voted on the Plan, voted overwhelmingly to accept the Plan.

11.     The restructuring contemplated by the proposed Plan will reduce the Debtors' outstanding indebtedness by approximately $572 million. The Debtors believe that the Plan is in the best interests of the Debtors and their creditors.

### Relief Requested

12.     To efficiently and seamlessly manage their business, the Debtors and certain of their non-debtor affiliates utilize a centralized cash management system (the "Cash Management System")[2] to collect and transfer the funds generated by the Debtors' operations and disburse the funds necessary to satisfy their obligations. Pursuant to the Cash Management System, the Debtors maintain numerous bank accounts (collectively, the "Bank Accounts")[3] at the banks (collectively, the "Banks") listed on Exhibit A annexed hereto and described herein.

13.     By this Motion, the Debtors request, pursuant to sections 105(a), 363(c), and 345(b) of the Bankruptcy Code, (i) authority to (a) continue to utilize their existing Cash Management System to fund the Debtors' operations, (b) maintain the Debtors' existing Bank Accounts and business forms, and (c) continue their intercompany arrangements, including intercompany loans, and (ii) an extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code.

---

[2] In addition to the Bank Accounts described herein, Simmons Bedding entered into two separate escrow agreements, one relating to obligations with respect to certain environmental remediation in New Jersey, and the other relating to obligations with respect to certain letters of credit. Because neither account is a part of the Debtors' Cash Management System, and the funds in both of those escrow accounts are not for the benefit of the Debtors, the Debtors do not include an explanation of those accounts herein.

[3] Pursuant to a forbearance agreement (the "Forbearance Agreement") between the Debtors and certain of their prepetition secured lenders dated December 10, 2008, the Debtors and the collateral agent for those prepetition secured lenders entered into Deposit Account Control Agreements (the "DACAs") for each of the Bank Accounts, except for the five ZBAs (as defined below). Under the DACAs, the Debtors are permitted continued use of those Bank Accounts without being in violation of (i) other terms of the Forbearance Agreement, and (ii) a related prepetition credit agreement.

## The Debtors' Cash Management System[4]

14.      The Debtors' Cash Management System is similar to that utilized by other large, multiple entity companies that operate in geographically dispersed locations.  The Cash Management System allows the Debtors to accurately and efficiently collect, transfer, and disburse funds generated in the course of their business operations.  In particular, the Cash Management System performs several functions: (i) collecting payments made to the Debtors by their customers; (ii) disbursing payments to the Debtors' vendors, service providers, employees, taxing authorities, and other entities to whom they owe obligations (including payment of refunds and warranty claims to customers and consumers); (iii) transferring and aggregating funds into a concentration account; and (iv) maintaining certain miscellaneous stand-alone accounts.  A diagram depicting the Cash Management System is annexed hereto as Exhibit B.

## The Debtors' Cash Collection Activities

15.      The Debtors generate revenue primarily from the sale of their bedding products. That is, the Debtors invoice customers for products purchased by them, and those customers remit payments to the Debtors via a "lockbox" account maintained at Wachovia Bank in Atlanta, Georgia (the "Wachovia Lockbox Account").  In addition, and solely for the ease of their customers in Honolulu, Hawaii, the Debtors also maintain a lockbox account with First Hawaiian Bank (the "Hawaiian Lockbox Account") wherein customers in Hawaii remit their payments to the Debtors.  The amounts deposited into the Hawaiian Lockbox Account represent approximately 1% of the total funds received by the Debtors on any given day.  In addition, the

---

[4] Several of the Debtors' non-debtor foreign affiliates have their own cash management system, which is separate from the Cash Management System, except insofar as they may potentially receive the proceeds of certain Intercompany Loans (as defined and discussed herein).  Thus, the Debtors' non-debtor foreign affiliates, any bank accounts maintained in their names, and their cash management system are not discussed herein.  Accordingly, the Debtors are not seeking authority to maintain any such system pursuant to this Motion.

Debtors maintain a separate Bank Account into which all amounts paid via credit cards to the Debtors are deposited.

### The Debtors' Cash Concentration Activities

16.     At the end of each business day, the funds deposited into the Wachovia Lockbox Account are transferred to a designated concentration account at Wachovia Bank in Atlanta, Georgia (the "Concentration Account").  Because of the relatively small amount of funds deposited into the Hawaiian Lockbox Account, the funds from that account are transferred only weekly to the Concentration Account.  The concentration of cash into the Concentration Account allows the Debtors to earn a slightly higher rate of interest than would be possible if the funds were held in separate accounts.  Once the Concentration Account balance reaches an amount greater than $1,000,000, all amounts in excess of $1,000,000 are swept, at the end of each business day, into a money-market account managed by Wachovia Bank (the "Overnight Sweep Account").  These funds are invested in certain repurchase agreement transactions in U.S. government or agency securities (the "Repurchase Agreement Transactions"), and are automatically swept back into the Concentration account, along with the earned interest, the next business day.

### The Debtors' Cash Distribution Activities

17.     Funds in the Concentration Account are transferred, as needed, into five "zero balance accounts" (the "ZBAs"), which are identified on Exhibit A and the proceeds of which are used to fund the Debtors' operating expenses, including, but not limited to: (i) payroll and related employee obligations (including obligations arising from the self-insured portions of the Debtors' healthcare related insurance programs), (ii) plant operating obligations, (iii) advertising and other public relations charges, (iv) marketing and related charges owed to dealers and other high-volume customers, (v) material purchases, and (vi) corporate overhead.

7

18.     The Debtors manage their payables by utilizing the five ZBAs. The ZBAs are accounts in which the Debtors maintain zero balances at the end of each business day. If a ZBA has a negative balance at the end of each day, funds flow into such account from the Concentration Account. If a ZBA has a positive balance at the end of each day, funds flow out of that ZBA account and into the Concentration Account. By managing their ZBAs in this manner, the Debtors ensure reliable and adequate funding for each of the disbursement accounts described herein.[5]

19.     World of Sleep Outlets, LLC, a debtor herein, owns and manages five outlet stores (collectively, the "Outlets") which sell certain of their products (generally discontinued models and overstock), at a discounted rate, directly to consumers. Each of the Outlets maintains a separate Bank Account into which receivables are deposited and from which operating expenses are paid. The Banks at which the Outlets maintain Bank Accounts are identified on Exhibits A and B attached hereto. The Bank Accounts related to the Outlets are swept into the Concentration Account on a weekly basis, and disbursements are made as needed from the Concentration Account to the individual accounts for each Outlet.

## Miscellaneous Accounts

20.     Dreamwell Ltd. ("Dreamwell"), a debtor herein, acts as a licensor under certain licensing agreements and as a collections agent for certain technology service fees and other amounts payable by intercompany and various third-party licensees for the use of the Debtors' intellectual property. Consequently, monies due and owing to the Debtors on account of such

---

[5] In addition, an amount (approximately $80,000 per month) is transferred from the Concentration Account into a ZBA account to fund the payroll (including applicable withholding taxes) of Simmons Caribbean Bedding, Inc. ("Simmons Caribbean"), which is a non-debtor foreign affiliate of the Debtors. At the end of each month, Simmons Caribbean reimburses the Debtors by transferring the exact amount of funds paid from that ZBA to fund its payroll into the Concentration Account. Because (i) changing this aspect of the Debtors' Cash Management System may create delays and increase costs, and (ii) Simmons Caribbean regularly reimburses the Debtors in the exact amount the Debtors' transfer to fund Simmons Caribbean's payroll, the Debtors ask that they be permitted to continue this prepetition arrangement with Simmons Caribbean.

licensing agreements are remitted to Dreamwell and deposited into two US Bank accounts maintained in Nevada (the "IP Proceeds Accounts"). In addition, Dreamwell pays third-party providers for services, and associated expenses, related to the preservation of the Debtors' intellectual property. Dreamwell distributes periodically to Simmons Bedding excess funds held in the IP Proceeds Accounts. In 2008, Dreamwell distributed approximately $23,192,000 to Simmons Bedding from the IP Proceeds Accounts, of which approximately $9,185,000 came from third-party licensees and the remainder was related to intercompany licenses. Funds distributed to Simmons Bedding are placed into the Concentration Account.

21.    Simmons Capital Management, LLC ("Capital Management") acts as an intercompany lender among the Debtors and certain of their non-debtor affiliates. Capital Management utilizes funds held in an account maintained at US Bank (the "Intercompany Lending Account") to make all intercompany loans. All payments of principal and interest on account of the intercompany loans are retained in a second account which is also maintained at US Bank. Capital Management assesses the liquidity of the Debtors and their affiliates approximately every three months (although such meetings have been suspended in 2009) and makes determinations as to whether funds should be loaned (the "Intercompany Loans") to any such entity from the Intercompany Lending Account. The Intercompany Loans are documented, arm's length transactions governed by market-based interest rates and repayment terms. As of December 27, 2008, Capital Management had Intercompany Loans in the aggregate amount of approximately $58,418,000 and received approximately $1,329,000 in interest payments in fiscal year 2008 (net of all applicable taxes due). Though there are still Intercompany Loans outstanding, no Intercompany Loans have been issued by Capital Management in 2009.

Accordingly, this motion only seeks authority to allow the Debtors to continue receiving payment on Intercompany Loans issued prior to the Commencement Date.

22.      Simmons Export Co. ("Simmons Export") is a special purpose entity with no employees and no tangible assets, which functions in accordance with the Internal Revenue Code & Regulations as an Interest Charge – Domestic International Sales Corporation ("IC-DISC"). An IC-DISC functions as a foreign sales pass-through entity to capture all related-party sales shipped outside the U.S., thereby enabling special inter-company "commission expenses" to be charged to the selling companies that, in turn, generate tax deductions for the selling companies and save taxes on the consolidated U.S. tax return.[6] At the end of each year, when all foreign sales by the separate Debtor entities are tabulated, a commission is determined and charged by Simmons Export. Each respective selling Debtor entity pays its commission to Simmons Export, which amounts are then deposited by wire into an account set up for the purpose of holding such commissions (the "Simmons Export Account"). Approximately one to three days later, the monies in the Simmons Export Account are then "loaned" back to each Debtor entity that paid the commission for their unrestricted use for the rest of the year at a certain prescribed interest rate. Simmons Export separately files an IC-DISC tax return and is allowed to defer taxation almost indefinitely on that "commission income." At the subsequent year-end date, the process is renewed for the current year's foreign sales, provided that all past commission charges and interest (cumulative for all years) must be paid back to Simmons Export for the approximately one to three day period before it can all be loaned back to the paying Debtor entities.

---

[6] IC-DISCs were established by Congress to provide incentives to the private industry to make and sell goods to foreign buyers, thus helping to increase exports and reduce certain trade imbalances between the United States and other countries. In effect, IC-DISCs provide a long-term tax deferral mechanism. An IC-DISC can save and/or defer up to $750,000 a year in federal taxes, assuming there are enough foreign sales to reach the maximum savings allowed. IC-DISCs are also non-taxable for state tax purposes.

10

**Continuing the Cash Management System is in the Best
Interests of the Debtors, Their Creditors and All Parties in Interest**

23.     The Debtors seek authority to continue to operate their Cash Management System

consistent with their prepetition practices and operations and in accordance with the terms and

conditions of the Plan Sponsor Agreement.  The Cash Management System constitutes an

ordinary course and essential business practice providing significant benefits to the Debtors,

including, among other things, providing the Debtors with the ability to (i) control corporate

funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce

administrative expenses by facilitating the movement of funds and the maintenance of timely and

accurate account balance information.

24.     As a practical matter, it would be extremely burdensome and expensive to

establish and maintain a different cash management system because (a) the Debtors have

extensive and geographically dispersed operations that require a coordinated and integrated

means of disbursing and collecting cash to and from multiple locations and for multiple

purposes, and (b) the Cash Management System has been developed over time to achieve these

objectives.  Accordingly, the Debtors request that the Court allow them to continue the existing

Cash Management System after the Commencement Date in accordance with their prepetition

practices.

25.     The relief sought by the Debtors is contemplated by the Bankruptcy Code.  In

particular, section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use

property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C.

§ 363(c)(1).  The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in

possession with the flexibility to undertake such ordinary course transactions as are required to

operate its business without unneeded oversight by creditors or the court.  *See, e.g., In re Roth*

*Am.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (internal quotation omitted); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007); *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997); *In re Enron Corp.*, 2003 WL 1562202, at *15 (Bankr. S.D.N.Y. Mar. 21, 2003). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue their cash collection, concentration, and disbursement activities pursuant to the Cash Management System.

26. Moreover, the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Cash Management System without interruption is vital to the efficient and economic administration of the Debtors' chapter 11 cases.

## Extension of Time to Comply With Section 345(b)

27. Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes such deposits and investments as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United

12

States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain from the entity with which the money is deposited or invested a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. *Id.* In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation. 31 U.S.C. § 9303.

28.     In the ordinary course of business, the Debtors engage in relatively simple investment activities through the automatic transfer of funds from the Concentration Account into the Overnight Sweep Account. These funds are invested in Repurchase Agreement Transactions, and are automatically swept back into the Concentration Account, along with the earned interest, the next business day.

29.     By this Motion, the Debtors seek a 60-day extension of the time to comply with section 345(b) of the Bankruptcy Code. During the extension period, the Debtors propose to engage the Office of the United States Trustee (the "U.S. Trustee") in discussions to determine what modifications to their current practices, if any, would be appropriate under the circumstances. The Debtors believe that the benefits of the requested extension far outweigh any harm to the estates. Moreover, such an extension is contemplated by the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), which state: "if a motion for [a waiver of section 345] is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held." Local Rule 2015-2(b).

30.     Strict compliance with the requirements of section 345(b) of the Bankruptcy Code, in a case such as this, would be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." 11 U.S.C. § 345(a).  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H10,767 (Oct. 4, 1994).

31.     The Debtors believe that the investment of their funds in the Overnight Sweep Account will provide the protection contemplated by section 345(b) of the Bankruptcy Code, notwithstanding the absence of a "corporate surety." By utilizing the Overnight Sweep Account, the Debtors are investing their funds in a manner that will provide the greatest amount of return while minimizing the attendant risk.  Moreover, any corporate surety that might be obtained to guarantee the safety of investments in the Overnight Sweep Account likely would not have significantly greater strength than the investments made pursuant to such account.  Indeed, apart from the fact that a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such bond is available at all), such costs would likely offset much of the financial gain derived from the short-term investments made in the Overnight Sweep Account. Accordingly, the 60-day extension requested herein would allow the Debtors to discuss with the U.S. Trustee the benefits to the Debtors, their estates, and other parties in interest as a result of these investment practices.

32.     Similarly, the Debtors believe that funds held in all of the Bank Accounts, which may exceed the amounts insured by the Federal Deposit Insurance Corporation, are secure and that obtaining bonds to further secure these funds would be prohibitively expensive and therefore

14

detrimental to the Debtors' estates and creditors.  Cause exists pursuant to section 345(b) of the

Bankruptcy Code to extend the time to comply with such requirement because, among other

considerations, (i) the Banks are federally chartered banks subject to supervision by federal

banking regulators, (ii) the Debtors retain the right to remove funds held at the Banks and

establish new bank accounts as needed, (iii) the costs associated with satisfying the requirements

of section 345 are significant, and (iv) the process of satisfying those requirements would lead to

needless inefficiencies in the management of the Debtors' business.  The Debtors believe that the

benefits of extending the time to comply with the requirements of section 345(b) far outweigh

any harm to the estates.  *See generally In re Serv. Merch. Co.*, 240 B.R. 894 (Bankr. M.D. Tenn.

1999).

   33.  Similar extensions have been granted in other chapter 11 cases in this district.

*See, e.g., In re SemCrude, L.P., et al.*, Case No. 08-11525 (BLS) (Docket No. 59) (Bankr. D.

Del. July 23, 2008); *In re LandSource Communities Dev. LLC*, Case No. 08-11111 (KJC)

(Docket No. 29) (Bankr. D. Del. June 10, 2008); *In re Sharper Image Corp.*, Case No. 08-10322

(KG) (Docket No. 43) (Bankr. D. Del. Feb. 20, 2008); *In re HomeBanc Mortgage Corp.*, Case

No. 07-11079 (KJC) (Docket No. 38) (Bankr. D. Del. Aug. 14, 2007); *In re New Century TRS

Holdings*, Case No. 07-10416 (KJC) (Docket No. 54) (Bankr. D. Del. April 3, 2007); *In re

Riverstone Networks, Inc.*, Case No. 06-10110 (CSS) (Docket No. 18) (Bankr. D. Del. Feb. 7,

2006); *In re Foamex Int'l, Inc.*, Case No. 05-12685 (PJW) (Docket No. 39) (Bankr. D. Del.

Sept. 20, 2005).

**Maintenance of the Debtor's Existing
Bank Accounts and Business Forms is Warranted**

   34.  Prior to the Commencement Date and in the ordinary course of their business, the

Debtors maintained the Bank Accounts identified on <u>Exhibit A</u>.  The U.S. Trustee's "Operating

15

Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11" (the

"U.S. Trustee Guidelines") mandate the closure of the Debtors' prepetition bank accounts, the

opening of new accounts, and the immediate printing of new checks with a "Debtor in

Possession" designation on them. If the Debtors are required to comply with these guidelines,

their operations would be severely harmed by the disruption, confusion, delay, and cost that

would most certainly result from such compliance. Closure of the Bank Accounts would disrupt

the Debtors' cash collection and disbursement activities and potentially cause the Debtors to

default on their postpetition obligations to third parties and their employees. Such defaults

would likely, in turn, cause vendors, the Debtors' employees, and other third parties to cease

providing goods and services to the Debtors and would severely harm the estates.

35.    The Debtors believe, therefore, that their transition to chapter 11 will be smoother

and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts

are continued following the Commencement Date with the same account numbers;[7] *provided,*

*however,* that checks issued or dated prior to the Commencement Date will not be honored,

absent a prior order of the Court. By preserving business continuity and avoiding the disruption

and delay to the Debtors' collection and disbursement activities that would necessarily result

from closing the Bank Accounts and opening new accounts, all parties in interest, including

employees, vendors and customers, will be best served. Accordingly, the Debtors respectfully

---

[7] In other similar chapter 11 cases, courts in this and other districts have recognized that strict enforcement of the requirement that a debtor in possession close its bank accounts does not serve the rehabilitative process of chapter 11. *See, e.g., In re SemCrude, L.P., et al.,* Case No. 08-11525 (BLS) (Docket No. 59) (Bankr. D. Del. July 23, 2008); *In re LandSource Communities Dev. LLC,* Case No. 08-11111 (KJC) (Docket No. 29) (Bankr. D. Del. June 10, 2008); *In re Sharper Image Corp.,* Case No. 08-10322 (KG) (Docket No. 43) (Bankr. D. Del. Feb. 20, 2008); *In re New Century TRS Holdings,* Case No. 07-10416 (KJC) (Docket No. 54) (Bankr. D. Del. Apr. 3, 2007); *In re Riverstone Networks, Inc.,* Case No. 06-10110 (CSS) (Docket No. 18) (Bankr. D. Del. Feb. 7, 2006); *In re Foamex Int'l, Inc.,* Case No. 05-12685 (PJW) (Docket No. 39) (Bankr. D. Del. Sept. 20, 2005); *In re IWO Holdings, Inc.,* Ch. 11 Case No. 05-10009 (PJW) (Docket No. 108) (Bankr. D. Del. Jan. 4, 2005); *In re Footstar, Inc.,* Ch. 11 Case No. 04-22350 (ASH) (Docket No. 250) (Bankr. S.D.N.Y. Mar. 2, 2004); *In re Loral Space & Commc'ns Ltd.,* Ch. 11 Case No. 03-41710 (FDD) (Docket No. 26) (Bankr. S.D.N.Y. July 31, 2003). Similar authorization is appropriate in these chapter 11 cases.

request authority to maintain the Bank Accounts in the ordinary course of business, to continue utilizing the Cash Management System in a manner consistent with their prepetition practices, and to pay any ordinary course fees that may be incurred in connection with the Bank Accounts prior to or following the Commencement Date.

36.      Unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim, except where this Court has specifically authorized such checks to be honored.  Furthermore, notwithstanding anything to the contrary in any other "first day" order or other order of this Court, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Commencement Date.  The Banks shall not be liable to any party on account of following the Debtors' instructions or representations regarding which checks should be honored.  The Banks also shall be permitted to accept and process chargebacks against the Bank Accounts arising out of returned deposits into such accounts without regard to the date such return item was deposited.

37.      In addition to mandating the closure of all bank accounts, the U.S. Trustee Guidelines require the immediate printing of new checks with the label "Debtor in Possession." Similarly, Local Rule 2015-2(a) mandates that the Debtors, upon exhausting their existing check stock, order new ones with a "Debtor in Possession" label.  As soon as practicable, the Debtors shall commence printing "Debtor in Possession" and the chapter 11 case number under which these cases are being administered (or jointly administered), on their check stock and wire transfer instructions.  However, to minimize expenses, the Debtors request that they be authorized to continue using their existing correspondence and business forms, including, but not

17

limited to, purchase orders, letterhead, envelopes, promotional materials, and other business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Commencement Date, without reference to their status as a debtors in possession.

38.     If the Debtors are not permitted to continue using their existing Business Forms, the resulting prejudice will include: (i) disruption of the ordinary financial affairs and business operations of the Debtors; (ii) delay in the administration of the Debtors' estates; and (iii) cost to the estates to print new Business Forms.

### Continued Performance of Intercompany Arrangements and Historical Practices is Warranted

39.     Under the Cash Management System, the Debtors enter into certain intercompany transactions, including the Intercompany Loans, in the ordinary course of business. If these intercompany transactions are discontinued there will be significant disruption to the Debtors' business operations. Accordingly, the Debtors believe continuation of such intercompany transactions is in the best interests of the Debtors' estates and their creditors.[8] The Debtors maintain records of all intercompany transactions and can ascertain, trace, and account for the intercompany transactions at all times. The Debtors will continue to maintain such records postpetition. The Court should authorize the Debtors to continue their intercompany arrangements in accordance with their historical practices.

40.     As a result of the intercompany transactions, there may be intercompany claims. To ensure that each Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the

---

[8] Courts have routinely granted authority to continue intercompany transactions in other multi-debtor chapter 11 cases. *See, e.g., In re SemCrude, L.P., et al.*, Case No. 08-11525 (BLS) (Docket No. 59) (Bankr. D. Del. July 23, 2008); *In re Leiner Health Products Inc.*, Case No. 08-10446 (KJC) (Docket No. 29) (Bankr. D. Del. Mar. 12, 2008); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Docket No. 61) (Bankr. D. Del. Nov. 21, 2007); *In re Joan Fabrics Corp.*, No. 07-10479 (CSS) (Docket No. 141) (Bankr. D. Del. May 7, 2007); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Docket No. 272) (Bankr. D. Del. Nov. 21, 2006); *In re FLYi, Inc.*, Case No. 05-20011 (MFW) (Docket No. 38) (Bankr. D. Del. Nov. 7, 2005).

Bankruptcy Code, all intercompany transactions, arising after the Commencement Date, in the ordinary course of business and pursuant to the Cash Management System, be accorded administrative expense status. If intercompany claims are accorded administrative expense status, each entity utilizing funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for such ordinary course transactions. Administrative expense treatment for intercompany transactions has been granted in other comparable chapter 11 cases in this District.[9]

### No Payments to Affiliates

41.    Debtors are not requesting and shall not be permitted to make any transfer with respect to the Cash Management System or otherwise to or for the benefit of any affiliate of the Debtors other than wholly-owned subsidiaries of the Debtors, notwithstanding any contrary prior practice of any of the Debtors, except to the extent of the following transfers expressly permitted by Section 7.2(b)(N) of the Plan Sponsor Agreement: (i) the redemption or repurchase of capital stock or comparable equity interests held by Simmons Company or any of its wholly-owned subsidiaries, (ii) cash distributions to Simmons Company or Bedding Superholdco Incorporated in amounts not to exceed $300,000 in the aggregate, consistent with prior practice to the extent necessary to provide such entity with sufficient cash to pay its on-going operating expenses, (iii) cash distributions to Simmons Company or Bedding Superholdco Incorporated in amounts not to exceed $150,000 per such entity in connection with the restructuring, liquidation, or winding up of such entity, (iv) cash distributions to Simmons Company or Bedding Superholdco Incorporated in the ordinary course of business pursuant to tax sharing agreements, or (v) cash distributions to Simmons Company or Bedding Superholdco Incorporated to pay any deductible

---

[9] *Id.*

required under such entity's directors' and officers' liability insurance in an amount not exceeding $100,000 per claim or occurrence.

## Satisfaction and Waiver of Bankruptcy Rules

42.    The Debtors submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has been satisfied.

43.    To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay applicable under Bankruptcy Rule 6004(h).

## No Previous Request

44.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

## Notice

45.    The Debtors have served notice of this Motion on (i) the Office of the United States Trustee for the District of Delaware; (ii) those creditors listed on the Debtors' Consolidated List of Creditors Holding 50 Largest Unsecured Claims; (iii) counsel to Deutsche Bank AG, New York Branch, as administrative agent for the Debtors' prepetition and postpetition secured lenders and Deutsche Bank Trust Company Americas, as administrative agent and collateral agent for the Debtors' postpetition secured lenders; (iv) counsel to the Purchasers; (v) counsel to the holders of a majority of Simmons Bedding's 7.875% Senior Subordinate Notes due 2014; (vi) counsel to the holders of a majority of Simmons Company's 10% Senior Discount Notes due 2014; (vii) the Debtors' majority equity holder; (viii) Wachovia Bank, N.A; and (ix) the Banks.

WHEREFORE, the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto, granting the relief requested herein and such other and further relief as the Court may deem just.

Dated: November 16, 2009
Wilmington, Delaware

Respectfully submitted,

By: _____
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Jason M. Madron (No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

Michael F. Walsh
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

-and-

Lydia T. Protopapas
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Exhibit A**

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| Simmons Bedding Company | Wachovia | 3033 | Concentration Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| The Simmons Manufacturing Co., LLC | Wachovia | 4799 | Lockbox Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| The Simmons Manufacturing Co., LLC | First Hawaiian | 0212 | Lockbox Account | First Hawaiian Bank Credit Operations P.O. Box 3200 Honolulu, HI 96847 | Vern Nakamura | 808-525-6192 |
| Simmons Bedding Company | Wachovia | 9374 | Payroll Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | JP Morgan Chase | 3967 | Healthcare Disbursement Account | JP Morgan Chase Northeast Market P.O. Box 260180 Baton Rouge, LA 70826 | N/A | 225-332-7788 |
| Simmons Bedding Company | Wachovia | 6707 | Corporate A/P Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exhb. A-1

RLF1 3504963v.1

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| Simmons Bedding Company | Wachovia | 6697 | Advertising Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | Wachovia | 1808 | Chattahoochee, GA Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | Wachovia | 0051 | Credit Card Receipts Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Contract Sales, LLC | Wachovia | 3223 | Contract Sales Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| World of Sleep Outlets, LLC | Wachovia | 5182 | Seneca, SC Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| World of Sleep Outlets, LLC | Wachovia | 9654 | Dallas, TX Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exh. A-2

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| World of Sleep Outlets, LLC | Bank of America | 8105 | Reno, NV Outlet Account | Bank of America Securities 600 Peachtree Street Atlanta, GA 30308 | William Tucker | 404-607-5561 |
| World of Sleep Outlets, LLC | National Penn Bank | 0974 | Morgantown, WV Outlet Account | P.O. Box 547 Boyerton, PA 19512 | Diane Mason | 610-286-8230 |
| Simmons Capital Management, LLC | US Bank | 9847 | Intercompany Lending Disbursement Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Simmons Capital Management, LLC | US Bank | 4841 | Intercompany Lending Receivables Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Dreamwell, Ltd. | US Bank | 4858 | Intellectual Property and Licensing Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Simmons Export Co. | Wachovia | 2845 | Export Sales Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exh. A-3



**Exhibit B**

**Graphical Representation of the Debtors' Bank Accounts**

Overnight Sweep Account
(for short-term interest bearing vehicles)

Excess Cash (any balance greater than $1,000,000)

Funding (daily)

Wachovia Concentration Account
(all funds in non-Miscellaneous Bank Accounts sweep into this account daily, weekly or as needed)

Acct: 3033

Disbursements for intercompany lending (as needed)

Receivables (swept as needed)

Miscellaneous Bank Accounts

1) Acct. 9947 (Intercompany Lending Disbursement Account, at US Bank)
2) Acct. 4941 (Intercompany Lending Receivables Account, at US Bank)
3) Acct. 4858 (Intellectual Property and Licensing Receivables, at US Bank)
4) Acct. 2845 (Export Sales Account, at Wachovia)

Operational Disbursements (as needed)

Receivables (swept weekly)

Accounts for Receivables and Operational Expenses

1) Acct. 5182 (for Outlet in Seneca, SC, at Wachovia)
2) Acct. 9654 (for Outlet in Dallas, TX, at Wachovia)
3) Acct. 8105 (for Outlet in Reno, NV, at Bank of America)
4) Acct. 0974 (for Outlet in Morgantown, WV, at National Penn)
5) Acct. 1808 (for Outlet in Chattahoochee, GA, at Wachovia)
6) Acct. 0051 (for all Credit Card receipts, at Wachovia)

Receivables (swept daily or weekly)

Operational Disbursements (as needed)

Bank Accounts for Operations

1)* Acct. 9374 (Payroll, at Wachovia)
2)* Acct. 3967 (Healthcare Disbursements, at JP Morgan Chase)
3)* Acct. 6697 (Advertising, at Wachovia)
4)* Acct. 3223 (Contract Sales, at Wachovia)
5)* Acct. 6707 (Corporate A/P, at Wachovia)
6)  Acct. 4799 (Lockbox Account, at Wachovia – swept daily)
7)  Acct. 0212 (Lockbox Account at First Hawaiian Bank – swept weekly)

* Zero Balance Account

*To protect the Debtors' privacy, "Acct. xxxx" refers to the last four digits of that Bank Account.*

Exh. B

RLF1 3504963v.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------------x
                                          :
In re                                     :     Chapter 11
                                          :
SIMMONS BEDDING COMPANY, et al.,          :     Case No. _____ (____)
                                          :
           Debtors.                       :     Joint Administration
                                          :     Requested
                                          :
------------------------------------------------------------------x
```

**ORDER GRANTING MOTION OF THE DEBTORS FOR ORDER
(I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING
CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING BANK ACCOUNTS
AND BUSINESS FORMS, AND (C) CONTINUE INTERCOMPANY
ARRANGEMENTS, AND (II) GRANTING AN EXTENSION OF TIME TO COMPLY
WITH THE REQUIREMENTS OF SECTION 345(B) OF THE BANKRUPTCY CODE**

Upon the motion (the "Motion") of Simmons Bedding Company, and certain of

its affiliates, as debtors and debtors in possession (collectively, the "Debtors") for an order (i)

authorizing the Debtors to (a) continue to utilize their existing Cash Management System[1] to

fund the Debtors' operations, (b) maintain the Debtors' existing Bank Accounts and business

forms, and (c) continue their intercompany arrangements, including intercompany loans, and (ii)

granting an extension of time to comply with the requirements of section 345(b) of the

Bankruptcy Code, as more fully set forth in the Motion; and upon consideration of the

Declaration of William S. Creekmuir in Support of the Debtors' Chapter 11 Petitions and

Request for First Day Relief; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion

and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

Motion having been provided to the parties listed therein, and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED in its entirety.

2.      The Debtors are authorized and empowered, but not directed, pursuant to sections 105(a) and 363(c)(1) of the Bankruptcy Code and in accordance with the terms and conditions of the Plan Sponsor Agreement, to continue the Cash Management System maintained by the Debtors before the Commencement Date, and to collect, concentrate, and disburse cash in accordance with the Cash Management System.

3.      The Debtors are authorized, but not directed, to: (i) designate, maintain, and continue to use any or all of their existing Bank Accounts, include payment of any administrative fees associated with maintenance of the Bank Accounts, with those banks listed on Exhibit A annexed hereto, in the names and with the account numbers existing immediately prior to the Commencement Date; (ii) deposit funds into and withdraw funds from such accounts by all usual means including, without limitation, checks, wire transfers, automated clearing house transfers and other debits; and (iii) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; *provided, however*, that nothing contained herein shall authorize any bank or financial institution in which a Bank Account is maintained (a "Bank"), to honor or pay any check issued or dated prior to the Commencement Date, except as otherwise provided by order of this Court.

2

4.      Any Bank that honors a prepetition check or other item drawn on any Bank Account that is the subject of this Order either (i) at the direction of the Debtors to honor such prepetition check or item, or (ii) in the good faith belief that the Court has authorized such prepetition check or item to be honored, shall not be deemed in violation of this Order and shall not be liable for a prepetition or other item drawn on any Bank Account that is the subject of this Order.

5.      The Debtors are directed to maintain records of each and every transfer within the Cash Management System occurring on or after the Commencement Date to the same extent maintained by the Debtors prior to the Commencement Date, such that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, the Debtors' books and records.

6.      Nothing contained herein shall prevent the Debtors from opening any additional bank accounts, or closing any existing Bank Account(s), as the Debtors may deem necessary and appropriate, and the Banks, and any other bank the Debtors deem appropriate are authorized to honor the Debtors' requests to open or close, as the case may be, such Bank Accounts or additional bank accounts, *provided*, *however*, that the Debtors will provide notice to the United States Trustee for the District of Delaware (the "U.S. Trustee") and counsel to any statutorily appointed committee prior to the closing of any of the Bank Accounts, or the opening of any additional bank account.

7.      The Debtors' time to come into compliance with section 345(b) of the Bankruptcy Code is hereby extended for a period of sixty (60) days from the Commencement Date; *provided*, *however*, that such extension is without prejudice to the Debtors' right to request a further extension or the waiver of the requirements of section 345(b) in these cases.

RLF1 3504963v.1

8.      The Debtors are authorized, but not directed, to continue performing all obligations, commitments and transactions constituting intercompany transactions, including receiving payments on the Intercompany Loans issued prior to the Commencement Date, in the ordinary course of business.

9.      Pursuant to section 364(b) of the Bankruptcy Code, all intercompany claims owed by one Debtor to another Debtor arising after the Commencement Date shall be accorded administrative expense priority status of the kind specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code.

10.     The Debtors are authorized, but not directed, to use their existing Business Forms; *provided, however*, that the Debtors' check stock and wire transfer instructions shall, as soon as practicable, contain a "Debtor In Possession" designation and the chapter 11 case number under which these cases are being administered.

11.     The Debtors are authorized, but not directed, to (i) pay undisputed prepetition amounts outstanding as of the date hereof, if any, owed to their Banks as service charges for the maintenance of the Cash Management System, and (ii) reimburse the Banks for any claims arising, or chargebacks of deposits made, before or after the Commencement Date in connection with customer checks or other deposits into the Bank Accounts that have been dishonored or returned for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtors were responsible for such items prior to the Commencement Date; *provided, however*, that none of the Banks shall be required to make transfers from or honor any draws against any of the Bank Accounts except to the extent of collected funds available in such Bank Accounts.

4

12.    Notwithstanding the foregoing, the Debtors are not authorized to, and are ordered not to, make any transfer with respect to the Cash Management System or otherwise to or for the benefit of any affiliate of the Debtors other than wholly-owned subsidiaries of the Debtors, except (i) the redemption or repurchase of capital stock or comparable equity interests held by Simmons Company or any of its wholly-owned subsidiaries, (ii) cash distributions to Simmons Company or Bedding Superholdco Incorporated in amounts not to exceed $300,000 in the aggregate, consistent with prior practice to the extent necessary to provide such entity with sufficient cash to pay its on-going operating expenses, (iii) cash distributions to Simmons Company or Bedding Superholdco Incorporated in amounts not to exceed $150,000 per such entity in connection with the restructuring, liquidation, or winding up of such entity, (iv) cash distributions to Simmons Company or Bedding Superholdco Incorporated in the ordinary course of business pursuant to tax sharing agreements, or (v) cash distributions to Simmons Company or Bedding Superholdco Incorporated to pay any deductible required under such entity's directors' and officers' liability insurance in an amount not exceeding $100,000 per claim or occurrence.

13.    For Banks at which the Debtors hold accounts that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days from the date of entry of this Order, the Debtors shall (a) contact each Bank, (b) provide the Bank with each of the Debtors' employer identification numbers, (c) identify each of their accounts held at such banks as being held by a debtor in possession, and (d) serve a copy of this Order on the Banks.

14.    For Banks that are not party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall  use their good-faith efforts to cause the Bank to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within forty-five (45) days of the date of entry of this Order.

15.     Bankruptcy Rule 6003(b) has been satisfied.

16.     The requirements of Bankruptcy Rule 6004(a) are waived.

17.     Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and

conditions of this Order shall be immediately effective and enforceable upon entry of this Order.

18.     The Debtors are authorized to take all steps necessary to carry out this Order.

19.     This Court retains jurisdiction to interpret and enforce this Order.

Dated: _____, 2009
       Wilmington, Delaware

 

                          _____
                          UNITED STATES BANKRUPTCY JUDGE

RLF1 3504963v.1

**Exhibit A**

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| Simmons Bedding Company | Wachovia | 3033 | Concentration Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| The Simmons Manufacturing Co., LLC | Wachovia | 4799 | Lockbox Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| The Simmons Manufacturing Co., LLC | First Hawaiian | 0212 | Lockbox Account | First Hawaiian Bank Credit Operations P.O. Box 3200 Honolulu, HI 96847 | Vern Nakamura | 808-525-6192 |
| Simmons Bedding Company | JP Morgan Chase | 3967 | Healthcare Disbursement Account | JP Morgan Chase Northeast Market P.O. Box 260180 Baton Rouge, LA 70826 | N/A | 225-332-7788 |
| Simmons Bedding Company | Wachovia | 9374 | Payroll Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | Wachovia | 6707 | Corporate A/P Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exh. A-1

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| Simmons Bedding Company | Wachovia | 6697 | Advertising Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | Wachovia | 1808 | Chattahoochee, GA Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Bedding Company | Wachovia | 0051 | Credit Card Receipts Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| Simmons Contract Sales, LLC | Wachovia | 3223 | Contract Sales Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| World of Sleep Outlets, LLC | Wachovia | 5182 | Seneca, SC Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |
| World of Sleep Outlets, LLC | Wachovia | 9654 | Dallas, TX Outlet Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exh. A-2

| Debtor or Non-Debtor Affiliate | Bank Name | Last 4 Digits of the Account No. | Description of Account | Bank Address | Contact Name | Phone # |
|---|---|---|---|---|---|---|
| World of Sleep Outlets, LLC | Bank of America | 8105 | Reno, NV Outlet Account | Bank of America Securities 600 Peachtree Street Atlanta, GA 30308 | William Tucker | 404-607-5561 |
| World of Sleep Outlets, LLC | National Penn Bank | 0974 | Morgantown, WV Outlet Account | P.O. Box 547 Boyerton, PA 19512 | Diane Mason | 610-286-8230 |
| Simmons Capital Management, LLC | US Bank | 9847 | Intercompany Lending Disbursement Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Simmons Capital Management, LLC | US Bank | 4841 | Intercompany Lending Receivables Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Dreamwell, Ltd. | US Bank | 4858 | Intellectual Property and Licensing Account | Commercial Banking 2300 West Sahara Avenue, Suite 120 Las Vegas, NV 89102 | Karal Presley | 702-386-0074 |
| Simmons Export Co. | Wachovia | 2845 | Export Sales Account | Wachovia Bank 171 17th Street, NW 100 Building, 2nd Fl, Mailcode GA 4512 Atlanta, GA 30363 | Kim Del Pozzo | 404-214-1418 |

Exh. A-3