### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11** |
|  | : |  |
| **SIMMONS BEDDING COMPANY, *et al.*,** | : | **Case No. _____ (\_\_\_\_ )** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |

--------------------------------------------------------------------x

### DEBTORS' MOTION TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) UTILIZE CASH COLLATERAL, (C) GRANT PRIMING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS, (D) PROVIDE ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (E) SCHEDULE A FINAL HEARING, AND (F) OBTAIN RELATED RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Simmons Bedding Company ("Simmons Bedding") and certain of its affiliated

debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (the

"Debtors"),[1] respectfully represent:

### Bankruptcy Rule 4001 Concise Statement[2]

1.     By this motion (the "Motion"), the Debtors request, pursuant to sections

105, 361, 362, 363(c) and (e), 364(c), (d), (e), and 507 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 4001, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and Rule 4001-2(b) of the Local Rules of Bankruptcy Practice and

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are:  Simmons Company (6221); Bedding Holdco Incorporated (5929); Simmons Bedding Company (5743); The Simmons Manufacturing Co., LLC (0960); Windsor Bedding Co., LLC (8616); World of Sleep Outlets, LLC (0957); Simmons Contract Sales, LLC (2016); Dreamwell, Ltd. (2419); Simmons Capital Management, LLC (2470); and Simmons Export Co. (1370). Each of the Debtors maintains its principal corporate office at One Concourse Parkway, Atlanta, Georgia 30328.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below).

Procedure for the District of Delaware (the "Local Bankruptcy Rules"), entry of the proposed interim order substantially in the form attached hereto as Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") authorizing the Debtors to (i) obtain postpetition financing with priority over administrative expenses and secured by liens on property of the Debtors' estates and make required payments thereunder, (ii) utilize cash collateral, (iii) grant adequate protection to the Debtors' prepetition secured lenders, (iv) modify the automatic stay (collectively, the "DIP Financing"), (v) schedule a final hearing (the "Final Hearing") on the Motion, and (vi) keep certain information regarding fees arising in connection with the DIP Financing confidential.

    2.  Pending the Final Hearing and entry of the Final Order, the Debtors request that DIP Financing be approved on an interim basis pursuant to the terms of the Credit and Guaranty Agreement in substantially the form attached hereto as Exhibit B (the "DIP Credit Agreement"). Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the DIP Credit Agreement and/or the Interim Order:[3]

| | |
|---|---|
| **Borrower** | Simmons Bedding. |
| **Guarantors** | All Debtors (other than Simmons Bedding and Simmons Company). |
| **DIP Obligors** | Borrower and Guarantors |
| **Administrative Agent and Collateral Agent** | Deutsche Bank Trust Company Americas ("DBTCA" or the "DIP Agent"). |
| **Sole Lead Arranger and** | Deutsche Bank Securities Inc. ("DBSI"). |

---

[3] The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties-in-interest with an overview of the significant terms thereof and should only be relied on as such. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and Interim Order. In the event that there is a conflict between this Motion and the DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, shall control in all respects.

**Book-Runner**

**DIP Lenders**          Various banks, financial institutions and other entities party to the DIP Credit Agreement who are Lenders thereunder (collectively, the "DIP Lenders").

**Commitment**          The DIP Lenders have agreed to make a $35 million revolving credit facility (the "DIP Facility"), including (i) a letter of credit sub-facility in an aggregate face amount of $15 million and (ii) a swing line sub-facility in an aggregate principal amount of $5 million. Of the total $35 million DIP Facility, $15 million shall be made available upon the entry of the Interim Order. (DIP Credit Agreement § 1.1, Definition of "Revolving Loan Commitment"; Interim Order ¶ I, VII.)

**Term**          The earlier to occur of (i) six (6) months from the Commencement Date, which may be extended by six (6) months pursuant to the terms of the DIP Credit Agreement under certain circumstances, (ii) the effective date of a chapter 11 plan, (iii) the date of closing of the sale of all or substantially all of the assets of Simmons Bedding, (iv) the date that the amount of the DIP Obligors' obligations under the DIP Facility are permanently reduced to zero, and (v) the date of the termination of the Revolving Loan Commitments pursuant to an Event of Default. (DIP Credit Agreement § 1.1, Definition of "Revolving Loan Commitment Termination Date.")

**Use of DIP Facility**          The DIP Credit Agreement shall be used for working capital and general corporate purposes of the DIP Obligors and other purposes permitted thereunder, including without limitation, to pay interest, fees and expenses in connection with the DIP Financing. (DIP Credit Agreement § 2.4; Interim Order ¶¶ 5, 18.)

**Entities with Interest in Cash Collateral**          The Prepetition Agent and Prepetition Lenders (each as defined below) have an interest in the Cash Collateral. (Interim Order ¶ 13.)

**Use and Duration of Cash Collateral**          The DIP Obligors are authorized to use the Cash Collateral (except any L/C Cash Collateral (as defined below)) for working capital and general corporate purposes until the earlier to occur of (i) five (5) Business Days prior written notice is provided to the DIP Obligors that an Event of Default has occurred and is continuing or (ii) the Termination Date. The Carve Out shall not be paid from the L/C Cash Collateral. (Interim Order ¶¶ 8, 11, 12.)

**Interim Financing**          Up to $15 million. (DIP Credit Agreement § 1.1, Definition of "Revolving Loan Commitment"; Interim Order ¶ 5.)

**Amortization**          None.

**Interest Rates**          Base Rate Loans: Base Rate + 3.50% with a 4.00% Base Rate floor. (DIP Credit Agreement § 1.1, Definitions of "Applicable Margin" and "Base Rate".)

LIBOR Loans: LIBOR + 4.50% with a 3.00% LIBOR floor. (DIP Credit Agreement § 1.1, Definitions of "Adjusted Eurodollar Rate" and "Applicable Margin.")

Default Rate: Applicable rate plus 2.00% per annum. (DIP Credit Agreement § 2.8.)

**Fees**

Due to the confidentiality provisions in the Commitment Letter, prohibiting disclosure of the Fee Letter (each as defined below) or its contents, the DIP Obligors have not attached a copy of the Fee Letter to this Motion and the Debtors have not disclosed the fees contained therein in the Motion. However, the Debtors will provide certain parties with a copy of the Fee Letter in advance of the hearing on this Motion.

**Budget**

The DIP Obligors will provide certain forecasts, including a 13-week cash flow forecast (reported on a weekly basis), which will include projected and actual cash receipts, operating disbursements, and cash balances, as may be amended, updated or supplemented (collectively, the "Budget"). (DIP Credit Agreement §§ 3.1(h), 5.1(k) and (n).)

**Financial Covenant**

Minimum cumulative consolidated EBITDA (applied over trailing 12 month periods). (DIP Credit Agreement § 6.6.)

**Other Covenants**

Compliance with affirmative and negative covenants as are usual and customary for DIP financings, including, among other things, (a) delivery of monthly, quarterly and annual financial statements and compliance certificates, (b) limitations on liens and indebtedness, restricted payments, fundamental changes, asset sales, investments, acquisitions, capital expenditures, and affiliate transactions and payments relating to Prepetition Obligations (with baskets for certain covenants to be mutually agreed upon), and (c) excess availability requirements. (DIP Credit Agreement §§ 5 and 6.)

**Liens and Priorities**

Subject to the Carve-Out, the obligations of the DIP Obligors under the DIP Facility will be secured by:

> (i) a perfected first priority lien on unencumbered prepetition and postpetition property of the DIP Obligors, including, subject to entry of the Final Order, proceeds or property recovered in respect of any Avoidance Actions (as defined below) (but not the actual claims and causes of action);

> (ii) a perfected junior lien on prepetition and postpetition property of the DIP Obligors now existing or hereafter acquired and all proceeds thereof that is otherwise subject to a valid and perfected lien (other than liens securing the DIP Obligors' obligations arising under the Prepetition Credit Agreement (as defined below) (the "Prepetition Obligations") and liens that are junior to the liens securing the Prepetition Obligations) in existence on the Commencement Date or a valid lien perfected (but not granted) after the Commencement Date to the extent such perfection is expressly permitted under

the Bankruptcy Code; and

(iii) a perfected first priority senior priming lien on all now or hereafter acquired property of the DIP Obligors and all proceeds thereof that (x) constitutes collateral under the Prepetition Credit Agreement, subject to liens that were senior to the liens of the Prepetition Secured Parties as of the Commencement Date, that (y) is subject to a lien granted after the Commencement Date to provide adequate protection in respect of the Prepetition Obligations, or (z) is subject to a valid lien in effect on the Commencement Date that is junior to the liens that secure the collateral under the Prepetition Credit Agreement (collectively, (i)-(iii), the "<u>DIP Liens</u>"). (DIP Credit Agreement § 2.23; Interim Order ¶ 7.)

Obligations of the DIP Obligors under the DIP Credit Agreement shall be ranked as superpriority administrative expense claims and senior to all administrative expenses, adequate protection claims and all other claims against the DIP Obligors, now existing or hereafter arising, subject only to the Carve-Out. (DIP Credit Agreement § 2.23; Interim Order ¶ 6.)

**Carve-Out**

The "Carve Out" shall mean (i) all fees required to be paid pursuant to 28 U.S.C. § 1930, and (ii) after the occurrence and during the continuance of an Event of Default under the DIP Agreement and delivery of notice thereof to each of the counsel for the Debtors and (if any) the Committee (the "Carve Out Notice"), the payment of accrued and unpaid professional fees and expenses incurred by the Debtors and any statutory committee and allowed by this Court at any time, in an aggregate amount not exceeding $7 million (plus all unpaid professional fees and expenses of the Debtors and the Committee allowed by this Court at any time that were incurred prior to the delivery of the Carve Out Notice).

The Carve Out shall not be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation which seeks any order, judgment, determination or similar relief (x) with respect to claims against the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Secured Parties or invalidating, setting aside, avoiding, recharacterizing or subordinating, the Prepetition Obligations, the Prepetition Liens, any of the Prepetition Agent's or Prepetition Secured Parties' rights under the Prepetition Loan Documents, the DIP Obligations, the DIP Liens, or any of the DIP Agent's or DIP Lenders' rights under the DIP Documents, or (y) preventing, hindering or delaying the DIP Agent's, the DIP Lenders', the Prepetition Agent's or the Prepetition Secured Parties' assertion or enforcement of their respective liens or collateral.

Notwithstanding anything herein to the contrary, the Carve Out shall not be payable from the L/C Cash Collateral or the L/C Cash Collateral Account. (Interim Order ¶ 6.)

| | |
|---|---|
| **Waivers of Rights** | The DIP Obligors waive their right to contest the validity, non-enforceability, and non-avoidability of the DIP Liens and the obligations under the DIP Facility related thereto (the "<u>DIP Obligations</u>"). (Interim Order ¶ 5(c).) |
| | Subject to the entry of the Final Order, and except to the extent of the Carve Out, the DIP Obligors waive their ability to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Agent or the Prepetition Agent, as applicable. (Interim Order ¶ 9.) |
| | The DIP Obligors waive their right to contest the validity, non-enforceability and non-avoidability of the Prepetition Secured Parties' liens and the Prepetition Obligations related thereto.  (Interim Order ¶ 17.) |
| | In addition, the time in which any statutory committee may challenge the obligations to or liens of the Prepetition Secured Parties will be limited, such that any statutory committee must obtain standing and file an adversary proceeding before the date that is 45 days from the date of entry of the Interim Order or any such later date as agreed to in writing by the Prepetition Agent in its sole and absolute discretion. (Interim Order ¶ 17.) |
| **Adequate Protection for the Prepetition Secured Parties** | Adequate protection for the Prepetition Secured Parties will include (to the extent of diminution in the value of its collateral) (i) a superpriority claim subject and subordinate only to the Carve Out and the superpriority claim granted to the DIP Agent and the DIP Lenders, (ii) a replacement lien subject only to (w) Permitted Liens (as defined in the Interim Order), (x) the Carve Out, (y) the DIP Liens, and (z) the Permitted Prepetition Liens (as defined in the Interim Order), and (iii) the payment on a current basis of all (u) unpaid pre-petition interest, fees and costs, (v) post-petition, non-default interest, fees and costs, (w) regularly scheduled payments under the Hedge Agreements (as defined in the Interim Order), (x) scheduled amortization payments in respect of the Tranche D Term Loan on the date such payments become due, (y) mandatory prepayments under certain circumstances and (z) reasonable fees and expenses incurred or accrued by the Prepetition Agent under the Prepetition Loan Documents, including without limitation, the reasonable fees and disbursements of advisors and a counsel (and a local counsel) for the Prepetition Agent (including the reasonable out-of-pocket expenses of the Prepetition Agent) and reasonable out-of-pocket expenses (other than counsel fees) of the members of the steering committee of the Prepetition Secured Parties. (DIP Credit Agreement § 2.23; Interim Order ¶ 13.) |
| **Prohibitions on Enforcement** | The Prepetition Secured Parties may not exercise any rights or remedies under the Interim Order unless and until all DIP Obligations have been paid in full in cash, all letters of credit have been cash collateralized, backstopped or returned undrawn, and all commitments thereunder have been terminated. (Interim Order ¶ 8(b).) |

| | |
|---|---|
| **Events of Default** | The DIP Credit Agreement contains events of default that are usual and customary for debtor in possession financings, including, among other things, (i) failure to make principal or interest payments when due under the DIP Credit Agreement, (ii) certain uncured defaults with respect to material Indebtedness (other than the DIP Obligations), (iii) failure to comply with covenants set forth in the DIP Documents (as defined in the Interim Order), (iv) material misrepresentations made in the DIP Documents, (v) unsatisfied or unstayed judgment against Bedding Holdco Incorporated, Simmons Bedding, or any of its subsidiaries in an amount in excess of $5,000,000, (vii) any of the cases of certain Debtors shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or a trustee under chapter 11 of the Bankruptcy Code shall be appointed in any of these chapter 11 cases, (viii) the occurrence of a Change of Control, (ix) any Guaranty or Collateral Document ceases to be in full force and effect or is declared null and void, and (x) certain occurrences during these chapter 11 cases. (DIP Credit Agreement § 8.1.) |
| **Waiver or Modification of the Automatic Stay** | Subject to the notice requirements, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and the DIP Lenders and in accordance with the DIP Documents. (Interim Order ¶ 8.) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** | All liens granted to secure the DIP Obligations and replacement lien granted for the benefit of the Prepetition Secured Parties shall be deemed valid, perfected, allowed, enforceable non-avoidable and not subject to challenge, dispute or subordination, effective upon entry of the Interim Order, and no further action shall be required to effect such perfection; provided that the DIP Obligors are required to take certain additional actions in respect of such perfection upon the reasonable request of the DIP Agent. (DIP Credit Agreement § 5.13; Interim Order ¶ 15(a).) |
| **Indemnification** | The DIP Obligors agree to indemnify the DIP Agent and the DIP Lenders, and their respective officers, partners, directors, trustees, employees, agents and affiliates from and against any and all Indemnified Liabilities; provided, however, that such indemnity shall not extend to any Indemnified Liabilities arising from the bad faith, gross negligence or willful misconduct of the relevant Indemnified Party as determined by a final judgment of a court of competent jurisdiction. (DIP Credit Agreement § 10.3.) |
| **Conditions to Borrowing** | Customary borrowing conditions include, among others, (i) entry of the Interim Order or Final Order, as the case may be, (ii) execution and delivery of definitive documentation, (iii) delivery of the Budget, (iv) payment of fees, and (v) since December 27, 2008, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect. (DIP Credit Agreement §§ 3.1-3.3.) |
| **Liens on Causes of Action Under** | Subject to the entry of the Final Order, the DIP Lenders shall be granted liens on the proceeds or property recovered in respect of the |

**Chapters 5 and 7**          Debtors' Avoidance Actions (but not on the actual claims and causes
of actions). (Interim Order ¶ 7(a).)

## Background

3.      On the date hereof (the "Commencement Date"), each of the Debtors

commenced a voluntary case in this Court under chapter 11 of the Bankruptcy Code.  The

Debtors are authorized to continue operating their businesses and managing their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction and Venue

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Debtors' Business

5.      The Debtors are one of the world's largest manufacturers and marketers of

bedding products.  Together with their non-debtor foreign affiliates, the Debtors operate 20

bedding manufacturing facilities across the United States, Canada, and Puerto Rico.  Founded in

1870, the Debtors and their predecessors have been developing innovative products and

technologies that provide their consumers a better night's sleep since 1876.  The Debtors'

headquarters are located in Atlanta, Georgia.

6.      The Debtors manufacture, sell and distribute their bedding products to

individual end-users through a diverse base of customers which, in 2009, include over 2,100

retailers in the United States with approximately 13,500 store locations, including furniture

stores, specialty sleep shops, department stores, furniture rental stores, mass merchandisers and

juvenile specialty stores.  The Debtors also sell their products to hospitality customers, such as

hotels, casinos and resort properties through Simmons Contract Sales, LLC, a debtor herein, and

sell overstock and discontinued models through retail outlets operated by World of Sleep Outlets, LLC, a debtor herein. Additionally, the Debtors license their intellectual property through Dreamwell, Ltd., a debtor herein, to both international companies that manufacture and sell Simmons branded bedding products throughout the world and to U.S. manufacturers and distributors of bedding accessories, furniture, airbeds and other products.

7.      As of the Commencement Date, the Debtors had approximately 2,300 employees in U.S. For the fiscal quarter ended September 26, 2009, the Debtors' unaudited consolidated financial statements reflected assets totaling approximately $900 million, liabilities totaling approximately $1 billion, and net sales for the trailing twelve months ended September 26, 2009 of approximately $782 million.

8.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 filings are contained in the Declaration of William S. Creekmuir in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief (the "Creekmuir Declaration"), filed contemporaneously herewith.

### The Proposed Prepackaged Plan

9.      The Debtors' proposed joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code (the "Plan") is proposed pursuant to the Plan Sponsor Agreement, dated September 24, 2009 (as has been or may be further amended, restated, supplemented, or otherwise modified from time to time, the "Plan Sponsor Agreement"), among the Debtors and AOT Bedding Super Holdings, LLC and AOT Bedding Intermediate Holdings, LLC (collectively, the "Purchasers"). The Plan Sponsor Agreement contemplates that Bedding Holdco Incorporated ("Bedding Holdco"), Simmons Bedding and its subsidiaries will be acquired by the Purchasers upon consummation of the Plan. The Debtors and the Purchasers entered into the Plan Sponsor Agreement after the Debtors conducted a comprehensive review of

various strategic alternatives, which included considering a wholesale restructuring of their capital structure or a third party sale. The Debtors believe the transactions contemplated by the Plan Sponsor Agreement are in the best interests of the Debtors and their creditors.

10.    The Debtors expect to file shortly a motion seeking approval of the Plan Sponsor Agreement. The Plan Sponsor Agreement includes certain covenants relating to the conduct of the Debtors' business, including, without limitation, a general requirement that the Debtors continue operating in the ordinary course of business. The Debtors' compliance with this and other covenants is a condition to the Purchasers' obligations under the Plan Sponsor Agreement, subject to certain qualifications and exceptions. In order to be able to satisfy these covenants if the Plan is approved by the Court, the Debtors intend to operate their business in accordance with the Plan Sponsor Agreement prior to the Court's approval thereof to the extent that such actions are consistent with the Bankruptcy Code and any applicable rules and orders of this Court.

11.    Under the Plan, secured creditors, unsecured trade creditors, and administrative and priority creditors are being paid in full or reinstated. Further, under the Plan, the Debtors will reinstate approximately $12.5 million of claims arising in connection with certain industrial revenue bonds and assume obligations aggregating approximately $10 million under certain letters of credit. In addition, holders of the SBC Notes (as defined below) and the Holdco Notes (as defined below) are receiving cash recoveries. The Debtors are financing those payments from an equity investment by the Purchasers of approximately $310 million (some portion of which may be funded by certain holders of the Holdco Notes in accordance with the terms of that certain equity commitment letter dated as of September 24, 2009), and the proceeds of the issuance of $425 million senior secured term notes. Certain holders of the SBC Notes,

Holdco Notes and SBC Credit Agreement Claims (as defined in the Plan), as well as an affiliate

of one of the Purchasers, have committed to purchase such senior secured term notes.

12.     On October 13, 2009, the Debtors commenced solicitation of votes on the

Plan via a disclosure statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.

As set forth in the Epiq Bankruptcy Solutions LLC affidavit filed on this date, the proposed Plan

has been accepted in excess of the statutory thresholds specified in section 1126(c) of the

Bankruptcy Code by all classes entitled to vote. Specifically, each of the voting classes, both by

number and by amount that voted on the Plan, voted overwhelmingly to accept the Plan.

### Prepetition Funding of the Debtors' Business Operations

**B.      The Prepetition Credit Agreement**

13.     As of the Commencement Date, Simmons Bedding was the borrower

under that certain Second Amended and Restated Credit and Guaranty Agreement, dated as of

May 25, 2006 (as has been or may be further amended, restated, amended and restated,

supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), by

and among Simmons Bedding, the guarantors party thereto (together with Simmons Bedding, the

"Prepetition Obligors"), Deutsche Bank AG, New York Branch, as administrative agent (the

"Prepetition Agent") and the various financial institutions and other persons party to the

Prepetition Credit Agreement from time to time as lenders thereunder (collectively, the

"Prepetition Lenders" and, together with the Prepetition Agent and the Lender Counterparties,

the "Prepetition Secured Parties").[4] The Prepetition Credit Agreement provides for (i) a

---

[4] At the time of execution of the Prepetition Credit Agreement, Simmons Bedding was known as Simmons Company, which was the surviving entity resulting from a number of mergers between affiliates of Thomas H. Lee Partners, L.P. ("THL"), a Boston-based private equity firm, and Simmons Company. In July 2004, Simmons Company was renamed Simmons Bedding when a THL affiliate changed its name to Simmons Company. Simmons Bedding, as the successor in interest to Simmons Company, is therefore the entity that is liable for the indebtedness described herein as reflected in subsequent amendments to the Prepetition Credit Agreement and, accordingly, will be referred to as the actual party in interest.

revolving credit facility, letters of credit and swingline facilities in the maximum aggregate amount of $75 million, which expire on December 19, 2009, and (ii) a term loan facility in the amount of $465 million, which matures on December 19, 2011. As of the Commencement Date, the revolving credit facility was almost fully drawn after taking into account approximately $7.4 million that was reserved for reimbursement obligations with respect to outstanding letters of credit.

14.    Bedding Holdco Incorporated and each of the domestic subsidiaries of Simmons Bedding are guarantors of Simmons Bedding's obligations under the Prepetition Credit Agreement. Pursuant to the Pledge and Security Agreement, dated as of December 19, 2003 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement"), the Prepetition Agent, on behalf of the Prepetition Secured Parties, holds a first priority lien (subject to certain limited exclusions set forth therein) on substantially all personal property of Simmons Bedding and the respective guarantors, including all of the capital stock of Simmons Bedding, each of Simmons Bedding's domestic subsidiaries, and 65% of the capital stock of each of Simmons Bedding's first-tier foreign subsidiaries, as set forth more fully in the Security Agreement (collectively, the "Prepetition Collateral"). Such Prepetition Collateral expressly includes, without limitation, all rights, title and interest in and to, whether now owned or later acquired and wherever located, all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, insurance, intellectual property, investment related property, letter of credit rights, money and deposit accounts, receivables, commercial tort claims, and all proceeds, products, accessions, rents and profits of any of the foregoing, subject to certain limitations.

15.    The amounts borrowed under the Prepetition Credit Agreement were used, among other things, to refinance certain existing indebtedness, for general corporate purposes and other purposes permitted under the Prepetition Credit Agreement and to fund working capital requirements. As of the Commencement Date, the aggregate face amount of issued and outstanding letters of credit under the Prepetition Credit Agreement was approximately $7.4 million, and the aggregate principal amount outstanding under the Prepetition Credit Agreement (exclusive of undrawn letters of credit) was approximately $529 million.

C.    **The 7.875% Senior Subordinated Notes**

16.    In addition to the Prepetition Credit Facility, Simmons Bedding issued $200 million of 7.875% Senior Subordinated Notes due 2014 pursuant to an indenture (the "Indenture"), dated as of December 19, 2003 (the "SBC Notes"). Wells Fargo Bank Minnesota, National Association is the indenture trustee under the Indenture. Under the SBC Notes, Simmons Bedding is required to make interest payments in arrears on January 15 and July 15 of each year. The SBC Notes are guaranteed, on a joint and several basis, and on an unsecured senior subordinated basis by Bedding Holdco and its parent, Simmons Company, and unconditionally by all of the other Debtors.

17.    The SBC Notes are subordinated in right of payment to the Prepetition Credit Agreement, as well as all of Simmons Bedding's existing and future senior debt. As of the Commencement Date, the balance outstanding on the Senior Subordinated Notes, including accrued interest, is approximately $222 million.

D.    **The 10% Senior Discount Notes**

18.    Simmons Company issued $269 million in 10% Senior Discount Notes due 2014 pursuant to an indenture, dated as of December 15, 2004 (the "Holdco Notes").

Wilmington Trust Company is the current indenture trustee under the indenture for the Senior Discount Notes. There are no guarantors of the obligations under the Holdco Notes.

19.     Under the Holdco Notes, Simmons Company is required to make interest payments in arrears on June 15 and December 15 of each year commencing on June 15, 2010. Prior to December 15, 2009, interest will accrue on the Holdco Notes in the form of an increase in the accreted value of the Holdco Notes. Such interest, along with principal and premium payments, in total aggregating approximately $108 million, are payable in cash on June 15, 2010. As of the Commencement Date, the balance outstanding on the Holdco Notes is approximately $267 million.

### E.     The Industrial Revenue Bonds

20.     The Debtors also have approximately $12.5 million in outstanding debt pursuant to industrial revenue bonds issued by municipalities in Janesville, Wisconsin and Shawnee Mission, Kansas to fund the construction of manufacturing facilities owned by the Debtors.[5]

## Debtors' Proposed Postpetition Financing Arrangements

### A.     Efforts to Obtain DIP Financing

21.     Prior to the Commencement Date, the Debtors and their investment bankers and financial advisors, Miller Buckfire & Co., LLC ("Miller Buckfire"), approached various parties, including the Prepetition Secured Parties and unrelated third parties that might potentially be interested in providing the Debtors with debtor in possession financing. Miller Buckfire sent a package including, among other things, a 12-month debtor in possession budget

---

[5] In addition, approximately $1 million is outstanding pursuant to a loan from Banco Santander to a wholly-owned non-debtor subsidiary of Simmons Bedding. As such amount is not an obligation of the Debtors and is not being restructured in these chapter 11 cases, such amount is not included herein.

and a 13-week cash flow statement to four institutions after each such institution executed a non-disclosure agreement, and subsequently provided such institutions with a copy of the confidential information memorandum used for marketing purposes and continued updates regarding Simmons Bedding's performance. Miller Buckfire then solicited proposals for debtor in possession financing from those parties. Two parties ultimately expressed an interest in providing such financing and provided concrete pricing and structure proposals.

22.    In considering their options, the Debtors recognized that the obligations owed to the Prepetition Secured Parties are secured by substantially all of the Debtors' real and personal property, such that either (i) the liens of the Prepetition Secured Parties would have to be primed to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Parties. Indeed, each of the proposals received by the Debtors required liens priming those of the Prepetition Secured Parties. The Prepetition Secured Parties advised the Debtors' representatives that they would not consent to being primed by another lender group. As such, borrowing from a different postpetition lender or lending group that required security senior to the Prepetition Secured Parties likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. Moreover, none of the potential lenders solicited by the Debtors was willing to extend (i) unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, (ii) credit secured by a junior lien on the Prepetition Obligors' property that is subject to the Prepetition Secured Parties' liens, or (iii) credit secured by a lien equal to the Prepetition Secured Parties' liens on the Prepetition Obligors' property.

23.     In view of these circumstances, the Debtors concluded that the DIP Facility proposed by the DIP Lenders, some of which are also Prepetition Secured Parties, is desirable because, among other things, it permits the Debtors to secure the postpetition financing required for their reorganization that provides for the necessary priming of the Prepetition Secured Parties' liens without the need for an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. This factor, in addition to the fact that no party was willing to provide postpetition financing with liens junior to the Prepetition Secured Parties has caused the Debtors to conclude that entering into the DIP Credit Agreement with the DIP Lenders is appropriate under the circumstances.

**B.      Implementation of the DIP Credit Agreement**

24.     The DIP Obligors, the DIP Lenders, and the DIP Agent engaged in extensive, arms' length negotiations with respect to the terms and conditions of the proposed DIP Facility. These negotiations culminated in an agreement upon the proposed financing, including the form of the DIP Credit Agreement. The material terms of the DIP Credit Agreement are summarized in paragraph 2 above. Significantly, the DIP Credit Agreement provides for a $15 million commitment from the DIP Lenders that would be immediately available to the Debtors, pending this Court's entry of the Final Order. This commitment will ensure that the DIP Obligors can meet all of their administrative and other obligations during the early stages of these chapter 11 cases.

25.     The DIP Obligors have provided to the DIP Agent a Budget forecasting, among other things, projected cash flow for the thirteen (13) week period following the Commencement Date. A copy of the Budget is annexed as Schedule 1 to the Interim Order. The $35 million DIP Facility is consistent with the Budget. In addition, the DIP Obligors will provide to the DIP Lenders an updated Budget on a rolling, weekly basis for the applicable

period in substantially the same format as the annexed Budget. The DIP Obligors believe that

the projections underlying the Budget are achievable and will allow the DIP Obligors to operate

without the accrual of unpaid administrative expenses.

   26. Pursuant to that certain Commitment Letter, dated August 20, 2009, by

and among DBTCA and DBSI, on the one hand, and certain of the DIP Obligors on the other

(the "Commitment Letter"), the parties agreed that the terms and substance of the Fee Letter,

dated, October 30, 2009, by and among Simmons Bedding, DBTCA and DBSI and executed in

connection with the Commitment Letter (the "Fee Letter"), and the contents therein shall be

treated as confidential information pursuant to Bankruptcy Rule 9018.

### C. Provisions to be Highlighted Under Local Bankruptcy Rule 4001-2

   27. The Debtors believe that of the material provisions in the DIP Credit

Agreement identified in paragraph 2 above and in the relief set forth in the attached Interim

Order, the following constitute "Provisions to be Highlighted" pursuant to Local Bankruptcy

Rule 4001-2:

    (a) **Binding the Estate to Validity, Perfection, or Amount of Secured Debt**. Although certain stipulations by the DIP Obligors relate to the validity, amount and perfection of the prepetition liens, the Interim Order reserves the rights of parties in interest, including any statutory committee, to challenge the validity, perfection and enforceability of such liens within 45 days from the entry of the Interim Order or any such later date as agreed to in writing by the Prepetition Agent in its sole and absolute discretion. (Interim Order ¶ 17.) In addition, the DIP Obligors waive any rights to contest the validity, non-enforceability and non-avoidability of the DIP Liens and the obligations under the DIP Facility related thereto. (Interim Order ¶ 5(c).)

    (b) **Waiver of Section 506(c) Surcharge**. The DIP Credit Agreement and Interim Order provide for the DIP Obligors to, subject to entry of the Final Order and except to the extent of the Carve Out waive their ability to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of

the DIP Agent or the Prepetition Agent, as applicable. (Interim Order ¶ 9.)

(c) **Liens on Avoidance Actions**. The Interim Order provides for the DIP Obligors to grant liens on the proceeds or property recovered in respect of any of the DIP Obligors' claims and causes of actions (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance Actions"); provided, however, that such relief will not be effective until approved in the Final Order. (Interim Order ¶ 7.)

(d) **Priming Liens**. The DIP Credit Agreement and Interim Order provide section 364(d)(1) perfected first priority, senior priming liens on all now and hereafter acquired property of the DIP Obligors (and all proceeds thereof) that constitutes collateral under the Prepetition Credit Agreement,[6] subject to liens that were senior to the liens of the Prepetition Secured Parties as of the Commencement Date. The Prepetition Secured Parties consent to such priming. (DIP Credit Agreement ¶ 2.23; Interim Order ¶ 7(c).)

28.    Further, the DIP Obligors agree to indemnify, pay and hold harmless the DIP Agent, and the DIP Lenders and their respective affiliates, and each of their respective directors, officers, partners, directors, trustees, investment advisors, employees, attorneys, agents, and affiliates from Indemnified Liabilities. The indemnity does not extend to Indemnified Liabilities caused by or resulting from the bad faith, willful misconduct or gross negligence of the indemnified parties as determined by a final judgment of a court of competent jurisdiction.

29.    As set forth herein, these provisions were thoroughly negotiated and are necessary for the DIP Obligors to procure the financing made available under the DIP Credit Agreement in a sufficient amount and on a timely basis.

---

[6] Notwithstanding the foregoing, in no event shall the DIP Lenders be granted security interests or liens on (i) the L/C Cash Collateral Account (as defined in the Interim Order) or the L/C Cash Collateral and (ii) the DIP Obligors' equity interests in the excess of 65% of the voting capital stock of their direct foreign subsidiaries.

## Use of Cash Collateral and Proposed Adequate Protection

**D.     Use of Cash Collateral**

30.     In order to address their working capital needs and fund their reorganization efforts, the DIP Obligors also require the use of the Prepetition Secured Parties' cash collateral (the "Cash Collateral"), other than that portion of the Cash Collateral comprised of cash totaling approximately $3.1 million, which collateralizes certain letters of credit at 105% of the face amount thereof, which term shall include all products, proceeds and investments (including interest accruing thereon) thereof (the "L/C Cash Collateral"). The use of Cash Collateral will provide the DIP Obligors with the additional capital necessary to operate their business, pay their employees, maximize value, and successfully reorganize under chapter 11.

31.     The Prepetition Secured Parties have consented to the DIP Obligors' use of Cash Collateral—other than the L/C Cash Collateral—in the ordinary course of business, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the DIP Credit Agreement and the Interim Order.

**E.     Proposed Adequate Protection for the Prepetition Secured Parties**

32.     The Prepetition Agent and the Prepetition Secured Parties are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral to the extent that there is a diminution in the value of such collateral from and after the Commencement Date resulting from (i) the use of such collateral and cash constituting proceeds of such collateral, (ii) the imposition of the DIP Lender's priming liens, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code. As adequate protection for any such diminution in the value of the Prepetition Collateral, the Prepetition Agent, for itself and on behalf of the Prepetition Secured Parties, shall be granted (i) a valid, perfected and enforceable security interest in and lien on upon all existing and after

acquired real and personal, tangible and intangible, property of the DIP Obligors (the "Adequate Protection Lien"). The Adequate Protection Lien shall be subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the DIP Liens and (iii) the Carve-Out, and (iv) Permitted Liens. The Adequate Protection Lien is and shall be valid, perfected, enforceable and effective as of the date of the entry of the Interim Order without any further action by the DIP Obligors, the Prepetition Agent, or the Prepetition Secured Parties and without the necessity of the execution by the DIP Obligors of mortgages, security agreements, pledge agreements, financing statements or other agreements.

33.    In addition to the Adequate Protection Lien, the Debtors propose to grant and/or pay the Prepetition Agent and the Prepetition Secured Parties the following as adequate protection (collectively, and together with the Adequate Protection Lien, the "Adequate Protection Obligations"):

(a)    an administrative claim under sections 503(b)(1), 507(a), and 507(b) of the Bankruptcy Code for the amount by which the Adequate Protection Lien proves to be inadequate, subject and subordinate only to the superpriority status of the DIP Obligations and the Carve-out;

(b)    payment on a current basis of the following: (i) all accrued but unpaid interest, fees and costs under the Prepetition Credit Agreement or the other applicable Prepetition Loan Documents or Hedge Agreements (whether prepetition or postpetition); (ii) amounts due in respect of the Hedge Agreements; (iv) all scheduled amortization payments arising in respect of the term loan under the Prepetition Credit Agreement and (v) after the discharge of the DIP Obligations, certain mandatory prepayments arising under the Prepetition Credit Agreement; and

(c)    all reasonable fees and expenses incurred or accrued by the Prepetition Agent under the Prepetition Loan Documents, including without limitation, the reasonable fees and disbursements of advisors and a counsel (and a local counsel) for the Prepetition Agent (including the reasonable out-of-pocket expenses of the Prepetition Agent) and reasonable out-of-pocket expenses (other

than counsel fees) of the members of the steering committee of the Prepetition Secured Parties.

34.     Given the Prepetition Secured Parties' consent to the use of their Cash Collateral, the proposed forms of adequate protection described above are needed for the purpose of, among other things, protecting the Prepetition Secured Parties' claims, obligations and collateral interests from potential diminution during the pendency of these chapter 11 cases. The DIP Obligors have agreed to satisfy the Adequate Protection Obligations in exchange for their ability to continue to use the Cash Collateral and the other Prepetition Collateral in their ongoing business and operating facilities.

## The DIP Facility Should Be Authorized

35.     The Debtors request that the Court authorize the DIP Obligors to obtain senior secured, superpriority, postpetition financing up to an aggregate principal amount of $35 million from the DIP Lenders, pursuant to the terms of this Motion, the DIP Orders and the DIP Credit Agreement.

36.     Pending the entry of the Final Order, the Debtors request that the Court authorize the DIP Obligors, on an interim basis, to (i) utilize up to $15 million from the DIP Facility for borrowings or the issuance of letters of credit, (ii) use cash collateral as provided in the Interim Order, (iii) grant to the DIP Lenders the liens and superpriority claims described herein, (iv) provide adequate protection in favor of the Prepetition Secured Parties, as described herein and in the Interim Order, (v) schedule and approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof, and (vi) keep the contents of the Fee Letter confidential.

37.     Approval of the DIP Credit Agreement will ensure the DIP Obligors will have adequate liquidity, in addition to cash on hand, to pay or support their current and ongoing

operating expenses, including postpetition wages and salaries, utilities, taxes, and vendor costs. Unless these expenditures are made, the Debtors may be forced to cease operations, which could result in irreparable harm to their business and their ability to reorganize and maximize value. The financing provided under the DIP Facility and the use of Cash Collateral will enable the Debtors to provide customer care and marketing services, pay their employees, and operate their business in the ordinary course. The availability of credit under the DIP Facility will provide confidence to the Debtors' creditors, including its trade vendors, that will enable and encourage them to continue their relationships with the Debtors and, thereby, enhance the value of the Debtors' estates. Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' employees, thereby promoting a successful reorganization. Accordingly, the Debtors request approval of the relief set forth herein.

38.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

39.    The DIP Obligors have been unable to procure debtor in possession financing in the form of (i) unsecured credit allowable under section 503(b)(1), (ii) an administrative expense under section 364(a) or (b), (iii) a superpriority administrative expense under section 364(c)(1), or (iv) a junior lien under section 364(c)(3). In addition, the DIP Obligors have been unable to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Accordingly, the DIP Obligors propose to obtain the financing set forth in the DIP Credit Agreement by providing, inter alia, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2) and (d) of the Bankruptcy Code.

40.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the DIP Obligors negotiated with the DIP Agent extensively and at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying the Bankruptcy Code, courts grant a debtor considerable deference. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); see also In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

41.    Section 364(d) does not require that a debtor seek alternative financing from every possible lender. Rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. Snowshoe., 789 F.2d at 1088 (concluding debtor demonstrated credit could not be obtained without the senior lien in part by showing unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").

42.    Substantially all of the DIP Obligors' assets are encumbered and the Debtors have been unable to procure the required funding absent the proposed superpriority claims and liens. Indeed, Miller Buckfire and the DIP Obligors solicited proposals from four potential lenders and each required liens priming those of the Prepetition Secured Parties. As such, the DIP Obligors submit that the circumstances of these cases require the DIP Obligors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Credit Agreement reflects the exercise of their sound business judgment.

43.    The terms and conditions of the DIP Credit Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Credit Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

44.    Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this

section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors, their estates and creditors. The interests of the Prepetition Secured Parties in the Cash Collateral will be protected by the adequate protection set forth above. The Prepetition Secured Parties have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral in the operation of their business and administration of the chapter 11 cases should be approved.

### The Proposed Adequate Protection Should Be Authorized

45.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Assoc. and Federal Land Bank, 104 B.R. 824 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

46.     The Prepetition Secured Parties have agreed to the Debtors' use of Cash Collateral and the DIP Obligors' entry into the DIP Credit Agreement in consideration for the adequate protection provided to them under such agreement. Moreover, the replacement liens,

cash payments and other protections offered to the Prepetition Secured Parties will sufficiently protect their interests in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate protection proposed herein is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

## The Automatic Stay Should Be Modified on a Limited Basis

47.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the DIP Obligors to (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, (ii) permit the DIP Agent and DIP Lenders to exercise, upon the occurrence and during the continuance of an event of default and after five business days' notice thereof, all rights and remedies under the DIP Credit Agreement; and (iii) implement the terms of the proposed DIP Orders.

48.    Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should be Granted

49.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain postpetition credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

50.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and obtain an extension of credit of up to $15 million, including, without limitation, the issuance of new letters of credit to replace existing letters of credit, under the DIP Facility on an interim basis, pending entry of the Final Order, in order to (i) maintain and finance the ongoing operations of the Debtors and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties-in-interest, and (b) schedule a hearing to consider entry of the Final Order.

51.     The Debtors have an urgent and immediate need for cash to continue to operate. The availability of the Cash Collateral and the DIP Facility, including, without limitation, the issuance of new letters of credit to replace existing letters of credit, on an interim basis, will provide necessary assurance to the Debtors' vendors, employees, and customers that the Debtors have the ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties-in-interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. Accordingly, the interim relief requested herein is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

## Waiver of Bankruptcy Rules 6004(a) and (h)

52.     The Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

53.    No trustee, examiner, or creditors' committee has been appointed in these

chapter 11 cases.  The Debtors have served notice of this Motion on (i) the Office of the United

States Trustee for the District of Delaware; (ii) those creditors listed on the Debtors'

Consolidated List of Creditors Holding the 50 Largest Unsecured Claims; (iii) counsel to

Deutsche Bank AG, New York Branch, as administrative agent for the Debtors' prepetition and

secured lenders and Deutsche Bank Trust Company Americas, as administrative agent and

collateral agent, for the Debtors' postpetition secured lenders; (iv) the Debtors' majority equity

holder; (v) AOT Bedding Super Holdings, LLC and AOT Bedding Intermediate Holdings, LLC,

as Plan sponsors; (vi) counsel to the informal committee of the holders of Holdco Notes; and

(vii) counsel to the informal committee of the holders of SBC Notes.  This Motion is seeking

first-day relief, notice of this Motion and any order entered hereon will be served on all parties

required by Del. Bankr. L.R. 9013-1(m).  Due to the exigencies of the circumstances surrounding

this Motion, and the nature of the relief requested herein, the Debtors respectfully submit that no

other or further notice need be provided.

54.    No previous application for the relief requested herein has been made to

this or any other Court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially similar to the proposed Interim Order attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem just.

Dated: November 16, 2009
       Wilmington, Delaware

Respectfully submitted,

By: _____
    Mark D. Collins (No. 2981)
    Michael J. Merchant (No. 3854)
    RICHARDS, LAYTON & FINGER, P.A.
    One Rodney Square
    920 North King Street
    Wilmington, Delaware 19801
    Telephone: (302) 651-7700
    Facsimile: (302) 651-7701

    - and -

    Michael F. Walsh
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York  10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007

    -and-

    Lydia T. Protopapas
    WEIL, GOTSHAL & MANGES LLP
    700 Louisiana, Suite 1600
    Houston, Texas  77002
    Telephone: (713) 546-5000
    Facsimile: (713) 224-9511

    *Proposed Attorneys for the Debtors and
    Debtors in Possession*

## EXHIBIT A

### Interim Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                          :
In re                                     :      Chapter 11
                                          :
SIMMONS BEDDING COMPANY, et al.,          :      Case No. _____ (____)
                                          :
            Debtors.                      :      (Jointly Administered)
                                          :
------------------------------------------------------x
```

**INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion, dated November 16, 2009 (the "Motion"), of Simmons Bedding

Company, a Delaware corporation (the "Borrower"), and its affiliated debtors, each as debtor and

debtor in possession (collectively, the "Debtors")[1] in the above-captioned cases (the "Cases")

commenced on November 16, 2009 (the "Petition Date") for interim and final orders under

sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11

of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the

---

[1] The Debtors in these Cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Simmons Company (6221); Bedding Holdco Incorporated (5929); Simmons Bedding Company (5743); The Simmons Manufacturing Co., LLC (0960); Windsor Bedding Co., LLC (8616); World of Sleep Outlets, LLC (0957); Simmons Contract Sales, LLC (2016); Dreamwell, Ltd. (2419); Simmons Capital Management, LLC (2470); and Simmons Export Co. (1370). Each of the Debtors maintains its principal corporate office at One Concourse Parkway, Atlanta, Georgia 30328.

"Bankruptcy Rules"), and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), seeking:

     (I)     authorization (a) for the Borrower to obtain up to $35,000,000 in aggregate principal amount of postpetition financing (the "DIP Financing") on the terms and conditions set forth in this interim order (this "Order") and the Credit and Guaranty Agreement (substantially in the form annexed to the Motion as Exhibit A thereto, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Agreement"; [2] together with all agreements, collateral agreements, documents and instruments delivered or executed from time to time in connection therewith, as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Documents"), among the Borrower, Bedding Holdco Incorporated, a Delaware corporation ("Holdings"), the Guarantors (as defined below), Deutsche Bank Trust Company Americas ("DBTCA"), as Administrative Agent and Collateral Agent (in such capacities, the "DIP Agent") for itself and such other financial institutions that may become a party thereto from time to time (collectively, the "DIP Lenders"), and (b) for each of the Debtors, other than the Borrower and Simmons Company (the "Guarantors"; and together with the Borrower, the "DIP Obligors"), to guaranty on a secured basis the Borrower's obligations in respect of the DIP Financing;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement.

(II)    authorization for the DIP Obligors to (a) execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith; and (b) use the proceeds of the DIP Agreement subject to the terms and conditions of the DIP Agreement and this Order;

(III)    authorization for the Debtors to (a) use cash collateral (as such term is defined in Section 363 of the Bankruptcy Code, which was approximately $40,000,000 as of the Petition Date (the "Cash Collateral")) pursuant to sections 361, 362 and 363 of the Bankruptcy Code on the terms set forth herein, and all other Prepetition Collateral (as defined in paragraph 3(b) below) on the terms set forth herein and (b) provide adequate protection on the terms set forth herein to the Lender Counterparties (as defined in the Prepetition Credit Agreement referred to below) and the lenders from time to time party to the Prepetition Credit Agreement (the "Prepetition Secured Lenders" and, together with the Lender Counterparties, the "Prepetition Secured Parties") under the Second Amended and Restated Credit and Guaranty Agreement, dated as of May 25, 2006 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"; and, together with any other mortgage, security, pledge, control or guaranty agreements and all other documentation executed in connection with the foregoing, each as amended, supplemented or otherwise modified, the "Prepetition Loan Documents"), among the Borrower, Holdings, certain subsidiaries of the Borrower from time to time party thereto

3

(together with the Borrower and Holdings, the "Prepetition Obligors"), the
Prepetition Secured Lenders and Deutsche Bank AG, New York Branch
("DBNY"), as administrative agent for the Prepetition Secured Lenders and as
collateral agent for the Prepetition Secured Parties (in such capacities, the
"Prepetition Agent");

(IV)    authorization for the DIP Obligors to grant to the DIP Agent (for
the benefit of itself and the other DIP Lenders) the DIP Liens as defined and
described and subject to the terms and conditions set forth in paragraph 7 below;

(V)    authorization for the DIP Obligors to grant Superpriority Claims
(as defined below) in respect of all DIP Obligations (as defined below), subject to
the terms and conditions set forth in paragraph 6 below;

(VI)    authorization for the DIP Obligors to grant to the Prepetition Agent
(for the benefit of itself and the other Prepetition Secured Parties) the Adequate
Protection Liens (as defined below), the 507(b) Claims and other adequate
protection set forth herein;

(VII)    authorization for the DIP Obligors to pay all amounts
contemplated to be paid under the DIP Documents, including all fees and
expenses set forth therein;

(VIII)    authorization for the DIP Agent to accelerate the Loans and
terminate the Commitments under the DIP Agreement upon the occurrence and
continuance of an Event of Default and the giving of the notice required by this
Order;

4

(IX)    subject to entry of the Final Order (as defined below),
authorization to grant liens to the DIP Lenders on the proceeds of the DIP
Obligors' claims and causes of action (but not on the actual claims and causes of
action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy
Code (collectively, the "Avoidance Actions");

(X)    subject to entry of the Final Order, the waiver by the Debtors of
any right to seek to surcharge the DIP Collateral (as defined in paragraph 7
below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable
law or principle of equity;

(XI)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing
(the "Interim Hearing") on the Motion to be held before this Court to consider
entry of this Order (a) authorizing the Borrower, on an interim basis, to borrow
under the DIP Agreement an aggregate principal amount, together with issued
Letters of Credit, not to exceed $15,000,000 at any time outstanding prior to the
entry of the Final Order, (b) authorizing the Debtors to use the Cash Collateral
and the other Prepetition Collateral on the terms set forth herein, and (c) granting
adequate protection to the Prepetition Secured Parties;

(XII)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the
"Final Hearing") for this Court to consider entry of a final order in form and
substance reasonably satisfactory to the DIP Agent (the "Final Order")
authorizing and approving on a final basis the relief requested in the Motion,
including without limitation, for the Borrower on a final basis to utilize the DIP

5

Financing and for the Debtors to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms and conditions of the DIP Documents and the Final Order;

(XIII)  authorization to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Order; and

(XIV) authorization to  waive any applicable stay of the effectiveness of this Order and provide for the immediate effectiveness of this Order.

The Interim Hearing having been held by this Court on November 17, 2009, and upon the record made by the Debtors at the Interim Hearing, including, without limitation, the admission into evidence of the Declaration of William S. Creekmuir in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief filed contemporaneously with the Motion and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction.*  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice.*  Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on their fifty (50) largest (on a consolidated basis) unsecured creditors, the DIP Agent, the Prepetition Agent, AOT Bedding Super Holdings, LLC and AOT Bedding Intermediate Holdings, LLC (the "Plan Sponsors"), counsel to the informal committee

6

of the Borrower's subordinated bondholders, counsel to the informal committee of Simmons Company's senior discount bondholders and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"). Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and no further notice of the relief sought at the Interim Hearing is necessary or required.

      3.    *Debtors' Stipulations.* Subject to the limitations contained in paragraphs 17 and 18 below (except with respect to subparagraph (f) below), the Debtors admit, stipulate and agree that:

      (a)    as of the Petition Date, the Prepetition Obligors were truly and justly indebted and liable to the Prepetition Secured Parties, without objection, defense, counterclaim or offset of any kind, (i) in the aggregate principal amount of not less than $529,000,000 in respect of loans made under the Prepetition Credit Agreement, (ii) $7,400,000 in undrawn available amounts under letters of credit issued pursuant to the Prepetition Credit Agreement plus amounts owed under Hedge Agreements with the Lender Counterparties (as each such term is defined in the Prepetition Credit Agreement), accrued and unpaid interest, all other Guaranteed Obligations and Secured Obligations (as each such term is defined in the Prepetition Credit Agreement) and fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Prepetition Loan Documents and applicable Hedge Agreements (collectively, the "Prepetition Obligations");

      (b)    the liens and security interests granted to the Prepetition Agent to secure the Prepetition Obligations (the "Prepetition Liens") are (i) valid, binding, perfected, enforceable

7

liens on and security interests in the personal and real property constituting Collateral under, and as defined in, the Prepetition Loan Documents in respect of the Prepetition Obligations (together with the Cash Collateral, the "Prepetition Collateral"), (ii) not subject to objection, defense, counterclaim, offset, contest, attachment, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) first-priority liens, subject and subordinate only to (A) after giving effect to this Order, the Carve Out (as defined in paragraph 6(b) below) and the liens and security interests granted to secure the DIP Financing and the Adequate Protection Obligations (as defined in paragraph 13 below), and (B) valid, perfected and unavoidable liens permitted under the Prepetition Loan Documents to the extent such permitted liens are senior to the liens securing the Prepetition Obligations (collectively, the "Permitted Prepetition Liens");

      (c)    the Prepetition Obligations constitute the legal, valid and binding obligations of the Prepetition Obligors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code);

      (d)    (i) no portion of the Prepetition Obligations shall be subject to objection, defense, counterclaim, offset, avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (ii) the Prepetition Obligors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses, setoff or recoupment rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Agent, the Prepetition Secured Parties and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case, as they

8

pertain to the Prepetition Obligations, the Prepetition Collateral or the Prepetition Loan Documents and Hedge Agreements; and

(e)     the aggregate value of the Prepetition Collateral exceeds the aggregate amount of the Prepetition Obligations;

(f)     at the request of the Prepetition Obligors prior to the Petition Date, DBNY agreed to issue letters of credit for the account of the Prepetition Obligors (and such letters of credit were not issued under the Prepetition Credit Agreement) in an aggregate stated amount of $3,100,556, and the Prepetition Obligors cash collateralized such letters of credit at 105% of the face amount thereof (the "L/C Cash Collateral", which term shall include all products, proceeds and investments thereof (including interest accruing thereon)). The L/C Cash Collateral is subject to valid, perfected and unavoidable liens for the benefit of DBNY as issuing lender of the letters of credit and the obligations from time to time owing to DBNY as the issuing lender are not subject to objection, defense, counterclaim, offset, avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

4.     *Findings Regarding the DIP Financing.*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors have an immediate need to obtain the DIP Financing and to use the Prepetition Collateral, including the Cash Collateral, to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, and satisfy payroll obligations and other working capital and general corporate purposes of the Debtors. The Debtors' use of the Prepetition Collateral (including the Cash Collateral) is

9

necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the DIP Obligors granting (i) the priming DIP Liens (as defined in paragraph 7 below) and (ii) the Superpriority Claims (as defined in paragraph 6(a) below), in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)     The terms of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair, reasonable, the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the DIP Obligors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the informal steering committee of Prepetition Secured Lenders, and all of the DIP Obligors' obligations and indebtedness arising under or in connection with the DIP Financing, including without limitation, (i) all Loans made to, and all Letters of Credit issued for the account of, the DIP Obligors pursuant to the DIP Agreement and (ii) all other obligations (including, without limitation, indemnification obligations) of the DIP Obligors under the DIP Documents and this

10

Order now or hereafter owing to the DIP Agent or any DIP Lender (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

5.  *Authorization of the DIP Financing and the DIP Documents.*

(a)  The DIP Obligors are hereby authorized to enter into and perform their obligations under the DIP Documents and, in the case of the Borrower, to borrow loans or request issuance of Letters of Credit under the DIP Agreement pending entry of the Final Order up to an aggregate principal amount of $15,000,000 for working capital and other general corporate purposes of the Debtors, including without limitation, to pay interest, fees and expenses in connection with the DIP Financing, and for other purposes, in each case, subject to the terms and conditions of the DIP Agreement and this Order.

(b)  In furtherance of the foregoing and without further approval of this Court, each DIP Obligor is authorized and directed to perform all acts and to execute and deliver all

11

instruments and documents reasonably required or necessary for the DIP Obligors' performance of their obligations under the DIP Documents, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the performance of the guarantees of the obligations of the Borrower by the Guarantors as provided in the DIP Agreement;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the DIP Obligors and the DIP Agent and, if applicable, the requisite DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) that do not (A) shorten the maturity of the Loans, (B) increase the Commitments or the rate of interest payable on the Loans under the DIP Agreement, or (C) change any Event of Default, add any covenants or amend the covenants therein, in each case as applicable to the DIP Obligors, in any such case to be materially more restrictive; provided, however, that a copy of any such executed amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and the statutory committee of unsecured creditors appointed in the Cases (the "Committee"), if any;

(iii)   the non-refundable payment to the DIP Agent and its affiliates, as the case may be, of the fees set forth in the DIP Documents and any separate fee letter with the DIP Agent or its affiliates, in each case, in accordance with the provisions of the DIP Documents or any such separate fee letter, as applicable; and

(iv)      the performance of all other acts reasonably required under or necessary in connection with the DIP Documents.

(c)      Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the DIP Obligors party thereto, enforceable against such DIP Obligors in accordance with the terms of this Order and the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law) or subject to any defense, reduction, setoff, recoupment or counterclaim, subject in all respects to the terms of the DIP Agreement.

6.      *Superpriority Claims.*

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against the DIP Obligors and, except to the extent expressly set forth in this Order in respect of the Carve Out, such Superpriority Claims shall have priority over any and all administrative expenses, adequate protection claims and all other claims against the DIP Obligors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether

13

or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Notwithstanding anything herein to the contrary, the Superpriority Claims shall not be payable from the L/C Cash Collateral or the L/C Cash Collateral Account (as defined below).

      (b)    For purposes hereof, the "Carve Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, and (ii) after the occurrence and during the continuance of an Event of Default under the DIP Agreement and delivery of notice thereof to each of the counsel for the Debtors and (if any) the Committee (the "Carve Out Notice"), the payment of accrued and unpaid professional fees and expenses incurred by the Debtors and the Committee (if any) and allowed by this Court at any time, in an aggregate amount not exceeding $7 million (plus all unpaid professional fees and expenses of the Debtors and the Committee allowed by this Court at any time that were incurred prior to the delivery of the Carve Out Notice); provided that (A) the Carve Out shall not be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation which seeks any order, judgment, determination or similar relief (x) with respect to claims against the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Secured Parties or invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, the Prepetition Obligations, the Prepetition Liens, any of the Prepetition Agent's or Prepetition Secured Parties' rights under the Prepetition Loan Documents, the DIP Obligations, the DIP Liens, or any of the DIP Agent's or DIP Lenders' rights under the DIP Documents, or (y) preventing, hindering or delaying the DIP

14

Agent's or the DIP Lenders' assertion or enforcement of the DIP Liens or realization upon any

DIP Collateral and, after the Discharge of the DIP Obligations (as defined in paragraph 8(b)

below), the Prepetition Agent's or the Prepetition Secured Parties' assertion or enforcement of

the Prepetition Liens or realization upon any Prepetition Collateral, (B) prior to the delivery of

the Carve Out Notice, the Carve Out shall not be reduced by the payment of fees and expenses

allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and

(C) nothing in this Order shall impair the right of any party to object to the reasonableness of any

such fees or expenses to be paid by the Debtors' estates.  Notwithstanding anything herein to the

contrary, the Carve Out shall not be payable from the L/C Cash Collateral or the L/C Cash

Collateral Account.

       7.    *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the

date of this Order and without the necessity of the execution by the DIP Obligors or any other

person (or recordation or other filing) of security agreements, control agreements, pledge

agreements, financing statements, mortgages or other similar documents, or the possession or

control by the DIP Agent of any property, the following security interests and liens are hereby

granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property

identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral";

provided that, (i) the L/C Cash Collateral Account and the L/C Cash Collateral, (ii) the DIP

Obligors' equity interests in excess of 65% of the voting capital stock of their direct foreign

subsidiaries and (iii) all other Excluded Assets (as defined in the Pledge and Security

Agreement) (any such property described in clauses (i), (ii) and (iii), the "Excluded Property")

shall in no event be deemed to be DIP Collateral), subject only to the Carve Out and Permitted

15

Liens (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "<u>DIP Liens</u>"):

      (a)    <u>First Lien On Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the DIP Obligors have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid Liens perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection is expressly permitted by the Bankruptcy Code (collectively, the "<u>Unencumbered Property</u>"), including without limitation, any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of Holdings and the proceeds of all of the foregoing; <u>provided</u> that, the Unencumbered Property shall not include the Avoidance Actions and any assets upon which security may not be lawfully granted, but subject to the entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions.

      (b)    <u>Liens Junior To Certain Existing Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property in which the DIP Obligors have an interest (other than the property described in paragraph 7(c), as to

16

which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to such valid, perfected and unavoidable liens.

(c)    Liens Priming Prepetition Secured Lenders' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all now or hereafter acquired Prepetition Collateral and all proceeds thereof. The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Agent and the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(a) below)), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition Collateral that were valid and senior to the liens of the Prepetition Agent and the Prepetition Secured Parties as of the Petition Date, including as permitted by section 546(b) of the Bankruptcy Code.

(d)    Liens Senior To Certain Other Liens.  Except as otherwise permitted under the DIP Documents, the DIP Liens and the Adequate Protection Liens  shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the DIP Obligors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising

17

after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

       8.     *Remedies After Event of Default.*

          (a)     The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence and during the continuance of an Event of Default and the delivery of notice of the occurrence of an Event of Default as and to the extent required by the DIP Agreement, all rights and remedies under the DIP Documents, other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) Business Days' prior written notice to the Debtors (with a copy to counsel for the Debtors, counsel to the Committee (if any) and to the U.S. Trustee), all rights and remedies against the DIP Collateral provided for in the DIP Documents and this Order (including, without limitation, the right to setoff monies of the DIP Obligors in accounts maintained with the DIP Agent or any DIP Lender and the right to prohibit further use of Cash Collateral).  Following the giving of written notice by the DIP Agent of the occurrence and continuance of an Event of Default, the Debtors shall be entitled to an emergency hearing before the Bankruptcy Court upon prior notice to the DIP Agent and its counsel.  In any such hearing, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The DIP Agent's or any DIP Lender's delay or failure to exercise

18

rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the DIP Agent's or the DIP Lenders' rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement.

       (b)    The Prepetition Secured Parties may not exercise any rights or remedies under the Prepetition Loan Documents or this Order unless and until all DIP Obligations have been paid in full in cash, all letters of credit have been cash collateralized, backstopped or returned undrawn, in each case, in accordance with the terms of the DIP Agreement and all commitments thereunder have been terminated (collectively, "Discharge of the DIP Obligations"). After the Discharge of the DIP Obligations, the Prepetition Secured Parties may prohibit further use of Cash Collateral and/or exercise such rights or remedies as provided herein, in each case, to the extent the Prepetition Obligors are in default of their Adequate Protection Obligations or other obligations hereunder. If, prior to the Discharge of the DIP Obligations, the Prepetition Secured Parties receive any DIP Collateral or proceeds thereof, the DIP Agent and the DIP Lenders shall have the right to seek to recover any such DIP Collateral or proceeds.

       9.    *Limitation On Charging Expenses Against Collateral.* Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out with respect to the DIP Collateral and the Prepetition Collateral, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the L/C Cash Collateral pursuant to section 506(c) of the Bankruptcy

RLF1 3504987v.1

Code or any similar principle of law or in equity, without the prior written consent of the DIP Agent or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders.

10.    *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Secured Lenders pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, except as expressly provided in the DIP Agreement.

11.    *The Cash Collateral.*  The L/C Cash Collateral deposited and maintained in the L/C Cash Collateral Account (as defined below) shall not constitute and shall not be included in the term "Cash Collateral" as used herein.  Notwithstanding anything herein to the contrary, neither the Debtors nor any other estate representatives (including, without limitation, the Committee (if any) or any trustee) shall use or be permitted to use any of the L/C Cash Collateral deposited or maintained from time to time in the letter of credit cash collateral account (the "L/C Cash Collateral Account"), including, without limitation, for purposes of the Carve Out.

12.    *Use Of Prepetition Collateral (including Cash Collateral).*  The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date under the DIP Agreement for working capital and general corporate purposes in accordance with the terms and conditions of this Order and the DIP Agreement; provided that the Prepetition Secured Lenders are granted adequate protection as hereinafter set forth.

20

13.    *Adequate Protection.* The Prepetition Agent and the Prepetition Secured Parties

are entitled, pursuant to sections 361, 363(c)(2) and 364(d)(1) of the Bankruptcy Code, to

adequate protection of their interests in the Prepetition Collateral and the use of Cash Collateral,

in an amount equal to the aggregate diminution in value of the Prepetition Collateral, including

without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or

other decline in value) of any Prepetition Collateral, including the Cash Collateral, the priming of

the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens, and the imposition

of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value,

the "Adequate Protection Obligations"). As adequate protection, the Prepetition Agent and the

Prepetition Secured Parties are hereby granted the following:

(a)    Adequate Protection Liens. As security for the payment of the Adequate

Protection Obligations, the Prepetition Agent (for itself and for the benefit of the Prepetition

Secured Parties) is hereby granted (effective and perfected upon the date of this Order and

without the necessity of the execution by the DIP Obligors of security agreements, pledge

agreements, mortgages, financing statements or other agreements) a valid, perfected replacement

security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"),

subject and subordinate only to (i) the Permitted Prepetition Liens, (ii) the DIP Liens, (iii) the

Carve Out and (iv) Permitted Liens.

(b)    Section 507(b) Claim. The Adequate Protection Obligations shall

constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the

"507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds

specified or ordered pursuant to any provision of the Bankruptcy Code, including without

21

limitation, sections 326, 328, 330, 331, 503(b), 506(c), 507(a), 726, 1113 and 1114 of the

Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the Superpriority

Claims granted in respect of the DIP Obligations.  Except to the extent expressly set forth in this

Order, the Prepetition Agent and the Prepetition Secured Parties shall not receive or retain any

payments, property or other amounts in respect of the 507(b) Claims unless and until the

Discharge of the DIP Obligations.  Notwithstanding anything herein to the contrary, the 507(b)

Claims shall not be payable from the L/C Cash Collateral.

       (c)    <u>Payments</u>.  The Prepetition Obligors are authorized and directed to pay to

the Prepetition Agent:  (i) within five (5) Business Days of entry of this Order, all accrued and

unpaid pre-petition interest, fees and costs (including, without limitation, interest on loans,

interest on terminated Hedge Agreements (to the extent provided therein), breakage costs, fees

for letters of credit, commitment fees, and accrued fees owing to the Prepetition Agent), in each

case, calculated based on the applicable non-default rate set forth in the Prepetition Credit

Agreement or the other applicable Prepetition Loan Documents or the applicable rate set forth in

Hedge Agreements with respect to obligations owing thereunder; (ii) on the last Business Day of

each calendar month after the entry of this Order, all accrued and unpaid post-petition interest,

fees and costs (including, without limitation, interest on loans, interest on terminated Hedge

Agreements (to the extent provided therein), breakage costs, fees for Letters of Credit,

commitment fees, and accrued fees owing to the Prepetition Agent), in each case, calculated

based on the applicable non-default rate set forth in the Prepetition Credit Agreement or the other

applicable Prepetition Loan Documents or Hedge Agreements (to the extent provided therein);

(iii) all regularly scheduled payments in respect of the Hedge Agreements on the date such

22

payments become due in accordance with the terms thereof, provided that a termination payment in respect of any Hedge Agreement shall not be deemed to be an administrative claim under section 503(b) of the Bankruptcy Code; (iv) all scheduled amortization payments on the Tranche D Term Loan (as defined in the Prepetition Credit Agreement) on the date such payments become due in accordance with the Prepetition Credit Agreement (determined without giving effect to the acceleration of the Obligations) and (v) after the Discharge of the DIP Obligations, all mandatory prepayments arising under Section 2.13 of the Prepetition Credit Agreement (it being understood that solely for purposes of Section 2.13(c) of the Prepetition Credit Agreement the incurrence of the DIP Obligations shall be deemed to be permitted by Section 6.1 of the Prepetition Credit Agreement); provided that for purposes of Section 2.13(a) of the Prepetition Credit Agreement, the Prepetition Obligors shall not be required to make a mandatory prepayment if the Net Asset Sale Proceeds (as defined in the Prepetition Credit Agreement) of any Asset Sale (as defined in the Prepetition Credit Agreement) are less than $3 million or such a sale is a permitted sale to an affiliate or subsidiary of the applicable Prepetition Obligor under the Prepetition Credit Agreement; provided further that this clause (v) shall be without prejudice to the rights of the Prepetition Secured Parties under applicable law.

(d)    Fees and Expenses. The Prepetition Agent shall receive from the Prepetition Obligors reimbursement of all reasonable fees and expenses incurred or accrued by the Prepetition Agent under the Prepetition Loan Documents, including without limitation, the reasonable fees and disbursements of advisors and a counsel (and a local counsel) for the Prepetition Agent (including the reasonable out-of-pocket expenses of the Prepetition Agent) and reasonable out-of-pocket expenses (other than counsel fees) of the members of the steering

23

committee shall be paid by the Prepetition Obligors.  None of the fees and expenses payable pursuant to this paragraph 13(d) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the fees and expenses provided for in this paragraph 13(d) promptly (but no later than ten (10) Business Days) after reasonably detailed invoices (consistent with prepetition practice, including redacted for work product and privilege) for such fees and expenses shall have been submitted to the Debtors, and the Debtors shall promptly provide copies of such invoices to the Committee (if any) and the U.S. Trustee.  Nothing herein shall be deemed to modify the Prepetition Credit Agreement or the Prepetition Obligors' obligations thereunder.

      (e)    Information.  The DIP Obligors shall promptly provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders, and after the Discharge of the DIP Obligations, the Prepetition Obligors shall comply with the reporting obligations set forth in paragraph 14(b) below.

      (f)    Application of Proceeds.  So long as the Discharge of the DIP Obligations has not occurred, all proceeds of any Prepetition Collateral pursuant to the enforcement of any of the Prepetition Loan Documents or the exercise of any remedial provision thereunder or under this Order or the Final Order, together with all other proceeds received by any Prepetition Secured Party as a result of any such enforcement or the exercise of any such remedial provision or as a result of any distribution of or in respect of any Prepetition Collateral (whether or not

24

expressly characterized as such), or the application of any Prepetition Collateral (or proceeds thereof) to the payment thereof or any distribution of Prepetition Collateral (or proceeds thereof) upon the liquidation or dissolution of any DIP Obligor, shall be applied against the DIP Obligations until the Discharge of the DIP Obligations has occurred. Upon the Discharge of the DIP Obligations, the DIP Agent shall deliver to the Prepetition Agent any proceeds of Prepetition Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Prepetition Secured Lenders in such order as specified in the Prepetition Loan Documents.

(g)    Cash Collateralized Letters of Credit.  DBNY, as the issuing lender of the letters of credit that are collateralized by the L/C Cash Collateral, shall be irrevocably authorized to immediately, and without further notice or action, debit amounts from the L/C Cash Collateral to: (i) pay all accrued and unpaid fees with respect to such letters of credit and (ii) reimburse itself for each drawing under such letter of credit.

14.    *Reservation of Rights of Prepetition Secured Parties.*

(a)    Based upon the consent of the Prepetition Secured Parties, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Agent and the Prepetition Secured Parties. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Agent and the Prepetition Secured Parties pursuant hereto is without prejudice to the right of the Prepetition Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification. Except as expressly provided herein, nothing

25

contained in this Order (including without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Agent or any Prepetition Secured Party.  The consent of the Prepetition Agent and the Prepetition Secured Parties to the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens (a) is limited to the DIP Financing and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Agent or the Prepetition Secured Parties that, absent such consent, their interests in the Prepetition Collateral would be adequately protected pursuant to this Order.

        (b)      In the event of the Discharge of the DIP Obligations, the Prepetition Obligors will continue to be bound by Section 6.6 and Article V of the DIP Agreement (as in effect immediately prior to its termination), which will thereafter be for the benefit of the Prepetition Secured Lenders so long as the Debtors are permitted to use the Cash Collateral.

      *15.*    *Perfection of DIP Liens and Adequate Protection Liens.*

        (a)      The DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent or the Prepetition Agent shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected,

26

allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

(b)    A certified copy of this Order may, in the discretion of the DIP Agent or the Prepetition Agent, as the case may be, (a) be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording or (b) be delivered to any depositary bank or brokerage or securities firm as evidence of the DIP Agent's control over the DIP Collateral (without the need to enter into any deposit account control agreement or securities account control agreement with respect thereto); provided that the DIP Obligors shall enter into deposit account control agreements or securities account control agreements, as applicable, with the DIP Agent in accordance with the terms of the DIP Agreement.

(c)    The DIP Obligors shall execute and deliver to the DIP Agent and the Prepetition Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent and the Prepetition Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the Adequate Protection Liens.

(d)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any DIP Obligor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect

27

with respect to the granting of DIP Liens or Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any DIP Obligor in favor of the DIP Lenders or the Prepetition Secured Lenders in accordance with the terms of the DIP Documents or this Order.

16.    *Preservation of Rights Granted Under the Order.*

(a)    Except as otherwise provided in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders shall be granted or allowed and the DIP Liens and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    The Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement if there is entered, (i) any modification of this Order (other than as permitted under the DIP Agreement) without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, or (ii) an order converting or dismissing any of the Cases (other than as permitted under the DIP Agreement). The Debtors shall not seek, and it shall constitute a termination of the right to use Cash Collateral if there is entered any modification of this Order in respect of (i) the provision of Adequate Protection hereunder, (ii) the use of Cash Collateral, or (iii) any of the other benefits, rights or protections of the Prepetition Secured Parties or Prepetition Agent, in each case that is adverse to such parties, without the prior written consent of the Prepetition Agent, and no such

28

consent shall be implied by any other action, inaction or acquiescence by the Prepetition Agent.

If an order dismissing any of the Cases of the DIP Obligors under section 1112 of the

Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance

with sections 105 and 349 of the Bankruptcy Code) that (A) the Superpriority Claims, the 507(b)

Claims, the other administrative expense claims granted pursuant to this Order, the DIP Liens

and the Adequate Protection Liens shall continue in full force and effect and shall maintain their

priorities as provided in this Order until all DIP Obligations and all Adequate Protection

Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, the

507(b) Claims, the other administrative expense claims granted pursuant to this Order, the DIP

Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding

on all parties in interest) and (B) this Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the claims, liens and security interests referred to in

clause (A) above.

(c)    If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the

validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations

incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as

applicable, of the effective date of such reversal, stay, modification or vacatur or (ii) the validity,

priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding

any such reversal, stay, modification or vacatur, any use of Cash Collateral, any DIP Obligations

or any Adequate Protection Obligations incurred by the DIP Obligors to the DIP Agent, the DIP

Parties, the Prepetition Agent or the Prepetition Secured Parties, as the case may be, prior to the

29

actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in sections 363(m) and 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents.

        (d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Parties, the Prepetition Agent and the Prepetition Secured Parties granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases of the DIP Obligors to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases of the DIP Obligors or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases of the DIP Obligors and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Obligors having waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Order and the DIP Documents shall continue in the Cases of the DIP Obligors, in any successor cases if the Cases of the DIP Obligors cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims, the Section 507(b) Claims, the other administrative expense claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured

30

Lenders granted by this Order and the DIP Documents shall continue in full force and effect until

all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash.

17.    *Effect of Stipulations on Third Parties.*  The stipulations and admissions contained

in this Order, including without limitation, in paragraph 3 of this Order, shall be binding solely

upon the Debtors in all circumstances.  The stipulations and admissions contained in this Order,

including without limitation, in paragraph 3 of this Order, shall be binding upon all other parties-

in-interest, including without limitation, the Committee (if any), unless (a) any such Committee

or any other party-in-interest, in each case, with requisite standing, has duly filed an adversary

proceeding (subject to the limitations contained herein, including without limitation, in

paragraph 18) by no later than the date that is 45 days after the date of entry of this Order or any

such later date agreed to in writing by the Prepetition Agent in its sole and absolute discretion

(A) challenging the validity, enforceability, priority or extent of the Prepetition Obligations or

the liens on the Prepetition Collateral securing the Prepetition Obligations or (B) otherwise

asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of

action, objections, contests or defenses (collectively, the "Claims and Defenses") against the

Prepetition Agent or any of the Prepetition Secured Parties or their respective agents, affiliates,

subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any

matter related to the Prepetition Obligations or the Prepetition Collateral and (b) an order is

entered by a court of competent jurisdiction and becomes final and non-appealable in favor of

the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding;

provided that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and

relinquished as of the Petition Date.  If no such adversary proceeding is duly filed in respect of

31

the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not

subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all

purposes in the Cases of the DIP Obligors and any subsequent chapter 7 case, (y) the liens on the

Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed

to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority

specified in paragraph 3(b), not subject to defense, counterclaim, recharacterization,

subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Agent and the

Prepetition Secured Parties, as the case may be, and the liens on the Prepetition Collateral

granted to secure the Prepetition Obligations shall not be subject to any other or further challenge

by the Committee (if any) or any other party-in-interest, and such Committee or party-in-interest

shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without

limitation, any successor thereto (including, without limitation, any estate representative or a

chapter 7 or 11 trustee appointed or elected for any of the Debtors).  If any such adversary

proceeding is duly filed, the stipulations and admissions contained in paragraph 3 of this Order

shall nonetheless remain binding and preclusive (as provided in the second sentence of this

paragraph) on the Committee (if any) and any other party-in-interest, except as to any such

findings and admissions that were expressly and successfully challenged in such adversary

proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code),

including the Committee (if any), standing or authority to pursue any cause of action belonging

to the Debtors or their estates, including without limitation, Claims and Defenses with respect to

32

the Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any

Prepetition Obligor to secure any of the foregoing.

      18.    *Limitation on Use of DIP Financing and DIP Collateral.*  The Debtors shall use

the DIP Financing and the Prepetition Collateral (including the Cash Collateral) solely as

provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other

order of this Court to the contrary, no Loans or Letters of Credit under the DIP Agreement, DIP

Collateral, Prepetition Collateral (including the Cash Collateral) or the Carve Out may be used to

(a) object, contest or raise any defense to, the validity, perfection, priority, extent or

enforceability of any amount due under the DIP Documents, the Prepetition Loan Documents or

the liens or claims granted under this Order, the DIP Documents or the Prepetition Loan

Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP

Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders or their

respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or

advisors, (c) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's

assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in

accordance with the DIP Documents, the Prepetition Loan Documents or this Order, (d) seek to

modify (whether directly or indirectly) by any motion, pleading or otherwise, any of the rights

granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured

Lenders hereunder or under the DIP Documents (other than as permitted therein) or the

Prepetition Loan Documents (that is adverse to the Prepetition Secured Parties or the Prepetition

Agent), in the case of each of the foregoing clauses (a) through (d), without such party's prior

written consent or (e) pay any amount on account of any claims arising prior to the Petition Date

unless such payments are (i) approved by an Order of this Court and (ii) permitted under the DIP

Documents; provided that, no more than an aggregate of $25,000 of the Prepetition Collateral

(including the Cash Collateral), Loans under the DIP Agreement, the DIP Collateral or the Carve

Out may be used by the Committee to investigate the validity, enforceability or priority of the

Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition

Obligations, or investigate any Claims and Defenses or other causes action against the

Prepetition Agent or the Prepetition Secured Parties.

19.     *Insurance.*  To the extent the Prepetition Agent is listed as loss payee under the

Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the

Debtors' insurance policies and shall act in that capacity and distribute any proceeds recovered

or received in respect of any such insurance policies, first, to the payment in full of the DIP

Obligations, and second, to the payment of the Prepetition Obligations.

20.     *Order Governs.*  In the event of any inconsistency or conflict between the

provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

21.     *Binding Effect; Successors And Assigns.*  The provisions of this Order, including

all findings herein, shall be binding upon all parties-in-interest in the Cases, including without

limitation, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured

Parties, the Committee, and the Debtors and their respective successors and assigns (including

any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an

examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary

appointed as a legal representative of any of the Debtors or with respect to the property of the

estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the

34

Prepetition Agent, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; provided that, except to the extent expressly set forth in this Order, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

      22.   *Limitation of Liability.*  In determining to make any loan under the DIP Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors and their affiliates (as defined in Section 101(2) of the Bankruptcy Code).

      23.   *Effectiveness.*  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Petition Date, and there shall be no stay of execution of effectiveness of this Order.

      24.   *Master Proof of Claim.*

35

(a)    To facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition Agent is authorized (but not required) to file a single master proof of claim on behalf of itself and the Prepetition Secured Lenders on account of their claims arising under the Prepetition Loan Documents and hereunder against all Debtors (the "Master Proof of Claim"), and the Prepetition Agent shall not be required to file a verified statement pursuant to Rule 2019 of the Bankruptcy Rules in any of the Cases.

(b)    Upon filing of the Master Proof of Claim, the Prepetition Agent, each Prepetition Secured Lender and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors arising under the Prepetition Loan Documents and the claims (as defined in section 101 of the Bankruptcy Code) of the Prepetition Agent and each Prepetition Secured Lender (and each of their respective successors and assigns) named in the Master Proof of Claim shall be allowed as if each such entity had filed a separate proof of claim in each of the Cases in the amount set forth in the Master Proof of Claim; provided that the Prepetition Agent may, but shall not be required, to amend the Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of any such claims.

(c)    The provisions set forth in paragraphs (a) and (b) above and the Master Proof of Claim are intended solely for the purpose of administrative convenience and, except to the extent set forth herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect the substantive rights of the Debtors, the Committee, the Prepetition

36

Agent, the Prepetition Secured Lenders or any other party in interest or their respective

successors in interest, including without limitation, the right of each Prepetition Secured Lender

(or its successor in interest) to vote separately on any plan of reorganization proposed in the

Cases.

      25.    *Final Hearing*. The Final Hearing is scheduled for \_\_\_\_\_ \_\_, 2009 at \_\_\_\_ \_.m.,

prevailing Eastern time, before this Court.

      26.    *Final Hearing Notice*. The Debtors shall promptly mail copies of this Order

(which shall constitute adequate notice of the Final Hearing to the parties having been given

notice of the Interim Hearing, and to any other party that has filed a request for notices with this

Court and to the Committee (if any) after the same has been appointed, or Committee counsel, if

the same shall have been appointed. Any party-in-interest objecting to the relief sought at the

Final Hearing shall serve and file written objections; which objections shall be served upon (a)

Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention:

Michael F. Walsh, Esq. and Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600,

Houston, Texas 77002, Attention: Lydia T. Protopapas, Esq., attorneys for the Debtors, (b)

Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017,

Attention: Peter V. Pantaleo, Esq. and Morris J. Massel, Esq., attorneys for the DIP Agent and

the Prepetition Agent, and (c) the Office of the U.S. Trustee for the District of Delaware, and

shall be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each

37

case to allow actual receipt by the foregoing no later than _____ __, 2009 at _____ _.m.,

prevailing Eastern time.

Dated:  November ___, 2009
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

38