**EXHIBIT B**

**DIP Credit Agreement**

CREDIT AND GUARANTY AGREEMENT

dated as of November [__], 2009

among,

SIMMONS BEDDING COMPANY,
a Debtor and Debtor-in-Possession, as Company,

BEDDING HOLDCO INCORPORATED AND CERTAIN SUBSIDIARIES OF COMPANY,
each a Debtor and Debtor-in-Possession, as Guarantors,

THE FINANCIAL INSTITUTIONS LISTED HEREIN,
as Lenders,

DEUTSCHE BANK SECURITIES INC.,
as Sole Bookrunner and Lead Arranger,

and

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Administrative Agent and Collateral Agent

---

**REVOLVING CREDIT FACILITY**

---

# Table of Contents

**Page**

SECTION 1. DEFINITIONS; INTERPRETATION................................................................2

    1.1    Defined Terms ...........................................................................................2
    1.2    Accounting Terms....................................................................................30
    1.3    Interpretation, etc. ..................................................................................31

SECTION 2. CREDIT EXTENSIONS ....................................................................31

    2.1    Revolving Loans and Swing Line Loans .................................................31
    2.2    Letters of Credit .....................................................................................34
    2.3    Pro Rata Shares.......................................................................................39
    2.4    Use of Proceeds......................................................................................39
    2.5    Notes; Register; Lenders' Books and Records .......................................40
    2.6    Interest Payments....................................................................................40
    2.7    Conversion; Continuation ......................................................................42
    2.8    Post Default Interest...............................................................................42
    2.9    Fees ........................................................................................................43
    2.10   Voluntary Prepayments/Commitment Reductions ..................................43
    2.11   Mandatory Prepayments/Commitment Reductions .................................44
    2.12   Application of Prepayments and Reductions of Commitments...............46
    2.13   Collateral Proceeds; Guaranty Payments...............................................46
    2.14   General Provisions Regarding Payments................................................47
    2.15   Ratable Sharing.......................................................................................47
    2.16   Making or Maintaining Eurodollar Rate Loans ......................................48
    2.17   Increased Costs; Capital Adequacy .......................................................50
    2.18   Taxes; Withholding, Etc. .......................................................................50
    2.19   Capital Adequacy Adjustment ...............................................................53
    2.20   Obligation to Mitigate............................................................................54
    2.21   Defaulting Lenders.................................................................................54
    2.22   Removal or Replacement of a Lender ....................................................55
    2.23   Priority and Liens...................................................................................56
    2.24   Payment of Obligations..........................................................................57
    2.25   No Discharge; Survival of Claims .........................................................57
    2.26   Conflicts.................................................................................................58
    2.27   Six Month Extension Option ..................................................................58

SECTION 3. CONDITIONS PRECEDENT ..............................................................58

    3.1    Closing Date............................................................................................58
    3.2    Final Order Entry Date............................................................................60
    3.3    Conditions to Each Credit Extension......................................................61

SECTION 4. REPRESENTATIONS AND WARRANTIES.....................................62

    4.1    Organization and Powers .......................................................................62
    4.2    Qualification, Good Standing and Compliance with Law......................63

022537-0167-11432-Active.11706310.13

| 4.3 | Subsidiaries | 63 |
|---|---|---|
| 4.4 | Authorization of Borrowing; No Conflict | 63 |
| 4.5 | Governmental Consents | 64 |
| 4.6 | Binding Obligation | 64 |
| 4.7 | Solvency | 64 |
| 4.8 | Financial Condition | 64 |
| 4.9 | No Material Adverse Change | 64 |
| 4.10 | Litigation; Adverse Facts | 64 |
| 4.11 | Payment of Taxes | 65 |
| 4.12 | Title to Properties; Real Property | 65 |
| 4.13 | Collateral | 65 |
| 4.14 | Environmental | 66 |
| 4.15 | No Defaults | 67 |
| 4.16 | Governmental Regulation | 67 |
| 4.17 | Margin Stock | 67 |
| 4.18 | Employee Matters | 67 |
| 4.19 | Employee Benefit Plans | 67 |
| 4.20 | Use of Proceeds | 68 |
| 4.21 | Disclosure | 68 |
| 4.22 | Intellectual Property | 68 |
| 4.23 | Regulation H | 68 |
| 4.24 | Patriot Act | 69 |
| 4.25 | The Orders | 69 |
| SECTION 5. | AFFIRMATIVE COVENANTS | 69 |
| 5.1 | Financial Statements and Other Reports | 69 |
| 5.2 | Legal Existence, etc. | 73 |
| 5.3 | Payment of Obligations | 74 |
| 5.4 | Maintenance of Properties | 74 |
| 5.5 | Insurance | 74 |
| 5.6 | Inspection Rights; Lender Meeting; Quarterly Lender Call: Books and Records | 74 |
| 5.7 | Compliance with Laws, Etc. | 75 |
| 5.8 | Environmental Matters | 75 |
| 5.9 | Subsidiaries | 77 |
| 5.10 | [Reserved] | 78 |
| 5.11 | Full Cash Dominion | 78 |
| 5.12 | [Reserved] | 78 |
| 5.13 | Further Assurances | 78 |
| SECTION 6. | NEGATIVE COVENANTS | 79 |
| 6.1 | Indebtedness | 79 |
| 6.2 | Liens | 81 |
| 6.3 | Investments | 82 |
| 6.4 | [Reserved] | 83 |
| 6.5 | Restricted Junior Payments | 84 |
| 6.6 | Financial Covenant. | 85 |
| 6.7 | Fundamental Changes; Asset Sales | 85 |

022537-0167-11432-Active.11706310.13

| | | |
|---|---|---|
| 6.8 | Consolidated Capital Expenditures | 87 |
| 6.9 | Sales and Lease-Backs | 87 |
| 6.10 | Transactions with Shareholders and Affiliates | 87 |
| 6.11 | Amendments or Waivers of Certain Documents. | 87 |
| 6.12 | Conduct of Company Business | 88 |
| 6.13 | Special Covenants of Holdings | 88 |
| 6.14 | Fiscal Year | 88 |
| 6.15 | Securities of Company and Subsidiaries; Restrictions on Subsidiaries. | 88 |
| 6.16 | Hedge Agreements | 89 |
| 6.17 | Right of Subrogation among Credit Parties | 89 |

**SECTION 7. GUARANTY** ........................................................................89

| | | |
|---|---|---|
| 7.1 | Guaranty of the Obligations | 89 |
| 7.2 | Payment by Guarantors | 89 |
| 7.3 | Liability of Guarantors Absolute | 90 |
| 7.4 | Waivers by Guarantors | 91 |
| 7.5 | Guarantors' Rights of Subrogation, Contribution, Etc. | 92 |
| 7.6 | Subordination of Other Obligations | 93 |
| 7.7 | Continuing Guaranty | 93 |
| 7.8 | Authority of Guarantors or Company | 93 |
| 7.9 | Financial Condition of Company and Guarantors | 93 |
| 7.10 | Discharge of Guaranty Upon Sale of Guarantor | 93 |
| 7.11 | Reinstatement | 94 |

**SECTION 8. EVENTS OF DEFAULT** ......................................................94

| | | |
|---|---|---|
| 8.1 | Events of Default | 94 |
| 8.2 | Certain Option of Lenders | 98 |

**SECTION 9. AGENTS** ..............................................................................99

| | | |
|---|---|---|
| 9.1 | Appointment of Agents | 99 |
| 9.2 | Powers and Duties | 99 |
| 9.3 | General Immunity | 99 |
| 9.4 | Agent Entitled to Act as Lender | 100 |
| 9.5 | Lenders' Representations and Warranties. | 100 |
| 9.6 | Right to Indemnity | 101 |
| 9.7 | Successor Administrative Agent and Swing Line Lender | 101 |
| 9.8 | Collateral Documents and Guaranties | 102 |

**SECTION 10. MISCELLANEOUS** ...........................................................104

| | | |
|---|---|---|
| 10.1 | Notices | 104 |
| 10.2 | Expenses | 104 |
| 10.3 | Indemnity | 105 |
| 10.4 | Set-Off | 106 |
| 10.5 | Amendments and Waivers | 106 |
| 10.6 | Successors and Assigns; Participations | 107 |
| 10.7 | Independence of Covenants | 110 |
| 10.8 | Survival of Representations, Warranties and Agreements | 110 |

022537-0167-11432-Active.11706310.13

10.9     No Waiver; Remedies Cumulative ..................................................110
10.10   Marshalling; Payments Set Aside ..................................................111
10.11   Severability ...................................................................................111
10.12   Obligations Several; Independent Nature of Lenders' Rights ...........111
10.13   Headings ......................................................................................111
10.14   APPLICABLE LAW ....................................................................111
10.15   CONSENT TO JURISDICTION AND SERVICE OF PROCESS...........112
10.16   WAIVER OF JURY TRIAL...........................................................112
10.17   [Reserved] ....................................................................................113
10.18   Confidentiality ............................................................................113
10.19   Counterparts; Effectiveness ........................................................113
10.20   Maximum Amount........................................................................114
10.21   Patriot Act ...................................................................................114

022537-0167-11432-Active.11706310.13

**SCHEDULES:**

| | |
|---|---|
| 1.1(b) | Revolving Loan Commitments and Pro Rata Shares |
| 3.1(j) | Filing Jurisdictions |
| 4.1 | Subsidiaries of Holdings |
| 4.10 | Adverse Proceedings |
| 4.12 | Real Property Assets |
| 4.19 | ERISA Events |
| 6.1 | Certain Existing Indebtedness |
| 6.2 | Certain Existing Liens |
| 6.3 | Certain Existing Investments |
| 6.10 | Transactions with Affiliates |

**EXHIBITS:**

| | |
|---|---|
| A-1 | Funding Notice |
| A-2 | Conversion/Continuation Notice |
| A-3 | Request for Issuance |
| B-1 | Revolving Note |
| B-2 | Swing Line Note |
| C | Compliance Certificate |
| D-1 | Opinion of Weil, Gotshal & Manges LLP |
| D-2 | Opinion of Kolesar & Leatham, Chtd. |
| E | Assignment Agreement |
| F | Certificate Re Non-Bank Status |
| G | Solvency Certificate |
| H | Closing Date Certificate |
| I | Counterpart Agreement |
| J | Pledge and Security Agreement |
| K | Budget |
| L | Certain Adjustments to EBITDA |
| M | Form of 13-week Projection |
| N | Form of Interim Order |

022537-0167-11432-Active.11706310.13

# CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT** dated as of November [__], 2009, is entered into by and among **SIMMONS BEDDING COMPANY**, a Delaware corporation (**"*Company*"**), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, **BEDDING HOLDCO INCORPORATED**, a Delaware corporation (**"*Holdings*"**), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, **CERTAIN SUBSIDIARIES OF COMPANY PARTY HERETO**, as Guarantors (such subsidiaries, collectively with Holdings and Company, the "***Debtors***"; each of Holdings, Company and each such subsidiary, a "***Debtor***"), each of which is a debtor and a debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "***Case***" and, collectively, the "***Cases***"), **DEUTSCHE BANK SECURITIES INC. ("DBSI")**, as sole bookrunner and lead arranger, **THE FINANCIAL INSTITUTIONS LISTED ON THE SIGNATURE PAGES HERETO** (together with each such institution's successors and permitted assigns from time to time to time parties hereto, collectively, the "***Lenders***" and, each, *a* "***Lender***") and **DEUTSCHE BANK TRUST COMPANY AMERICAS** (**"DBTCA"**), as administrative agent for the Lenders (together with its permitted successors in such capacity, "***Administrative Agent***") and as collateral agent for the Lenders (together with its permitted successors in such capacity, "***Collateral Agent***").

## INTRODUCTORY STATEMENTS

**WHEREAS**, capitalized terms used herein having the meanings assigned to those terms in Section 1.1;

On [__], 2009 (the "***Petition Date***"), the Debtors filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to the Bankruptcy Code Sections 1107 and 1108;

Pursuant to this Agreement and the Orders, the Lenders are making available to Company a $35,000,000 debtor-in-possession revolving credit facility, including (i) a letter of credit sub-facility in an aggregate face amount of $15,000,000 and (ii) a swing line sub-facility in an aggregate principal amount of $5,000,000, all of Company's obligations with respect to which are guaranteed by the Guarantors;

The proceeds of the Loans and the Letters of Credit will be used for working capital and other general corporate purposes of Company, the other Credit Parties and their respective Subsidiaries (including without limitation, for the payment of fees and expenses incurred in connection with entering into this Agreement, the Cases and the transactions contemplated hereby), in all cases subject to the terms of this Agreement and the Orders;

To provide guarantees for the repayment of the Loans, the reimbursement of any draft drawn under the Letters of Credit and the payment of the other respective Obligations of the Credit Parties hereunder and under the other Credit Documents, the Credit Parties are providing to Administrative Agent and the Lenders, pursuant to this Agreement, the other Credit Documents and the Orders, the following (each as more fully described herein):

(a)     a guarantee from each of the Guarantors of the due and punctual payment and performance of the Obligations of Company hereunder;

(b)     an allowed administrative expense claim entitled to the benefits of Bankruptcy Code Section 364(c)(1) in each of the Cases, having superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b);

(c)     pursuant to Bankruptcy Code Section 364(c)(2) a perfected First Priority Lien on all present and after-acquired property of the Debtors not subject to a valid and perfected Lien on the Petition Date or valid Liens perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code;

(d)     pursuant to Bankruptcy Code Section 364(c)(3) a perfected junior Lien on all present and after-acquired property of the Debtors that is otherwise subject to a valid and perfected Lien on the Petition Date (other than Liens securing the Debtors' Prepetition Obligations and Liens that are junior to the Liens securing the Debtors' Prepetition Obligations) or a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code; and

(e)     pursuant to Bankruptcy Code Section 364(d)(1) a perfected First Priority, senior priming Lien on (x) all present and after-acquired property of the Debtors that is subject to a Lien on or after the Petition Date to secure the Debtors' Prepetition Obligations and (y) all present and after-acquired assets that are presently subject to Liens that are junior to the Liens that secure the Debtors' Prepetition Obligations.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1.  DEFINITIONS; INTERPRETATION

**1.1     Defined Terms.** The following terms used herein, including (except to the extent specifically stated otherwise) the preamble, introductory statements, exhibits and schedules hereto, shall have the following meanings:

"*Adjusted Eurodollar Rate*" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate per annum obtained by dividing (i) the offered rate (rounded upward to the nearest 1/16 of one percent) appearing on the Reuters Screen LIBOR01 Page (or if such page or service is not available, any page reasonably determined by Administrative Agent to be the successor thereto) at or about 10:00 a.m. (New York time) on such Interest Rate Determination Date for U.S. dollar deposits of amounts in same day funds comparable to the principal amount of the Eurodollar Rate Loan for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such Interest Period, by (ii) the difference of (1) a percentage equal to 100%, minus (2) the stated maximum rate of all reserve requirements (including any marginal, emergency, supplemental, special or other reserves) applicable on such Interest Rate Determination Date to any member bank of the Federal Reserve System in respect of "Eurocurrency liabilities" as defined in Regulation D (or any successor category of liabilities under Regulation D). If for any reason the portion of the

2

Adjusted Eurodollar Rate determined by reference to the mechanics of clause (i) of this definition is unavailable, as determined by Administrative Agent, such portion of Adjusted Eurodollar Rate for the applicable Interest Period shall mean the offered quotation (rounded upward to the nearest 1/16 of one percent) to first class banks in the London interbank market by DBTCA for U.S. dollar deposits of amounts in same day funds comparable to the principal amount of the Eurodollar Rate Loan of DBTCA for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such Interest Period as of approximately 10:00 a.m. (New York time) on such Interest Rate Determination Date. Notwithstanding any of the foregoing, the Adjusted Eurodollar Rate shall not at any time be less than 3.00% per annum.

"***Administrative Agent***" has the meaning assigned to that term in the preamble hereto.

"***Adverse Proceeding***" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Company or any of its Subsidiaries) at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Company or its Material Subsidiaries, threatened in writing against or affecting Company or any of its Subsidiaries or any property of Company or any of its Subsidiaries.

"***Affected Lender***" has the meaning assigned to that term in Section 2.16(b).

"***Affected Loans***" has the meaning assigned to that term in Section 2.16(b).

"***Affiliate***" as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "***control***" (including, with correlative meanings, the terms "***controlling***," "***controlled by***" and "***under common control with***"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise. Notwithstanding the foregoing, neither any Agent nor any Lender shall be deemed to be an Affiliate of any Credit Parties or any Affiliate thereof.

"***Agent***" means each of Lead Arranger, Administrative Agent and Collateral Agent.

"***Aggregate Amounts Due***" has the meaning assigned to that term in Section 2.15.

"***Agreement***" means this Credit and Guaranty Agreement, as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"***Applicable Commitment Fee Percentage***" means 1.00% per annum.

"***Applicable Margin***" means (i) for all Loans which are Base Rate Loans, 3.50% per annum and (ii) for all Loans which are Eurodollar Rate Loans, 4.50% per annum.

"***Applied Amount***" has the meaning assigned to that term in Section 2.12(b).

"***Asset Sale***" means a sale, lease or sub-lease (as lessor or sublessor), transfer, conveyance or disposition to any Person of all or any part of Company's or any of its Subsidiaries' businesses, properties or assets, including, without limitation, a sale, transfer or other disposition of any Security of Company or any of its Subsidiaries.

"***Assignment Agreement***" means an Assignment and Assumption Agreement in the form of Exhibit E.

"***Authorized Officers***" means, as applied to any Person, (i) its chairman of the board (if an officer) or president or any vice president, and (ii) its chief financial officer, treasurer or any assistant treasurer.

"***Bankruptcy Code***" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Cases from time to time.

"***Base Rate***" means, at any time, the greatest of (a) the Prime Rate, (b) the rate equal to the sum of (i) 0.50% plus (ii) the Federal Funds Effective Rate, and (c) the Adjusted Eurodollar Rate for a Eurodollar Rate Loan with a one month interest period plus 1.00%. Notwithstanding any of the foregoing, the Base Rate shall not at any time be less than 4.00% per annum.

"***Base Rate Loan***" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"***Bedding Superholdco***" means Bedding Superholdco Incorporated (formerly known as Simmons Holdco, Inc.), a Delaware corporation.

"***Bedding Superholdco Credit Agreement***" means that certain Credit Agreement, dated as of February 9, 2007, by and among Bedding Superholdco, as borrower, and DBTCA, as administrative agent.

"***Beneficiary***" means Administrative Agent, each of the other Agents, each of the Lenders, and each Lender Counterparty.

"***Business Day***" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, and with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, that is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"***Capital Lease***" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of that Person; provided that in no event will a Capital Lease be deemed to include an operating lease as determined in accordance with GAAP as of December 31, 2008.

4

"*Carve Out*" has the meaning assigned to that term in the Interim Order or the Final Order, as applicable.

"*Case*" has the meaning assigned to that term in the preamble hereto.

"*Cash*" means money, currency or a credit balance in any demand or deposit account.

"*Cash Collateral*" has the meaning assigned to that term in Section 363(a) of the Bankruptcy Code.

"*Cash Equivalents*" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (b) issued by any agency or instrumentality of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable general obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of "A" or better from either Standard & Poor's Ratings Group ("*S&P*") or Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit, time deposits, eurodollar time deposits or bankers' acceptances maturing within one year after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that has capital and surplus in excess of $500,000,000; (v) repurchase obligations for underlying securities of the types described in clauses (i), (ii) and (iv) above entered into with any financial institution meeting the qualifications specified in clause (iv) above; and (vi) shares of any money market mutual fund that invests substantially all of its assets in the types of investments referred to in clauses (i) through (iv) above or in Dollars.

"*Cash Flow Forecast*" means, with respect to any calendar week during which the requirements of Section 3.1(i) or Section 5.1(n) are applicable, a projected statement of sources and uses of cash for Company and its Subsidiaries on a weekly basis for the following 13 calendar weeks, including the anticipated uses of the Revolving Loan Commitments for each week during such period, in substantially the form of Exhibit M hereto.

"*Certificate re Non Bank Status*" means a certificate in the form of Exhibit F.

"*CFO Certification*" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of Company that such financial statements fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to (in the case of unaudited financial statements) changes resulting from audit and normal year-end adjustments and, in the case of monthly financial statements and the absence of footnotes.

022537-0167-11432-Active.11706310.13

"**Change of Control**" means the occurrence of any of the following: (a) the Equity Investors shall cease to have the power, directly or indirectly, to vote or direct the voting of equity Securities having a majority of the ordinary voting power for the election of directors of Holdings; or (b) the Equity Investors shall cease to own of record and beneficially, directly or indirectly, an amount of common stock of Holdings that exceeds fifty percent (50%) of the amount of common stock of Holdings owned, directly or indirectly, by the Equity Investors of record and beneficially as of the Closing Date; or (c) any "Change of Control" (or any comparable term) in the Prepetition Credit Documents, the Senior Subordinated Note Documents or any document pertaining to other Material Indebtedness; or (d) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interests in of the equity Securities of Company; provided, in any case, that the existence of the Plan Sponsor Agreement shall not be deemed to constitute a Change of Control for any purpose under this Agreement.

"**Closing Date**" means the date on which the conditions precedent set forth in Section 3.1 shall have been satisfied or waived, which date is [ ], 2009.

"**Closing Date Certificate**" means a certificate in the form of Exhibit H.

"**Collateral**" means all of the properties (including real property and leasehold interests) and assets (including all cash, Cash Equivalents and capital stock) in which Liens are purported to be granted by this Agreement, the Collateral Documents or the Orders, as more particularly described and referred to as "DIP Collateral" in the Orders.

"**Collateral Agent**" has the meaning assigned to that term in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, any Control Agreement and any other documents, instruments or agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant or perfect Liens on any assets of such Credit Party as security for the Obligations.

"**Commercial Letter of Credit**" means any letter of credit or similar instrument issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by Company or any of its Subsidiaries in the ordinary course of business of Company or such Subsidiary.

"**Commitment Letter**" means that certain Commitment Letter, dated as of August 20, 2009, as amended on October 30, 2009, by and among Company, DBTCA and DBSI.

"**Commitments**" means, collectively, the Swing Line Loan Commitments and the Revolving Loan Commitments.

"**Committee**" means any statutory committee appointed in the Cases and allowed by the Bankruptcy Court.

"**Commodity Agreement**" means each agreement entered into by Company or any of its Subsidiaries to hedge, on a physical or financial basis, the price of diesel fuel purchases or purchases or sales of other commodities, in each case, on a non-speculative basis.

"*Company*" has the meaning assigned to that term in the preamble hereto.

"*Compliance Certificate*" means a certificate executed by an Authorized Officer in the form of Exhibit C.

"*Concentration Account*" means the concentration account established and maintained by Company with Wachovia Bank, National Association and designated as the "Simmons Concentration Account".

"*Confirmation Order*" means an order of the Bankruptcy Court confirming Reorganization Plan.

"*Consolidated Adjusted EBITDA*" means, for any period, without duplication, the sum of the amounts for such period of (i) Consolidated Net Income, plus (in each case to the extent the following amounts were deducted in calculating Consolidated Net Income) (ii) Consolidated Interest Expense, plus (iii) provisions for taxes based on income, including but not limited to (without duplication) taxes imposed in lieu of income-based taxes, such as those taxes based upon gross receipts, net worth, equity, capital or property values (except normal real and personal property taxes) and the like, to the extent that such alternative tax provisions do not exceed $2,000,000 in the aggregate for any Fiscal Year, plus (iv) total depreciation expense, plus, (v) total amortization expense, plus (vi) impairment charges relating to intangible assets, plus (vii) other non-cash items reducing Consolidated Net Income (including, without limitation, non-cash purchase accounting adjustments and debt extinguishment costs but excluding accruals of expenses and the establishment of reserves in the ordinary course of business), plus (viii) any extraordinary, unusual or non-recurring cash losses or charges, including, without limitation, losses or charges relating to the Cases and the events and circumstances giving rise thereto; provided, that the amounts added back pursuant to this clause (viii) shall not, in the aggregate, exceed $5,000,000 for any Fiscal Year, plus (ix) acquisition related integration costs and expenses and restructuring expenses incurred in connection with the transactions contemplated by the Plan Sponsor Agreement, plus (x) any reasonable expenses or charges related to any issuance of Securities, Investments permitted under Section 6.3, recapitalizations, Asset Sales permitted by Section 6.7 or Indebtedness permitted to be incurred under Section 6.1; provided, that the amounts added back pursuant to this clause (x) shall not, in the aggregate exceed $2,000,000 for any Fiscal Year, plus (xi) any costs or expense deducted (and not added back) in computing Consolidated Net Income relating to the litigation proceedings with Tempur-Pedic; provided, that the amounts added back pursuant to this clause (xi) shall not, in the aggregate, exceed $1,000,000, plus (xii) any foreign currency losses, minus (in each case to the extent the following amounts were added in calculating Consolidated Net Income), (xiii) non-cash items increasing Consolidated Net Income (other than accruals of revenue or reversals of reserves in the ordinary course of business), minus, (xiv) interest income, minus (xv) any extraordinary, unusual or non-recurring income or gains, minus (xvi) income tax credits (to the extent not netted from income tax expense), minus (xvii) foreign currency gains, minus (xviii) any other non-cash income, all of the foregoing as determined on a consolidated basis for Company and its Subsidiaries in conformity with GAAP; provided, that for the periods set forth on Exhibit L, Consolidated Adjusted EBITDA shall be the amount set forth opposite such period on Exhibit L.

7

"**_Consolidated Capital Expenditures_**" means, for any period, the sum of all expenditures (whether paid in cash or other consideration or accrued as a liability and including that portion of Capital Leases which is capitalized on the consolidated balance sheet of Company and its Subsidiaries) by Company and its Subsidiaries during that period that, in conformity with GAAP, are included in "additions to property, plant or equipment" or comparable items reflected in the consolidated statement of cash flows of Company and its Subsidiaries; provided, that Consolidated Capital Expenditures shall not include capital expenditures arising from deployment of any Proposed Reinvestment Proceeds or the net cash proceeds of any issuance of Securities not otherwise required to repay the Loans pursuant to Section 2.11(b).

"**_Consolidated Cash Interest Expense_**" means, for any period, Consolidated Interest Expense for such period; provided, however, any (i) interest expense not payable in Cash (including amortization of discount and amortization of debt issuance costs), (ii) any amounts referred to in Section 2.9 payable on or before the Closing Date and (iii) any costs associated with mark-to-market changes in Interest Rate Agreements and any other charges or payments related to any Interest Rate Agreements, in each case, shall be excluded from the calculation of Consolidated Cash Interest Expense.

"**_Consolidated Interest Expense_**" means, for any period, total interest expense (including that portion attributable to Capital Leases in accordance with GAAP and capitalized interest) of Company and its Subsidiaries on a consolidated basis with respect to all outstanding Indebtedness of Company and its Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, but excluding net costs under Interest Rate Agreements.

"**_Consolidated Net Income_**" means, for any period, the net income (or loss) of Company and its Subsidiaries on a consolidated basis for such period determined in conformity with GAAP; provided, there shall be excluded the sum of (i) the income (or loss) of any Person (other than a Subsidiary of Company) in which any other Person (other than Company or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Company or any of its Subsidiaries by such Person during such period; plus (ii) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Company or is merged into or consolidated with Company or any of its Subsidiaries or that Person's assets are acquired by Company or any of its Subsidiaries; plus (iii) the income of any Subsidiary of Company to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary; plus (iv) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any Pension Plan; plus (v) (to the extent not included in clauses (i) through (iv) above) any net non-cash extraordinary gains or net non-cash extraordinary losses; plus (vi) any gains, losses or charges associated with Interest Rate Agreements.

"**_Consolidated Total Debt_**" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of the type specified in clauses (a) or (b) of the definition thereof of Holdings, Company and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

8

"***Contingent Obligation***" means, as to any Person, without duplication, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part). The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"***Contractual Obligation***" means, as applied to any Person, any provision of any equity Security issued by that Person or of any material indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"***Control Agreements***" means a tri-party deposit account control agreement by and among the applicable Credit Party, Collateral Agent and the respective depository institution, each in form and substance reasonably satisfactory to Collateral Agent and in any event providing Collateral Agent "control" of such deposit account within the meaning of Article 9 of the UCC.

"***Conversion/Continuation Notice***" means a notice in the form of <u>Exhibit A-2</u>.

"***Co-Op Subsidiary***" means a Subsidiary formed by The Simmons Manufacturing Co., LLC, Simmons Caribbean Bedding, Inc. (or another Subsidiary of Company) and a third Person, to which part I, subchapter T, chapter 1 of under the Internal Revenue Code applies.

"***Counterpart Agreement***" means a counterpart agreement in the form of <u>Exhibit I</u>.

"***Credit Document***" means any of this Agreement, the Orders, the Notes, any documents or certificates executed by Company in favor of Issuing Bank relating to the Letters of Credit, the Collateral Documents and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of Agents, Issuing Bank or any Lender in connection herewith (in each case, as such other documents, instruments or agreements may be amended, restated, supplemented or otherwise modified from time to time).

"***Credit Extension***" means the making of a Loan or the issuing of a Letter of Credit.

"***Credit Extension Date***" means the date of a Credit Extension.

9

"**Credit Party**" means any of Holdings, Company and any of the Subsidiary Guarantors.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement to which Company or any of its Subsidiaries is a party and which is designed to hedge against fluctuations in currency values and not for speculative purposes.

"**DBSI**" has the meaning assigned to that term in the preamble hereto.

"**DBTCA**" has the meaning assigned to that term in the preamble hereto.

"**Debtor**" has the meaning assigned to that term in the preamble hereto.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Excess**" means, with respect to any Defaulting Lender, the excess, if any, of such Defaulting Lender's Pro Rata Share of the aggregate outstanding principal amount of Revolving Loans of all Lenders (calculated as if all Defaulting Lenders (other than such Defaulting Lender) had funded all of their respective Defaulted Revolving Loans) over the aggregate outstanding principal amount of all Revolving Loans of such Defaulting Lender.

"**Defaulting Lender**" has the meaning assigned to that term in <u>Section 2.21</u>.

"**Default Period**" means, with respect to any Defaulting Lender, the period commencing on the date of the applicable Funding Default and ending on the earliest of the following dates: (i) the date on which all Commitments are cancelled or terminated and/or the Obligations are declared or become immediately due and payable, (ii) the date on which (a) the Default Excess with respect to such Defaulting Lender shall have been reduced to zero (whether by the funding by such Defaulting Lender of any Defaulted Revolving Loans of such Defaulting Lender or by the non-pro rata application of any voluntary or mandatory prepayments of the Revolving Loans in accordance with the terms of <u>Section 2.10</u> or <u>Section 2.11</u> or by a combination thereof) and (b) such Defaulting Lender shall have delivered to Company and Administrative Agent a written reaffirmation of its intention to honor its obligations hereunder with respect to its Commitment, and (iii) the date on which Company, Administrative Agent and Requisite Lenders waive all Funding Defaults of such Defaulting Lender in writing.

"**Defaulted Revolving Loan**" has the meaning assigned to that term in <u>Section 2.21</u>.

"**Disqualified Institution**" means, collectively, (i) those financial institutions or other institutional lenders reasonably acceptable to DBSI and identified to it in writing by Company prior to the date hereof and (ii) those persons (or affiliates of such persons) that are competitors of Company and its Subsidiaries and identified by Company, in writing, prior to the date of the Commitment Letter.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

022537-0167-11432-Active.11706310.13

"***Domestic Subsidiary***" means any Subsidiary of Company organized under the laws of any jurisdiction within the United States of America (but excluding any Foreign Subsidiary).

"***Effective Date***" means the effective date of the Reorganization Plan.

"***Eligible Assets***" has the meaning assigned to that term in Section 2.11(a).

"***Eligible Assignee***" means (i) a commercial bank, savings and loan association or savings bank or any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act) which extends credit or buys loans as one of its businesses including insurance companies, mutual funds and lease financing companies and any investment fund that invests in commercial loans or (ii) any Lender, any Affiliate of any Lender and, with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor; provided, Eligible Assignee shall not include (a) any Affiliate of Company or Holdings or (b) any Disqualified Institution or any of its Affiliates or Subsidiaries.

"***Employee Benefit Plan***" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is (currently or hereafter) or within the prior 6 years was maintained or contributed to by Company or any of its Subsidiaries or any of their respective ERISA Affiliates.

"***Environmental Claim***" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"***Environmental Laws***" means any and all federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) insofar as any of the following relates to protection of the environment or exposure to Hazardous Materials, occupational safety and health, industrial hygiene, or the protection of human, plant or animal health and safety, in any manner applicable to Company or any of its Subsidiaries or any Facility; provided for the sake of clarity health and safety does not encompass laws enacted by the Consumer Product Safety Commission or analogous state or local Governmental Authority.

"***Equity Investors***" means Sponsor and the Management Investors.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"***ERISA Affiliate***" means, as applied to any Person, (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the

11

Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.

"**_ERISA Event_**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure by any Pension Plan to satisfy the minimum funding standards of Section 412 or 430 of the Internal Revenue Code or Section 302 of ERISA applicable with respect to such Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code), (iii) the filing pursuant to Section 412 of the Internal Revenue Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan, or the failure to make any required contribution or payment under Sections 431 or 432 of the Internal Revenue Code to a Multiemployer Plan; (iv) the determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Internal Revenue Code or Title IV of ERISA; (v) the filing by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (vi) the withdrawal by Company or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA; (vii) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (viii) the imposition of liability on Company or any of its ERISA Affiliates pursuant to Section 4062 or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (ix) the withdrawal of Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan that could reasonably be expected to result in material liability therefor; (x) the receipt by Company or any ERISA Affiliate of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, that it is in "endangered" or "critical" status within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (xi) the occurrence of an act or omission which could give rise to the imposition on Company or any of its ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Sections 406, 409, 502(c), (i) or (l), or 4071 of ERISA in respect of any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Company, any of its Subsidiaries or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, (xii) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code to qualify for exemption from taxation under Section 501(a) of the

12

Internal Revenue Code; or (xiii) the imposition of a Lien pursuant to Section 401(a)(29) or 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"***Eurodollar Rate Loan***" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"***Event of Default***" means each of the events set forth in <u>Section 8.1</u>.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"***Excess Availability***" means, on any date of determination, the excess (if any) of (a) the aggregate amount of Revolving Loan Commitments of all Lenders over (b) the Total Utilization of Revolving Loan Commitments.

"***Facilities***" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or (except with respect to <u>Section 5</u> and <u>Section 6</u>) heretofore owned, leased, operated or used by Company or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"***Federal Funds Effective Rate***" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by Administrative Agent.

"***Final Order***" means an order of the Bankruptcy Court entered in the Cases, in substantially the form of the Interim Order, and, solely to the extent of any changes to the Interim Order that are materially adverse to the interests of the Lenders and Agents, reasonably satisfactory to Administrative Agent.

"***Final Order Entry Date***" means the date the Final Order is entered in the Cases.

"***Financial Performance Covenant***" means the covenant of Company set forth in <u>Section 6.6</u>.

"***Financial Plan***" has the meaning assigned to that term in <u>Section 5.1(k)</u>.

"***First Day Orders***" means the orders entered by the Bankruptcy Court in the Cases pursuant to motions and applications filed within ten (10) days after the Petition Date, in each case, in form and substance reasonably satisfactory to Administrative Agent, it being understood and agreed that the First Day Orders delivered to Administrative Agent prior to the Petition Date are satisfactory.

022537-0167-11432-Active.11706310.13

"***First Priority***" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document or the Orders, that (i) such Lien has first priority over any other Lien on such Collateral (other than Permitted Encumbrances and Liens permitted pursuant to Section 6.2) and (ii) such Lien is the only Lien (other than Permitted Encumbrances and Liens permitted pursuant to Section 6.2) to which such Collateral is subject.

"***Fiscal Quarter***" means a fiscal quarter of any Fiscal Year.

"***Fiscal Year***" means the fiscal year of Company and its Subsidiaries ending on the last Saturday of each calendar year or, at the option of Company, December 31 of each calendar year.

"***Flood Hazard Property***" means any Real Estate Asset subject to a Mortgage in favor of Collateral Agent, for the benefit of the Lenders, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"***Foreign Subsidiary***" means any Subsidiary of Company organized under the laws of any jurisdiction outside the United States of America (and including any Subsidiary of a Foreign Subsidiary that is organized under the laws of any jurisdiction within the United States of America).

"***Funding and Payment Office***" means (i) the office of Administrative Agent located at the address set forth on Administrative Agent's signature page hereto, or (ii) such other office of Administrative Agent as may from time to time hereafter be designated as such in a written notice delivered by Administrative Agent to Company and each Lender.

"***Funding Default***" has the meaning assigned to that term in Section 2.21.

"***Funding Notice***" means a notice substantially in the form of Exhibit A-1.

"***GAAP***" means United States of America generally accepted accounting principles in effect as of the date of determination thereof.

"***Governmental Act***" means any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or Governmental Authority.

"***Governmental Authority***" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"***Governmental Authorization***" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any federal, state or local Governmental Authority, agency or court.

"***Guaranteed Obligations***" has the meaning assigned to that term in Section 7.1.

022537-0167-11432-Active.11706310.13

"**Guarantor**" means Holdings and each Subsidiary Guarantor.

"**Guaranty**" means the Guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos or asbestos-containing materials, molds, pollutants, contaminants, radioactive materials, and any other substance that is regulated pursuant to or could give rise to liability under any Environmental Law.

"**Hazardous Materials Activity**" means any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Hedge Agreement**" means an Interest Rate Agreement, Commodity Agreement or a Currency Agreement designed to hedge against fluctuations in interest rates, commodity values or currency values, respectively, and not for speculative purposes.

"**Historical Financial Statements**" means (1) the audited financial statements of Company and its Subsidiaries for the Fiscal Year ended December 27, 2008, consisting of a consolidated balance sheet and the related consolidated statements of operations, changes in stockholders' deficit and cash flows for such Fiscal Year; and (ii) unaudited financial statements of Company and its Subsidiaries for the first and second Fiscal Quarters of 2009, consisting of a consolidated balance sheet and the related consolidated statements of operations, changes in stockholders' deficit and cash flows for the period ending on the last day of such Fiscal Quarters, all in reasonable detail and certified by the chief financial officer of Company that they fairly present, in all material respects, the financial condition of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments and the absence of footnotes, in the case of such unaudited financial statements.

"**Holdings**" has the meaning assigned to that term in the preamble hereto.

"**Increased Cost Lender**" has the meaning assigned to that term in Section 2.22.

"**Indebtedness**", as applied to any Person, means, without duplication (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA or any deferred compensation plan), which purchase price is (i) due more than six months from the date of incurrence of the obligation in respect thereof (other than trade payables which are due more than six months from the date of incurrence in the ordinary course of business) or (ii) evidenced by a note or similar written debt instrument, (e) the face amount of any letter of credit issued for

the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, (f) all obligations of such Person in respect of any exchange traded or over-the-counter derivative transaction, including, without limitation, any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes, (g) Contingent Obligations of such Person in respect of any of the foregoing and (h) all indebtedness of the type specified in clauses (a) through (g) secured by any Lien on any property or asset owned by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided, in no event shall obligations under any Interest Rate Agreement and any Currency Agreement be deemed "Indebtedness" for any purpose under Section 6.6. The amount of Indebtedness of any Person for purposes of clause (h) shall be deemed to be the lesser of (X) the aggregate unpaid principal amount of such Indebtedness and (Y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"*Indemnified Liabilities*" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, actions, judgments, suits, claims (including Environmental Claims), costs (including the reasonable out-of-pocket costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), reasonable expenses and disbursements (including the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct or indirect and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof or the use or intended use of any thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); (ii) the statements contained in the commitment letter delivered by any Lender to Company with respect thereto; or (iii) any Environmental Claim or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Company or any of its Subsidiaries.

"*Indemnitee*" has the meaning assigned to that term in Section 10.3.

"*Intellectual Property*" means all patents, trademarks, servicemarks, tradenames, copyrights, mask works, trade secrets, technology, know-how and processes and rights of publicity used in or necessary for the conduct of the business of Company and its Subsidiaries as currently conducted that are material to the condition (financial or otherwise), business or operations of Company and its Subsidiaries, individually or in the aggregate.

"*Interest Payment Date*" means with respect to (i) any Base Rate Loan, the last Business Day of each calendar month and the Termination Date, commencing on the first such date to

occur after the Closing Date; and (ii) any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; *provided*, in the case of each Interest Period of longer than one month "***Interest Payment Date***" shall also include each date that is one month, or an integral multiple thereof, after the commencement of such Interest Period.

"***Interest Period***" means, in connection with a Eurodollar Rate Loan, an interest period of one, two, three or six months, as selected by Company in the applicable Notice, (i) initially, commencing on the Credit Extension Date or the date of any conversion of any Base Rate Loan into such Eurodollar Rate Loan, as the case may be (permitted pursuant to <u>Section 2.7</u>); and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided, (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and (c) no Interest Period with respect to any portion of the Revolving Loans shall extend beyond the Revolving Loan Commitment Termination Date.

"***Interest Rate Agreement***" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or other similar agreement or arrangement to which Company or any of its Subsidiaries is a party and which is designed to hedge against fluctuations in interest rates and not for speculative purposes.

"***Interest Rate Determination Date***" means, with respect to any Interest Period, the second Business Day prior to the first day of such Interest Period.

"***Interim Order***" means an order of the Bankruptcy Court entered in the Cases granting interim approval of the transactions involving the Debtors contemplated by this Agreement and the other Credit Documents and granting the Liens on the Collateral and the Superpriority Claims described in the Introductory Statements in favor of Administrative Agent and the Lenders, substantially in the form of <u>Exhibit N</u> hereto, and, to the extent any changes from <u>Exhibit N</u> are materially adverse to the interests of the Lenders and Agents in their respective capacities as such, such changes shall be in form and substance reasonably satisfactory to Administrative Agent.

"***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"***Investment***" means (a) any direct or indirect purchase or other acquisition by Holdings, Company or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (including any Subsidiary of Company); (b) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by Holdings, Company or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business; (c) Interest Rate Agreements or Currency

17

Agreements not constituting Hedge Agreements; or (d) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of any other Person. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"*Issuing Bank*" means, with respect to any Letter of Credit, the Lender or any of its Subsidiaries or Affiliates, which issues such Letter of Credit.

"*Joinder Agreement*" means a Joinder Agreement substantially in the form of <u>Exhibit M</u>.

"*Joint Venture*" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; <u>provided</u>, in no event shall any Subsidiary of any Person be considered to be a Joint Venture.

"*Lead Arranger*" means DBSI, in its capacity as lead arranger.

"*Lender*" has the meaning assigned to that term in the preamble hereto; <u>provided</u>, the term "Lenders" shall include Swing Line Lender unless the context otherwise requires.

"*Lender Counterparty*" means each Lender, Lead Arranger or any of their respective Affiliates counterparty to a Hedge Agreement.

"*Letter of Credit*" or "*Letters of Credit*" means Commercial Letters of Credit and Standby Letters of Credit issued or to be issued by Issuing Bank for the account of Company pursuant to <u>Section 2.2</u>.

"*Letter of Credit Sublimit*" means the lesser of (i) $15,000,000 and (ii) the aggregate amount of the Revolving Loan Commitments then in effect.

"*Letter of Credit Usage*" means, as at any date of determination, the sum of (i) the maximum aggregate amount which is, or at any time thereafter may become, available for drawing under all Letters of Credit then outstanding, <u>plus</u> (ii) the aggregate amount of all drawings under Letters of Credit honored by Issuing Bank and not theretofore reimbursed by or on behalf of Company.

"*Lien*" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"*Loan*" means a Revolving Loan or a Swing Line Loan.

"*Management Agreement*" means that certain Management Agreement dated as of December 19, 2003 by and among Company and THL Managers V, LLC, a Delaware limited liability company, as the same may be amended, restated, supplemented or otherwise modified from time to time in a manner not prohibited by this Agreement.

18

"**_Management Investors_**" means the management officers and employees of Parent and its Subsidiaries who are investors in Parent or Holdings on the Closing Date.

"**_Margin Stock_**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**_Material Adverse Effect_**" means (i) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of Company and its Subsidiaries, taken as a whole (other than (a) any events and circumstances leading up to the filing of the Cases disclosed to the Lenders and (b) those events and circumstances which may occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and other events ancillary thereto), or (ii) the impairment (other than as a result of circumstances covered by clause (i) above) of the ability of Company or any of its Subsidiaries to perform, or Administrative Agent or the Lenders to enforce (subject to the Orders), the Obligations in any material respect.

"**_Material Indebtedness_**" means any Indebtedness of any Credit Party with an aggregate principal amount equal to or greater than $10,000,000.

"**_Material Subsidiary_**" means each Subsidiary of Company now existing or hereafter acquired or formed by Company or its Subsidiaries which, on a consolidated basis for such Subsidiary and its Subsidiaries, (i) for the most recent Fiscal Year accounted for more than 5% of the consolidated revenues of Company and its Subsidiaries or (ii) as at the end of such Fiscal Year, was the owner of more than 5% of the consolidated assets of Company and its Subsidiaries.

"**_Maturity Date_**" means the six (6) month anniversary of the Petition Date; <u>provided</u>, that if the Six Month Extension Option shall become effective, the Maturity Date shall thereupon be extended to the twelve (12) month anniversary of the Petition Date.

"**_Maximum Amount_**" has the meaning assigned to that term in <u>Section 10.20</u>.

"**_MD&A_**" means, with respect to financial statements to which it pertains, management's discussion and analysis of Company's and its Subsidiaries' financial performance for the period covered by such financial statements as compared to projected financial performance for such period.

"**_Monthly Reports_**" has the meaning assigned to that term in <u>Section 5.1(a)</u>.

"**_Moody's_**" means Moody's Investors Service, Inc.

"**_Multiemployer Plan_**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**_National Flood Insurance Program_**" means the National Flood Insurance Program under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973.

19

"*Net Asset Sale Proceeds*" means, with respect to any Asset Sale, an amount equal to the difference of (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (a) income taxes reasonably estimated to be actually payable within two (2) years of the date of such Asset Sale as a result of any gain recognized in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is repaid as a result of such Asset Sale, (c) the out-of-pocket expenses incurred by such Person in connection with such Asset Sale and (d) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by such Person after such sale or disposition thereof, including, without limitation, pension and other post employment benefit liabilities, liabilities related to environmental matters and any indemnification obligations associated with such transaction.

"*Net Insurance/Condemnation Proceeds*" means the difference of (i) any Cash payments or proceeds received by Company or any of its Subsidiaries (a) under any business interruption or casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Company or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus, in each case, (ii)(a) any actual and reasonable documented costs incurred by Company or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Company or such Subsidiary in respect thereof, (b) income taxes reasonably estimated to be actually payable within two years of the date of such event giving rise to such Net Insurance/Condemnation Proceeds as a result of any gain recognized in connection with such event, (c) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the assets in question and that is repaid as a result of such casualty or condemnation, (d) the out-of-pocket expenses incurred by such Person in connection with such casualty or condemnation and (e) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by such Person after such sale or other disposition thereof, including, without limitation, liabilities related to environmental matters or against any indemnification obligations associated with such transaction, provided, however, that the receipt by Company and its Subsidiaries from the Closing Date through the date of determination of up to an aggregate of $2,000,000 in Net Insurance/Condemnation Proceeds in respect of business interruption insurance described in clause (a) above shall not be "Net Insurance/Condemnation Proceeds" for purposes of Section 2.11(a).

"*Non-Consenting Lender*" has the meaning assigned to that term in Section 2.22.

"*Non-Guarantor Subsidiary*" means (i) each of the Subsidiaries identified as a Non-Guarantor Subsidiary on Schedule 4.1 annexed hereto and (ii) each Person that becomes a Subsidiary of Company after the date hereof and in accordance with Section 5.9, and is not required to become a Subsidiary Guarantor; provided, however, that any such Domestic Subsidiary shall cease to be a Non-Guarantor Subsidiary if (x) it is or at any time becomes a

Material Subsidiary or (y) it otherwise ceases to be a Non-Guarantor Subsidiary pursuant to Section 5 9. Notwithstanding the foregoing, the Co-Op Subsidiary shall always be a Non-Guarantor Subsidiary.

"***Nonpublic Information***" means information that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act.

"***Non-U.S. Lender***" has the meaning assigned to that term in Section 2.18(e).

"***Note***" means a Revolving Note or a Swing Line Note.

"***Notice***" means a Funding Notice, a Request for Issuance or a Conversion/Continuation Notice.

"***Obligations***" means, with respect to any Credit Party, obligations of such Credit Party, whether now existing or hereafter made, incurred or created, whether absolute or contingent, liquidated or unliquidated, whether due or not due, and however arising under or in connection with this Agreement and any other Credit Documents, including those arising under successive borrowing transactions hereunder which shall either continue the Obligations of such Credit Party from time to time or renew them after they have been satisfied.

"***Obligee Guarantor***" has the meaning assigned to that term in Section 7.6.

"***Orders***" means the Interim Order and the Final Order.

"***Operating Lease***" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time but excluding any such lease under which that Person is the lessor) of any property (whether real, personal or mixed) that is not a Capital Lease.

"***Other Taxes***" means all present or future stamp, court or documentary Taxes and any other excise, property, intangible, recording, filing or similar Taxes which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, or from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document.

"***Parent***" means Simmons Company, a Delaware corporation.

"***Parent Notes***" means those certain 10% Senior Discount Notes due 2014 issued by Parent pursuant to the Parent Notes Indenture.

"***Parent Notes Indenture***" means that certain Indenture dated as of December 15, 2004, by and between Parent and Wilmington Trust Company (as successor to Wells Fargo Bank, National Association), as Trustee, as such notes and Indenture may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"***Patriot Act***" has the meaning assigned to that term in Section 4.24.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Title IV of ERISA or Sections 412 and 430 of the Internal Revenue Code.

"**Permitted Encumbrances**" means the following types of Liens (excluding any such Lien imposed by ERISA):

(a)     Liens for Taxes the payment of which is not at the time required by Section 5.3;

(b)     statutory Liens of landlords, statutory Liens of banks and rights of set-off, statutory Liens of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law, in each case incurred in the ordinary course of business which are not, at the time, required to be paid by Section 5.3;

(c)     Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance, old age pensions and other types of social security, or to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, insurance premiums, deductibles or co-insured amounts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money);

(d)     any attachment or judgment Lien not constituting an Event of Default under Section 8.1(h);

(e)     leases, subleases, licenses or sublicenses granted to third parties and not interfering in any material respect with the ordinary conduct of the business of Company or any of its Subsidiaries;

(f)     easements, rights-of-way, restrictions, encroachments, protrusions, and other minor defects or irregularities in title, in each case which do not and will not interfere in any material respect with the ordinary conduct of the business of Company or any of its Subsidiaries;

(g)     any (i) interest or title of a lessor, sublessor, licensor or sublicensor, (ii) restriction, Lien or encumbrance that the interest or title of such lessor or sublessor, licensor, sublicensor may be subject to, or (iii) subordination of the interest of the lessee, sublessee, licensee or sublicensee under such lease or license to any restriction, Lien or encumbrance referred to in the preceding clause (ii);

(h)     Liens arising from filing UCC financing statements relating to operating leases and in connection with consignment arrangements;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

22

(k)     Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of Company and its Subsidiaries; and

(l)     licenses of patents, trademarks and other intellectual property rights granted by Company or any of its Subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of Company or such Subsidiary.

"***Permitted Liens***" means each of the Liens permitted pursuant to Section 6.2.

"***Person***" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments (whether federal, state or local, domestic or foreign, and including political subdivisions thereof) and agencies or other administrative or regulatory bodies thereof.

"***Petition Date***" has the meaning assigned to that term in the introductory statements hereto.

"***PF Asset Sale***" means any Asset Sale pertaining to (x) an entire line of business of Company or its Subsidiaries or (y) all of the equity Securities or all or substantially all of the assets of any Subsidiary of Company.

"***Plan Sponsor Agreement***" means the Plan Sponsor Agreement, dated as of September 24, 2009, by and among Parent, Holdings, Company, AOT Bedding Super Holdings, LLC, a Delaware limited liability company and AOT Bedding Intermediate Holdings, LLC, as the same has been amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance therewith.

"***Platform***" has the meaning assigned to that term in Section 5.1(p).

"***Pledge and Security Agreement***" means the Pledge and Security Agreement entered into by and among Company, the Guarantors party thereto and Collateral Agent dated as of the Closing Date, substantially in the form of Exhibit J annexed hereto, as such Pledge and Security Agreement may hereafter be amended, restated, supplemented or otherwise modified from time to time.

"***Pledged Collateral***" means the "Pledged Collateral" as defined in the Pledge and Security Agreement.

"***Prepetition Agent***" means Deutsche Bank AG, New York Branch, in its capacity as administrative agent and collateral agent for the Prepetition Lenders.

"***Prepetition Credit Agreement***" means the Second Amended and Restated Credit and Guaranty Agreement, dated as of May 25, 2006, among Company, Holdings (formerly known as THL-SC Bedding Company) and the other guarantors party thereto, the Prepetition Lenders, the

Prepetition Agent and the other agents party thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"*Prepetition Lenders*" means the several banks and other financial institutions and entities from time to time parties to the Prepetition Credit Agreement, solely in their respective capacities as lenders thereunder.

"*Prepetition Credit Documents*" means the Prepetition Credit Agreement, the Collateral Documents (as defined in the Prepetition Credit Agreement), the Notes (as defined in the Prepetition Credit Agreement), any other guarantee delivered to the Prepetition Agent for the purpose of guaranteeing any or all of the Prepetition Obligations and any amendment, waiver, supplement or other modification to any of the foregoing.

"*Prepetition Obligations*" means the "Obligations" under, and as defined in, the Prepetition Credit Agreement.

"*Prepetition Secured Parties*" the Secured Parties under, and as defined in, the Prepetition Credit Agreement.

"*Prime Rate*" means the rate that Administrative Agent announces from time to time as its prime lending rate in effect at its principal office in New York City, as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Administrative Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"*Pro Forma Basis*" shall mean for purposes of this Agreement as to any Person, PF Asset Sale or incurrence or repayment of Indebtedness which occurs subsequent to the commencement of a period for which the financial effect of such events is being calculated (each, a "*Referent Event*"), and giving effect to the Referent Event for which such calculation is being made, such calculation as will give pro forma effect to such events as if same had occurred at the beginning of such period of calculation; and

(a)     for purposes of the foregoing calculation, each Referent Event shall be assumed to have occurred on the first day of the four consecutive Fiscal Quarter period last ended on or before the occurrence of the Referent Event for which such pro forma effect is being determined (the "*Reference Period*"); and

(b)  (x) all Indebtedness (including Indebtedness incurred or assumed in connection with the Referent Event, whether incurred under this Agreement or otherwise, but including, with respect to revolving Indebtedness the average amount of such Indebtedness outstanding during the Reference Period) incurred or permanently repaid in connection with the Referent Event shall be deemed to have been incurred or repaid at the beginning of such Reference Period and (y) interest expense of such Person attributable to interest on any Indebtedness, for which pro forma effect is being given as provided in preceding clause (x), bearing floating interest rates shall be computed on a pro forma basis as if the rates which would have been in effect during the period for which pro forma effect is being given had been actually in effect during such periods.

24

Calculations made pursuant to the definition of Pro Forma Basis shall be determined in good faith by an Authorized Officer of Company and may include adjustments, in the reasonable determination of Company as set forth in an officer's certificate, to (i) reflect operating expense reductions reasonably expected to result from any acquisition, merger or PF Asset Sale to the extent (x) determined on a basis consistent with Article 11 of Regulation S-X promulgated under the Securities Act or (y) reasonably acceptable to Administrative Agent and (ii) eliminate the effect of any extraordinary accounting event with respect to any acquired person or assets on Consolidated Net Income.

"**Prohibited Claim**" means any action or objection with respect to (a) claims of the Prepetition Secured Parties against the Debtors or the Liens which secure the Prepetition Obligations, (b) the Superpriority Claims or Liens granted to Administrative Agent and the Lenders pursuant to Sections 2.23(a) and (b), or (c) the Superpriority Claims or Liens granted to the Prepetition Secured Parties pursuant to Section 2.23(c).

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Revolving Loan Commitment or Revolving Loans of any Lender or any Letters of Credit issued or participations therein purchased by any Lender or any participations in any Swing Line Loans purchased by any Lender, the percentage obtained by dividing (a) the Revolving Credit Exposure of that Lender by (b) the aggregate Revolving Credit Exposure of all Lenders. The initial Pro Rata Share of each Lender is set forth opposite the name of that Lender in Schedule 1.1(b) annexed hereto.

"**Projections**" has the meaning assigned to that term in Section 4.21.

"**Proposed Reinvestment Proceeds**" has the meaning assigned to that term in Section 2.11(a).

"**RCRA**" means the Resource Conservation and Recovery Act and any state equivalents, as any of the same may be amended from time to time, and any successors thereto.

"**Real Property Asset**" means, at any time of determination, any interest then owned in fee simple by any Credit Party in any real property.

"**Refunded Swing Line Loan**" has the meaning assigned to that term in Section 2.1(e).

"**Refunding Notice**" has the meaning assigned to that term in Section 2.1(e).

"**Register**" has the meaning assigned to that term in Section 2.5.

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Reimbursement Date**" has the meaning assigned to that term in Section 2.2(d).

"**Related Agreements**" means, collectively, the Plan Sponsor Agreement, and that certain Restructuring Support Agreement, dated as of September 24, 2009, by and among Parent, Holdings, Company, the domestic subsidiaries of Company, AOT Bedding SuperHoldings, LLC,

25

AOT Bedding Intermediate Holdings, LLC and the creditor and lender parties identified on the signature pages thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and all documents relating to any of the foregoing, including the exhibits thereto.

"*Release*" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment, including the movement of any Hazardous Material through the air, soil, surface water or groundwater or the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials.

"*Reorganization Plan*" means a plan of reorganization proposed by the Debtors which is consistent with the Plan of Reorganization attached as Exhibit A to the Plan Sponsor Agreement, and otherwise in form and substance reasonably satisfactory to Administrative Agent.

"*Replacement Lender*" has the meaning assigned to that term in <u>Section 2.22</u>.

"*Request for Issuance*" means a notice in the form of <u>Exhibit A-3</u>.

"*Requirements of Law*" means, as to any Person, the Certificate of Incorporation and By Laws or other organizational or governing documents of such Person, and any law (including Environmental Laws), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Requisite Lenders*" means Lenders having or holding more than 50% of the aggregate Revolving Credit Exposure of all Lenders.

"*Responsible Officer*" means as to any Person, any of the president, chief executive officer (to the extent an individual has been appointed to such position by the Board of Directors or other applicable governing body of such Person), chief financial officer, the treasurer or the assistant treasurer, principal financial officer, principal accounting officer or the general counsel, of such Person.

"*Restricted Junior Payment*" means (i) any dividend or other distribution, direct or indirect, on account of any equity Securities of Holdings or its Subsidiaries now or hereafter outstanding, except a dividend or other distribution payable solely in shares of equity Securities, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any equity Securities of Holdings or its Subsidiaries now or hereafter outstanding, (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity Securities of Holdings or its Subsidiaries now or hereafter outstanding, (iv) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, repurchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to Indebtedness under the Senior Subordinated Note Documents and (v) any dividend, distribution or payment of fees pursuant to any agreement described on <u>Schedule 6.10</u> (but excluding for the avoidance of doubt reasonable out-of-pocket costs and expenses payable thereunder) (it being

understood and agreed that the payment of the reasonable and documented out of pocket fees and expenses of (A) the legal advisors to the trustee under each of the Senior Subordinated Note Indenture and the Parent Notes Indenture, (B) one (1) legal advisor and one (1) financial advisor to the holders of the Senior Subordinated Notes, taken as a whole, and (C) the legal advisors to the holders of the Parent Notes shall not be deemed Restricted Junior Payments for any purpose under this Agreement).

"***Revolving Credit Exposure***" means, with respect to any Lender as of any date of determination (i) prior to the termination of the Revolving Loan Commitments, such Lender's Revolving Loan Commitment; and (ii) after the termination of the Revolving Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the Revolving Loans of such Lender, plus (b) in the case of Issuing Bank, the aggregate Letter of Credit Usage in respect of all Letters of Credit (net of any participations purchased by the Lenders in such Letters of Credit or any unreimbursed drawing thereunder), plus (c) the aggregate amount of all participations purchased by such Lender in any outstanding Letters of Credit or any unreimbursed drawing under any Letter of Credit, plus (d) in the case of Swing Line Lender, the aggregate outstanding principal amount of all Swing Line Loans (net of any participation therein purchased by other Lenders), plus (e) the aggregate amount of all participations purchased by such Lender in any outstanding Swing Line Loans.

"***Revolving Loan***" means a Loan made by a Lender to Company pursuant to its Revolving Loan Commitment.

"***Revolving Loan Commitment***" means the commitment of a Lender to make Revolving Loans to Company pursuant to Section 2.1(a)(i) and "***Revolving Loan Commitments***" means such commitments of all Lenders in the aggregate. The amount of each Lender's Revolving Loan Commitment is initially as set forth opposite the name of that Lender in Schedule 1.1(b) annexed hereto, and may be adjusted or reduced pursuant to the terms and conditions hereof. As of the Closing Date, the aggregate amount of the Revolving Loan Commitments shall be $35,000,000; provided that (x) during the Revolving Loan Initial Commitment Period, the aggregate available amount of the Revolving Loan Commitments shall be $15,000,000 and (y) during the Revolving Loan Full Commitment Period, the aggregate available amount of the Revolving Loan Commitments shall be $35,000,000.

"***Revolving Loan Commitment Period***" means the period from the Closing Date to but excluding the Revolving Loan Commitment Termination Date.

"***Revolving Loan Commitment Termination Date***" means the earliest to occur of (i) the Maturity Date, (ii) the Effective Date, (iii) the date of closing of the sale of all or substantially all of the assets of Company, (iv) the date the Revolving Loan Commitments are permanently reduced to zero pursuant to Section 2.10(b), Section 2.11 or Section 2.12, and (v) the date of the termination of the Revolving Loan Commitments pursuant to Section 8.1.

"***Revolving Loan Full Commitment Period***" means the period from the Final Order Entry Date to but excluding the Revolving Loan Commitment Termination Date.

27

"***Revolving Loan Initial Commitment Period***" means the period from the Closing Date to but excluding the Final Order Entry Date.

"***Revolving Note***" means a promissory note in the form of Exhibit B-1, as it may be amended, restated, supplemented or otherwise modified from time to time.

"***Secured Obligations***" has the meaning assigned to that term in the Pledge and Security Agreement.

"***Secured Parties***" has the meaning assigned to that term in the Pledge and Security Agreement.

"***Securities***" means, with respect to any Person, any stock, shares, partnership or other similar interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing of such Person.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"***Senior Subordinated Note Documents***" means the Senior Subordinated Note Indenture, the Senior Subordinated Notes and each other document executed in connection with the Senior Subordinated Notes, as each such document may be amended, restated, supplemented or otherwise modified from time to time to the extent permitted under Section 6.11.

"***Senior Subordinated Note Indenture***" means the indenture dated December 19, 2003 pursuant to which the Senior Subordinated Notes are issued, as such indenture may thereafter be amended, restated, supplemented or otherwise modified from time to time to the extent permitted under Section 6.11 or replaced pursuant to a refinancing permitted under Section 6.11.

"***Senior Subordinated Notes***" means the Senior Subordinated Notes of Company in the aggregate principal amount not to exceed $200,000,000 and issued pursuant to the Senior Subordinated Note Indenture, with such changes thereto when executed as are permitted under Section 6.11, which principal amount may be increased by amounts permitted to be incurred pursuant to Section 6.1 and as such notes may thereafter be amended, restated, supplemented or otherwise modified from time to time to the extent permitted under Section 6.11 or refinanced to the extent permitted under Section 6.11.

"***Six Month Extension Option***" has the meaning assigned to that term in Section 2.27.

"***Solvency Certificate***" means a certificate in the form of Exhibit G.

"***Solvent***" means, with respect to any Person, that as of the date of determination both (a) the then book value of the property of such Person is (1) greater than the total amount of liabilities (including contingent liabilities) of such Person and (2) not less than the amount that

28

will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such Person; (b) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (c) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"*Sponsor*" means Thomas H. Lee Partners, L.P. and its Affiliates.

"*Standby Letter of Credit*" means any standby letter of credit or similar instrument issued for the purpose of supporting (i) workers' compensation liabilities of Company or any of its Subsidiaries, (ii) the obligations of third party insurers of Company or any of its Subsidiaries arising by virtue of the laws of any jurisdiction requiring third party insurers, (iii) performance, payment, deposit or surety obligations of Company or any of its Subsidiaries, in any case if required by law or governmental rule or regulation or in accordance with custom and practice in the industry, and (iv) such other obligations of Company and its Subsidiaries as may be reasonably acceptable to Administrative Agent.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"*Subsidiary Guarantor*" means any Domestic Subsidiary of Company that is a party hereto as of the Closing Date and is not identified as a Non-Guarantor Subsidiary on Schedule 4.1 or becomes a party to the Guaranty at any time after the Closing Date pursuant to Section 5.9.

"*Superpriority Claim*" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"*Supplemental Collateral Agent*" has the meaning assigned to that term in Section 9.8(c).

"*Swing Line Lender*" means DBTCA, in its capacity as Swing Line Lender hereunder, together with its permitted successors and assigns in such capacity.

"*Swing Line Loan*" means a Loan made by Swing Line Lender to Company pursuant to Section 2.1(a)(ii).

022537-0167-11432-Active.11706310.13

"**Swing Line Loan Commitment**" means the commitment of Swing Line Lender to make Swing Line Loans to Company pursuant to Section 2.1(a)(ii).

"**Swing Line Note**" means a promissory note substantially in the form of Exhibit B-2, as it may be amended, restated, supplemented or otherwise modified from time to time.

"**Swing Line Sublimit**" means the lesser of (i) $5,000,000, and (ii) the aggregate amount of Revolving Loan Commitments then in effect.

"**Tax**" means any present or future tax, levy, impost, duty, charge, fee, deduction, assessment or withholding of any nature and whatever called, by a Governmental Authority, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided, "**Tax on the overall net income**" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's principal office (and/or, in the case of a Lender, its applicable lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business, on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise, including, franchise taxes or taxes substantially similar to franchise taxes and branch profit taxes) of that Person (and/or, in the case of a Lender, its lending office).

"**Terminated Lender**" has the meaning assigned to that term in Section 2.22.

"**Termination Date**" means the date upon which all of the Commitments of the Lenders hereunder have terminated, any Loan or any other non-contingent Obligation which is accrued has been paid or satisfied in full in Cash and no Letters of Credit are then outstanding.

"**Total Utilization of Revolving Loan Commitments**" means, as at any date of determination, the sum of (i) the aggregate principal amount of all outstanding Revolving Loans (other than Revolving Loans made for the purpose of repaying any Refunded Swing Line Loans or reimbursing Issuing Bank for any amount drawn under any Letter of Credit but not yet so applied), plus (ii) the aggregate principal amount of all outstanding Swing Line Loans, plus (iii) the Letter of Credit Usage.

"**Type**" means (i) with respect to Revolving Loans, a Base Rate Loan or a Eurodollar Rate Loan, and (ii) with respect to Swing Line Loans, a Base Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unfunded Benefit Liabilities**" with respect to a Pension Plan means those liabilities as defined in Section 4001(a)(18) of ERISA.

"**U.S. Lender**" has the meaning assigned to that term in Section 2.18(f).

**1.2**   **Accounting Terms**. Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by

30

Company to Administrative Agent pursuant to Section 5.1(a), 5.1(b) and 5.1(c) shall be prepared in accordance with GAAP as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in Section 5.1(e), if applicable); provided, that all calculations in connection with financial definitions and the financial covenant set forth in Section 6.6 shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements; provided, further, if Company notifies Administrative Agent that Company wishes to amend any covenant in Section 2.11 or Section 6 or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if Administrative Agent notifies Company that the Requisite Lenders wish to amend Section 2.11, Section 6 or any related definition for such purpose), then (i) Company and Administrative Agent shall negotiate in good faith to agree upon an appropriate amendment to such covenant and (ii) Company's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective until such covenant is amended in a manner satisfactory to Company and Requisite Lenders.

1.3     **Interpretation, etc.** Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Exhibit or Schedule shall be to a Section, an Exhibit and a Schedule, respectively, hereof unless otherwise specifically provided. The use herein of the word "*include*" or "*including*", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "*without limitation*" or "*but not limited to*" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. Furthermore, when the performance of any covenant, duty or other non-monetary obligation is stated to be required on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day. Except as otherwise set forth in this Agreement, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.  For purposes of this Agreement and the other Credit Documents, Letters of Credit which have been cash collateralized or otherwise backstopped shall not be deemed to be outstanding Letters of Credit.

## SECTION 2.  CREDIT EXTENSIONS

2.1     **Revolving Loans and Swing Line Loans**. (a)  During the Revolving Loan Commitment Period, subject to the terms and conditions hereof, (i) each Lender severally agrees to make Revolving Loans to Company (provided that no Lender shall be required to make a Revolving Loan if after giving effect thereto, (x) such Lender's Revolving Credit Exposure would exceed the amount of such Lender's Revolving Loan Commitment or (x) the aggregate Revolving Credit Exposure of all Lenders would exceed the aggregate amount of Loans permitted to be borrowed (and/or Letters of Credit permitted to be issued) under the Interim Order or the Final Order, as applicable) and (ii) Swing Line Lender hereby agrees to make Swing Line Loans to Company (provided that Swing Line Lender shall not be required to make a Swing

31

Line Loan if after giving effect thereto, (x) Swing Line Lender's Swing Line Loans to Company would exceed the Swing Line Sublimit or (y) the aggregate Revolving Credit Exposure of all Lenders would exceed the aggregate amount of Loans permitted to be borrowed (and/or Letters of Credit permitted to be issued) under the Interim Order or the Final Order, as applicable), in each case to be used for the purposes identified in Section 2.4. Amounts borrowed pursuant to this Section 2.1 may be repaid and reborrowed during the Revolving Loan Commitment Period. Each Lender's Revolving Loan Commitment, and Swing Line Lender's Swing Line Loan Commitment, shall expire on the Revolving Loan Commitment Termination Date and all Revolving Loans and all Swing Line Loans and all other amounts owed hereunder with respect to the Revolving Loans, the Swing Line Loans, the Revolving Loan Commitments (other than any Letters of Credit that have been backstopped or cash collateralized on terms reasonably acceptable to the relevant Issuing Bank) and the Swing Line Loan Commitment shall be paid in full no later than such date.

(b)     Except pursuant to Section 2.1(e) or Section 2.2(d), (i) Revolving Loans that are Base Rate Loans shall be made in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount, (ii) Eurodollar Rate Revolving Loans shall be made in an aggregate minimum amount of $2,000,000 and integral multiples of $500,000 in excess of that amount, and (iii) Swing Line Loans shall be made in an aggregate minimum amount of $250,000 and integral multiples of $100,000 in excess of that amount. Anything contained herein to the contrary notwithstanding, in no event shall the Total Utilization of Revolving Loan Commitments at any time exceed the Revolving Loan Commitments then in effect.

(c)     Whenever Company desires that Lenders make Loans, Company shall deliver to Administrative Agent a fully executed and delivered Funding Notice no later than 12:00 noon (New York City time) (i) at least three (3) Business Days in advance of the proposed Credit Extension Date in the case of a Eurodollar Rate Loan; and (ii) at least one (1) Business Day in advance of the proposed Credit Extension Date in the case of a Base Rate Loan; provided, whenever Company desires that Swing Line Lender make a Swing Line Loan, it shall deliver to Administrative Agent a Funding Notice no later than 12:00 noon (New York City time) on the proposed Credit Extension Date. Except as otherwise provided herein, a Funding Notice for a Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to make a borrowing in accordance therewith. Promptly after receipt by Administrative Agent of a Funding Notice (or telephonic notice in lieu thereof), Administrative Agent shall notify each Lender or Swing Line Lender, as the case may be, of the proposed borrowing.

(d)     Each Lender shall make the amount of its Loan available to Administrative Agent not later than 12:00 noon (New York City time) on the applicable Credit Extension Date, and Swing Line Lender shall make the amount of its Swing Line Loan available to Administrative Agent not later than 2:30 p.m. (New York City time) on the applicable Credit Extension Date, in each case by wire transfer of same day funds in Dollars, at the Funding and Payment Office (or, in the case of Swing Line Loans, at such other place as Administrative Agent, Company and Swing Line Lender may approve). Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of such Loans available to Company on the applicable Credit Extension Date by causing an amount of

32

same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from the Lenders or Swing Line Lender, as the case may be, to be credited to the account of Company at the Funding and Payment Office (or, in the case of Swing Line Loans, at such other place as Administrative Agent, Company and Swing Line Lender may approve).

(e)     With respect to any Swing Line Loan that has not been voluntarily prepaid by Company, Swing Line Lender may, at any time in its sole and absolute discretion, deliver to Administrative Agent (with a copy to Company), no later than 10:00 a.m. (New York City time) on the first Business Day in advance of the proposed Credit Extension Date, a notice (the "**_Refunding Notice_**") (which shall be deemed to be a Funding Notice given by Company) requesting Lenders having Revolving Credit Exposure to make Revolving Loans that are Base Rate Loans on such Credit Extension Date in an amount equal to the amount of such Swing Line Loans (each, a "**_Refunded Swing Line Loan_**") outstanding on the date of such Refunding Notice. Promptly after receipt by Administrative Agent of a Refunding Notice, Administrative Agent shall notify each such Lender thereof. Anything contained herein to the contrary notwithstanding, the proceeds of such Revolving Loans made by the Lenders shall be immediately delivered by Administrative Agent solely to Swing Line Lender and applied to repay a corresponding amount of the applicable Refunded Swing Line Loans. Company hereby authorizes Administrative Agent and Swing Line Lender to charge Company's accounts, if any (up to the amount available in each such account) in order to immediately pay Swing Line Lender the amount of the Refunded Swing Line Loans to the extent the proceeds of such Revolving Loans made by the Lenders are not sufficient to repay in full the Refunded Swing Line Loans. If any portion of any such amount paid to Swing Line Lender should be recovered by or on behalf of Company from Swing Line Lender in bankruptcy, by assignment for the benefit of creditors or otherwise, the loss of the amount so recovered shall be ratably shared among all Lenders having Revolving Credit Exposure in the manner contemplated by Section 10.4.

(f)     If for any reason (i) Revolving Loans are not made upon the request of Swing Line Lender as provided in Section 2.1(e) in an amount sufficient to repay any amounts owed to Swing Line Lender in respect of any outstanding Swing Line Loans; or (ii) the Revolving Loan Commitments are terminated at a time when any Swing Line Loans are outstanding, then, in either case, each Lender having Revolving Credit Exposure shall be deemed to, and hereby agrees to, have purchased a participation in such outstanding Swing Line Loans in an amount equal to its Pro Rata Share (calculated, in the case of this clause (ii), immediately prior to such termination of the Revolving Loan Commitments) of the unpaid amount of such Swing Line Loans together with accrued interest thereon. Upon one Business Day's notice from Swing Line Lender, each such Lender shall deliver to Swing Line Lender an amount equal to its respective participation in same day funds at the Funding and Payment Office. In order to further evidence such participation (and without prejudice to the effectiveness of the participation provisions set forth above), each such Lender agrees to enter into a separate participation agreement at the request of Swing Line Lender in form and substance reasonably satisfactory to Swing Line Lender. In the event any such Lender fails to make available to Swing Line Lender the amount of such Lender's participation as provided herein, Swing Line Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon at the rate customarily used by Swing Line Lender for the correction of errors among banks for three (3) Business Days and thereafter at the Base Rate. In the event Swing Line Lender receives a payment of any

33

amount in which other Lenders have purchased participations as provided herein, Swing Line Lender shall promptly distribute to each such other Lender its Pro Rata Share of such payment. In addition, in the case of each Lender that is deemed to have purchased a participation in such outstanding Swing Line Loan as specified in this Section 2.1(f), the Swing Line Lender (i) shall keep a register, meeting the requirements of Temporary Treasury Regulation Section 5f.103-1(c), of each such Lender, specifying such Lender's entitlement to payments of principal and interest with respect to such participation, and (ii) shall collect, prior to the time such Lender receives payments, from each such Lender the appropriate forms, certificates and statements described in Section 2.18 (and updated as required by Section 2.18) as if such Lender were a Lender under Section 2.18.

(g) Anything contained herein to the contrary notwithstanding, each such Lender's obligation to make Revolving Loans for the purpose of repaying any Refunded Swing Line Loans, and each such Lender's obligation to purchase a participation in any unpaid Swing Line Loans, shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Swing Line Lender, any Credit Party or any other Person for any reason whatsoever; (ii) the occurrence or continuation of an Event of Default or a Default; (iii) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company or any of its Subsidiaries; (iv) any breach hereof or any other Credit Document by any party thereto; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing; provided, such obligations of each such Lender are subject to the condition that (1) Swing Line Lender believed in good faith that all conditions under Section 3 to the making of the applicable Refunded Swing Line Loans or other unpaid Swing Line Loans, as the case may be, were satisfied at the time such Refunded Swing Line Loans or unpaid Swing Line Loans were made, or (2) the satisfaction of any such condition not satisfied had been waived in accordance with Section 10.5 prior to or at the time such Refunded Swing Line Loans or other unpaid Swing Line Loans were made.

**2.2** **Letters of Credit**. (a) During the Revolving Loan Commitment Period, subject to the terms and conditions hereof, Company may request from time to time (but in no event later than the date that is fifteen (15) days prior to the Revolving Loan Commitment Termination Date, unless otherwise agreed to by the Issuing Bank) that one or more Lenders issue Letters of Credit for the account of Company for the purposes specified in the definitions of Commercial Letters of Credit and Standby Letters of Credit; provided that all such Letters of Credit shall provide for sight drawings. Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Company herein set forth, any one or more Lenders may, but (except as provided herein) shall not be obligated to, issue such Letters of Credit in accordance with the provisions hereof; provided, Company shall not request that any Lender issue, and no Lender shall issue: (i) any Letter of Credit if, after giving effect to such issuance, the Total Utilization of Revolving Loan Commitments would exceed the Revolving Loan Commitments then in effect; (ii) any Letter of Credit if, after giving effect to such issuance, the Letter of Credit Usage would exceed the Letter of Credit Sublimit then in effect; (iii) any Letter of Credit if, after giving effect to such issuance, the aggregate Revolving Credit Exposure of all Lenders would exceed the aggregate amount of Loans permitted to be borrowed (and/or Letters of Credit permitted to be issued) under the Interim Order or the Final Order, as applicable; (iv) any Standby Letter of Credit having an expiration date later than the 10th Business Day prior to

34

the Revolving Loan Commitment Termination Date, unless otherwise agreed to by the Issuing Bank; (v) any Commercial Letter of Credit having an expiration date (a) later than the earlier of (1) the 15th day prior to the Revolving Loan Commitment Termination Date, unless otherwise agreed to by the Issuing Bank and (2) the date which is 180 days after the date of issuance of such Commercial Letter of Credit (or such other date as shall be agreed to by the Issuing Bank) or (b) that is otherwise unacceptable to the Issuing Bank in its reasonable discretion; or (vi) any Letter of Credit denominated in a currency other than Dollars.

(b)    Whenever Company desires the issuance of a Letter of Credit, it shall deliver to Administrative Agent a Request for Issuance no later than 12:00 noon (New York City time) at least three (3) Business Days (in the case of Standby Letters of Credit) or five (5) Business Days (in the case of Commercial Letters of Credit), or in each case such shorter period as may be agreed to by Issuing Bank in any particular instance, in advance of the proposed date of issuance. Issuing Bank, in its reasonable discretion, may require changes in the text of the proposed Letter of Credit or any such documents. Upon receipt by Administrative Agent of a Request for Issuance pursuant to this Section, in the event Administrative Agent elects to issue such Letter of Credit, Administrative Agent shall promptly so notify Company, and Administrative Agent shall be Issuing Bank with respect thereto. In the event that Administrative Agent, in its sole discretion, elects not to issue such Letter of Credit, Administrative Agent shall promptly so notify Company, whereupon Company may request any other Lender to issue such Letter of Credit by delivering to such Lender a copy of the applicable Request for Issuance. Any Lender so requested to issue such Letter of Credit shall promptly notify Company and Administrative Agent whether or not, in its sole discretion, it has elected to issue such Letter of Credit, and any such Lender which so elects to issue such Letter of Credit shall be the Issuing Bank with respect thereto. In the event that all other Lenders shall have declined to issue such Letter of Credit, notwithstanding the prior election of Administrative Agent not to issue such Letter of Credit, Administrative Agent shall be obligated to issue such Letter of Credit and shall be Issuing Bank with respect thereto, notwithstanding the fact that the Letter of Credit Usage with respect to such Letter of Credit and with respect to all other Letters of Credit issued by Administrative Agent, when aggregated with Administrative Agent's outstanding Revolving Loans and Swing Line Loans, may exceed Administrative Agent's Revolving Loan Commitment then in effect. Upon satisfaction or waiver of the conditions set forth in Section 3.3, Issuing Bank shall issue the requested Letter of Credit. Upon the issuance or amendment of any Standby Letter of Credit, Issuing Bank shall notify Administrative Agent and Company in writing of such issuance or amendment and such notice shall be accompanied by a copy of such issuance or amendment. Promptly after the receipt of such notice, Administrative Agent shall notify each Lender, in writing, of such issuance or amendment and in the event any Lender shall so request, Administrative Agent shall provide such Lender with copies of such issuance or amendment. With regard to Commercial Letters of Credit, each Issuing Bank shall on the first Business Day of each week furnish Administrative Agent, by facsimile, with a report detailing the daily aggregate outstanding Commercial Letters of Credit for such Issuing Bank during the previous week.

(c)    In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, Issuing Bank shall be responsible only to examine the documents delivered under such Letter of Credit with reasonable care so as to ascertain whether they appear on their face to be in accordance with the terms and conditions of such Letter of Credit. As between

35