Company and Issuing Bank, Company assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by Issuing Bank by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, Issuing Bank shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit, except to the extent that such failure is the result of the gross negligence or willful misconduct of the Issuing Bank, as determined by a final and non-appealable judgment of a court of competent jurisdiction; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Issuing Bank, including any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of Issuing Bank's rights or powers hereunder. Without limiting the foregoing and in furtherance thereof, any action taken or omitted by Issuing Bank under or in connection with the Letters of Credit or any documents and certificates delivered thereunder, if taken or omitted in good faith (and without gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction and in accordance with the standard of care specified in the UCC with respect to Letters of Credit), shall not put Issuing Bank under any resulting liability to Company. Notwithstanding anything to the contrary contained in this Section 2.2(c), Company shall retain any and all rights it may have against Issuing Bank for any liability arising solely out of the gross negligence or willful misconduct of Issuing Bank, as determined by a final and non-appealable judgment of a court of competent jurisdiction or failure of such Issuing Bank to use the standard of care specified in the UCC with respect to Letters of Credit.

(d)      In the event Issuing Bank has determined to honor a drawing under a Letter of Credit, it shall immediately notify Company and Administrative Agent, and Company shall reimburse Issuing Bank on or before the Business Day immediately following the date on which such drawing is honored (the "***Reimbursement Date***") in an amount in Dollars and in same day funds equal to the amount of such honored drawing; provided, anything contained herein to the contrary notwithstanding, (i) unless Company shall have notified Administrative Agent and Issuing Bank prior to 11:00 a.m. (New York City time) on the date such drawing is honored (or prior to 11:00 a.m. (New York City time) on the immediately following Business Day if such drawing is made after 11:00 a.m. on the previous Business Day) that Company intends to reimburse Issuing Bank for the amount of such honored drawing with funds other than the proceeds of Revolving Loans, Company shall be deemed to have given a timely Funding Notice to Administrative Agent requesting Lenders having a Revolving Loan Commitment to make Revolving Loans that are Base Rate Loans on the Reimbursement Date in an amount in Dollars equal to the amount of such honored drawing, and (ii) subject to satisfaction or waiver of the

36

conditions specified in Section 3.3 (and Administrative Agent shall promptly notify each such Lender of such deemed request), Lenders having a Revolving Loan Commitment shall, on the Reimbursement Date, make Revolving Loans that are Base Rate Loans in the amount of such honored drawing, the proceeds of which shall be applied directly by Administrative Agent to reimburse Issuing Bank for the amount of such honored drawing; and provided further, if for any reason proceeds of Revolving Loans are not received by Issuing Bank on the Reimbursement Date in an amount equal to the amount of such honored drawing, Company shall reimburse Issuing Bank, on demand, in an amount in same day funds equal to the excess of the amount of such honored drawing over the aggregate amount of such Revolving Loans, if any, which are so received. Nothing in this Section 2.2(d) shall be deemed to relieve any Lender having a Revolving Loan Commitment from its obligation to make Revolving Loans on the terms and conditions set forth herein, and Company shall retain any and all rights it may have against any such Lender resulting from the failure of such Lender to make such Revolving Loans under this Section 2.2(d).

(e)     Immediately upon the issuance of each Letter of Credit, each Lender having a Revolving Loan Commitment shall be deemed to have irrevocably purchased, and hereby agrees to irrevocably purchase, from Issuing Bank a participation in such Letter of Credit and any drawings honored thereunder in an amount equal to such Lender's Pro Rata Share (with respect to the Revolving Loan Commitments) of the maximum amount which is or at any time may become available to be drawn thereunder. In the event that Company shall fail for any reason to reimburse Issuing Bank as provided in Section 2.2(d), Issuing Bank shall promptly notify each such Lender of the unreimbursed amount of such honored drawing and of such Lender's respective participation therein based on such Lender's Pro Rata Share of the Revolving Loan Commitments. Each such Lender shall make available to Issuing Bank an amount equal to its respective participation, in Dollars and in same day funds, at the office of Issuing Bank specified in such notice, not later than 12:00 noon (New York City time) on the first Business Day (under the laws of the jurisdiction in which such office of Issuing Bank is located) after the date notified by Issuing Bank. In the event that any Lender having a Revolving Loan Commitment fails to make available to Issuing Bank on such Business Day the amount of such Lender's participation in such Letter of Credit as provided in this Section 2.2(e), Issuing Bank shall be entitled to recover such amount on demand from such Lender together with interest thereon at the rate customarily used by Issuing Bank for the correction of errors among banks for three (3) Business Days and thereafter at the Base Rate. Nothing in this Section 2.2(e) shall be deemed to prejudice the right of any Lender to recover from Issuing Bank any amounts made available by such Lender to Issuing Bank pursuant to this Section in the event that it is determined by the final judgment of a court of competent jurisdiction that the payment with respect to a Letter of Credit in respect of which payment was made by such Lender constituted gross negligence or willful misconduct on the part of Issuing Bank or resulted from Issuing Bank's failure to use the standard of care specified in the UCC with respect to Letters of Credit. In the event Issuing Bank shall have been reimbursed by other Lenders pursuant to this Section 2.2(e) for all or any portion of any drawing honored by Issuing Bank under a Letter of Credit, such Issuing Bank shall distribute to each Lender which has paid all amounts payable by it under this Section 2.2(e) with respect to such honored drawing such Lender's Pro Rata Share of all payments subsequently received by Issuing Bank from Company in reimbursement of such honored drawing promptly when such payments are received. Any such distribution shall be made to a Lender at its primary address set forth below its name on the appropriate signature page hereof or at such other address

as such Lender may request. In addition, in the case of each Lender that is deemed to have irrevocably purchased from Issuing Bank a participation in such Letter of Credit as specified in this Section 2.2(e), the Issuing Bank shall keep a register specifying such Lender's entitlement to payments with respect to such participation in accordance with its normal business practice which is intended to meet the requirements of Temporary Treasury Regulation Section 5f.103-1(c).

(f)     The obligation of Company to reimburse Issuing Bank for drawings honored under the Letters of Credit issued by it and to repay any Revolving Loans made by Lenders pursuant to Section 2.2(d) and the obligations of Lenders having Revolving Credit Exposure under Section 2.2(e) shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms hereof under all circumstances including any of the following circumstances: (i) any lack of validity or enforceability of any Letter of Credit; (ii) the existence of any claim, set-off, defense or other right which Company or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), Issuing Bank, Lender or any other Person or, in the case of a Lender, against Company, whether in connection herewith, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Company or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured); (iii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; (iv) payment by Issuing Bank under any Letter of Credit against presentation of a draft or other document which does not substantially comply with the terms of such Letter of Credit, except where such payment constitutes gross negligence or willful misconduct on the part of the Issuing Bank, as determined by a final and non-appealable judgment of a court of competent jurisdiction or results from Issuing Bank's failure to use the standard of care specified in the UCC with respect to Letters of Credit; (v) any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company or any of its Subsidiaries; (vi) any breach of this Agreement or any other Credit Document by any party thereto; (vii) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or (viii) the fact that an Event of Default or a Default shall have occurred and be continuing; provided, in each case, that payment by Issuing Bank under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of Issuing Bank, as determined by a final and non-appealable judgment of a court of competent jurisdiction or failure of such Issuing Bank to use the standard of care specified in the UCC with respect to Letters of Credit under the circumstances in question.

(g)     In addition to amounts payable as provided herein, Company hereby agrees to protect, indemnify, pay and save harmless Issuing Bank from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable and documented out-of-pocket fees, expenses and disbursements of one (1) outside counsel to the applicable Issuing Bank but excluding, any and all claims, demands, liabilities, damages, losses, costs, charges and expenses relating to Taxes (and any liabilities relating thereto), the indemnity for which shall be governed solely and exclusively by Section 2.18) which Issuing Bank may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by Issuing Bank, other than as a result of (1) the gross negligence or willful misconduct of Issuing Bank, as determined by a final and non-appealable judgment of a court of competent

38

jurisdiction or failure of such Issuing Bank to use the standard of care specified in the UCC with respect to Letters of Credit, or (2) subject to the following clause (ii), the wrongful dishonor by Issuing Bank of a proper demand for payment made under any Letter of Credit issued by it, or (ii) the failure of Issuing Bank to honor a drawing under any such Letter of Credit as a result of any Governmental Act.

2.3     **Pro Rata Shares**. All Loans made and all participations purchased pursuant to Sections 2.1, and 2.2 shall be made or purchased, as the case may be, by the Lenders simultaneously and proportionately to their respective applicable Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby nor shall the Revolving Loan Commitment amount of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder or purchase a participation required hereby. Unless Administrative Agent shall have been notified by any Lender prior to the applicable Credit Extension Date that such Lender does not intend to make available to Administrative Agent the amount of such Lender's Loan requested on such Credit Extension Date, Administrative Agent may assume that such Lender has made such amount available to Administrative Agent on such Credit Extension Date and Administrative Agent may, in its sole discretion, but shall not be obligated to, make available to Company a corresponding amount on such Credit Extension Date. If such corresponding amount is not in fact made available to Administrative Agent by such Lender, Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Credit Extension Date until the date such amount is paid to Administrative Agent, at the customary rate set by Administrative Agent for the correction of errors among banks for three (3) Business Days and thereafter at the Base Rate. If such Lender does not pay such corresponding amount forthwith upon Administrative Agent's demand therefor, Administrative Agent shall promptly notify Company and Company shall immediately pay such corresponding amount to Administrative Agent together with interest thereon, for each day from such Credit Extension Date until the date such amount is paid to Administrative Agent, at the rate payable hereunder for Base Rate Loans. Nothing in this Section 2.3 shall be deemed to relieve any Lender from its obligation to fulfill its Revolving Loan Commitments hereunder or to prejudice any rights that Company may have against any Lender as a result of any default by such Lender hereunder.

2.4     **Use of Proceeds**. The proceeds of the Revolving Loans, Swing Line Loans and Letters of Credit made on and after the Closing Date shall be applied by Company for working capital and general corporate purposes of Parent and its Subsidiaries and other purposes permitted hereunder, including payments required by or permitted under the Orders: provided, that the proceeds of Loans and Letters of Credit may not, except as provided by the Orders, be used (i) in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Agent or (ii) to repay any borrowings under the Prepetition Credit Agreement. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or could reasonably be expected to cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

**2.5    Notes; Register; Lenders' Books and Records**. If so requested by any Lender by written notice to Company (with a copy to Administrative Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Company shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is a permitted assignee of such Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the Closing Date, promptly after Company's receipt of such notice) a Note or Notes to evidence such Lender's Revolving Loan or Swing Line Loan, as the case may be. Administrative Agent shall maintain, at its address referred to in Section 10.1, a register for the recordation of the names and addresses of the Lenders and Issuing Banks and the Revolving Loan Commitments and Loans of each Lender and Letters of Credit, and drawings honored under the Letters of Credit, issued by each Issuing Bank from time to time (the "**_Register_**"). The Register shall be available for inspection by Company or any Lender (solely as to its own holdings) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record in the Register the Revolving Loan Commitments and the Loans of each Lender and Letters of Credit, and drawings honored under the Letters of Credit, issued by each Issuing Bank, and each repayment or prepayment in respect of the principal amount of the Loans (and related interest payments with respect to the Loans) and any reimbursement amounts paid to each Issuing Bank pursuant to Section 2.2 (and related interest payments), and any such recordation shall be conclusive and binding on Company and each Lender, absent demonstrable error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Revolving Loan Commitment or Company's Obligations in respect of any Loan. Company hereby designates Administrative Agent to serve as Company's agent solely for purposes of maintaining the Register as provided in this Section 2.5, and Company hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents and affiliates shall constitute Indemnitees for all purposes. Each Lender shall record on its internal records, including its Notes, the amount of the Loans and Letters of Credit made or issued, as the case may be, by it and each repayment and prepayment and interest payment in respect thereof. Any such recordation shall be conclusive and binding on Company, absent demonstrable error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Company's Obligations in respect of any applicable Loans and Letters of Credit; and provided, further, in the event of any inconsistency between the Register and any Lender's records, the recordation in the Register shall govern. Company, Administrative Agent and the Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Revolving Loan Commitments and Loans listed therein for all purposes hereof.

**2.6    Interest Payments**. (a) Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through maturity (whether by acceleration or otherwise) at the sum of (x) the applicable interest rate for the Type of Loan plus (y) the Applicable Margin for such Type of Loan. The Type of any Loan (except a Swing Line Loan), and the Interest Period with respect to any Eurodollar Rate Loan, shall be selected by Company and notified to Administrative Agent and the Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be. If on any day a Loan is outstanding with respect to which notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan. Notwithstanding anything

contained herein to the contrary, in connection with Eurodollar Rate Loans (i) there shall be no more than 8 Interest Periods outstanding at any time; and (ii) in the event Company fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, Company shall be deemed to have selected an Interest Period of one (1) month. As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent demonstrable error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Company and each Lender.

(b)     Company agrees to pay to Issuing Bank, with respect to drawings honored under any Letter of Credit honored by it, interest on the amount paid by Issuing Bank in respect of each such honored drawing from the date such drawing is honored to but excluding the date such amount is reimbursed by or on behalf of Company at a rate equal to (i) for the period from the date such drawing is honored to but excluding one (1) day after the applicable Reimbursement Date, (1) the Base Rate, plus (2) the Applicable Margin for Revolving Loans that are Base Rate Loans, and (ii) thereafter, a rate which is 2% per annum in excess of the rate of interest otherwise payable hereunder with respect to Revolving Loans that are Base Rate Loans.

(c)     Interest payable hereunder shall be computed (i) in the case of Base Rate Loans, on the basis of a 365/6-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided, if a Loan is repaid on the same day on which it is made, one (1) day's interest shall be paid on that Loan.

(d)     Except as otherwise set forth herein, interest on each Loan shall be payable in arrears on and to (i) each Interest Payment Date applicable to that Loan; (ii) any prepayment of that Loan, to the extent accrued on the amount being prepaid; and (iii) at maturity, including final maturity; provided, in the event any Swing Line Loan or any Revolving Loan that is a Base Rate Loan is prepaid pursuant to Section 2.10(a), interest accrued on such Swing Line Loan or Revolving Loan through the date of such prepayment shall be payable on the next succeeding Interest Payment Date applicable to such Base Rate Loan, or, if earlier, at final maturity.

(e)     Interest payable pursuant to Section 2.6(b) shall be payable on demand or, if no demand is made, on the date on which the related drawing honored under a Letter of Credit is reimbursed in full. Promptly upon receipt by Issuing Bank of any payment of interest pursuant to Section 2.6(b), (i) Issuing Bank shall distribute to each Lender having Revolving Credit Exposure, out of the interest received by Issuing Bank in respect of the period from the date such drawing is honored to but excluding the date on which Issuing Bank is reimbursed for the

amount of such drawing (including any such reimbursement out of the proceeds of any Revolving Loans), the amount that such Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period if no drawing had been honored under such Letter of Credit, and (ii) in the event Issuing Bank shall have been reimbursed by the Lenders for all or any portion of such honored drawing, Issuing Bank shall distribute to each Lender having Revolving Credit Exposure which has paid all amounts payable by it under Section 2.2(e) with respect to such honored drawing such other Lender's Pro Rata Share of any interest received by Issuing Bank in respect of that portion of such honored drawing so reimbursed by the Lenders for the period from the date on which Issuing Bank was so reimbursed by the Lenders to but excluding the date on which such portion of such honored drawing is reimbursed by Company. Any such distribution shall be made to a Lender at its primary address set forth below its name on the appropriate signature page hereof or at such other address as such Lender may request.

2.7 **Conversion; Continuation**. Company shall have the option (a) to convert at any time all or any part of any Loan from one Type of Loan to another Type of Loan, provided, that partial conversions of Base Rate Loans shall be in the aggregate principal amount of $1,000,000 and integral multiples of $100,000 in excess of that amount and the aggregate principal amount of the resulting Eurodollar Rate Loans outstanding in respect of any one (1) Interest Period shall be at least $2,000,000 and integral multiples of $1,000,000 in excess of that amount; or (b) upon the expiration of any Interest Period applicable to a Eurodollar Rate Loan, to continue all or any portion of such Loan as a Eurodollar Rate Loan; provided, (1) a Eurodollar Rate Loan may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto and (2) the aggregate principal amount of the resulting Eurodollar Rate Loans outstanding in respect of any one Interest Period shall be at least $2,000,000 and integral multiples of $1,000,000 in excess of that amount. Company shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 10:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, a Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Company shall be bound to effect a conversion or continuation in accordance therewith. After the occurrence of and during the continuation of an Event of Default, unless the Requisite Lenders otherwise consent, (i) Company may not elect to have a Loan be made or maintained as, or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan; and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by Company.

2.8 **Post Default Interest**. After the occurrence of an Event of Default and for so long as it continues, the principal on all outstanding Loans and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest payable on demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per

42

annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective, such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate which is 2% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

2.9    **Fees.** (a)  Company agrees to pay to Administrative Agent, for distribution to each Lender having Revolving Credit Exposure in proportion to that Lender's Pro Rata Share (determined with respect to the Revolving Loan Commitments), commitment fees for the Revolving Loan Commitment Period equal to the product of (i) the average of the daily difference between (1) the Revolving Loan Commitments, minus (2) the sum of (A) the aggregate principal amount of outstanding Revolving Loans (but not any outstanding Swing Line Loans) plus (B) the Letter of Credit Usage, multiplied by the (ii) Applicable Commitment Fee Percentage. All such commitment fees shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be payable monthly in arrears on the last Business Day of each calendar month, commencing on the first such date to occur after the Closing Date, and on the Revolving Loan Commitment Termination Date.

(b)    Company agrees to pay (i) a fronting fee, payable directly to Issuing Bank for its own account, equal to 0.25% per annum of the aggregate daily amount available to be drawn under all Letters of Credit issued by it, and (ii) a letter of credit fee, payable to Administrative Agent for the account of the Lenders, equal to the product of (1) the Applicable Margin for Revolving Loans that are Eurodollar Rate Loans, multiplied by (2) the daily amount available to be drawn under all such Letters of Credit, each such fee to be payable in arrears on and to (but not including) the last Business Day of each calendar month and computed on the basis of a 360-day year for the actual number of days elapsed. Without duplication of the foregoing fees, Company agrees to pay documentary and processing charges payable directly to Issuing Bank for its own account in accordance with Issuing Bank's standard schedule for such charges in effect at the time of such issuance, amendment, transfer or payment, as the case may be. For purposes of calculating any fees payable under this Section, the daily amount available to be drawn under any Letter of Credit shall be determined as of the close of business on any date of determination. Promptly upon receipt by Administrative Agent of any amount described in clause (ii) above, Administrative Agent shall distribute to each Lender having Revolving Credit Exposure its Pro Rata Share (determined with respect to the Revolving Loan Commitments) of such amount.

(c)    Company agrees to pay to the Agents such other fees in the amounts and at the times separately agreed upon between Company and the Agents.

2.10    **Voluntary Prepayments/Commitment Reductions.** (a)  Company may, upon written or telephonic notice to Administrative Agent on or prior to 12:00 noon (New York City time) on the date of prepayment, which notice, if telephonic, shall be promptly confirmed in writing, at any time and from time to time prepay any Swing Line Loan on any Business Day in whole or in part in an aggregate minimum amount of $250,000 and integral multiples of

43

$100,000 in excess of that amount. Company may, upon not less than one (1) Business Day's prior written or telephonic notice, in the case of Base Rate Loans, and three (3) Business Days' prior written or telephonic notice, in the case of Eurodollar Rate Loans, in each case given to Administrative Agent by 12:00 noon (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each Lender), at any time and from time to time prepay Revolving Loans on any Business Day in whole or in part in an aggregate minimum amount of $100,000 and integral multiples of $500,000 in excess of that amount in the case of Revolving Loans; provided, however, that a Eurodollar Rate Loan may only be prepaid on the expiration of the Interest Period applicable thereto unless Company pays Lenders any amount required pursuant to Section 2.16(c) on the date of such prepayment. Notice of prepayment having been given as aforesaid, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; provided that Company may rescind or postpone any such notice of prepayment if such prepayment would have resulted from a refinancing of all of the Loans and such refinancing shall not be consummated or otherwise shall be delayed.

(b)     Company may, upon not less than three (3) Business Days' prior written or telephonic notice confirmed in writing to Administrative Agent (which original written or telephonic notice Administrative Agent will promptly transmit by telefacsimile or telephone to each Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Revolving Loan Commitments in an amount up to the amount by which the Revolving Loan Commitments exceed the Total Utilization of Revolving Loan Commitments at the time of such proposed termination or reduction; provided, any such partial reduction of the Revolving Loan Commitments shall be in an aggregate minimum amount of $2,000,000 and integral multiples of $1,000,000 in excess of that amount. Company's notice to Administrative Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of the Revolving Loan Commitments shall be effective on the date specified in Company's notice and shall reduce the Revolving Loan Commitment of each Lender having Revolving Credit Exposure proportionately to its Pro Rata Share (determined with respect to Revolving Loan Commitments); provided that Company may rescind or postpone any such notice of termination of the Revolving Loan Commitments if such termination would have resulted from a refinancing of all of the Loans and such refinancing shall not be consummated or otherwise shall be delayed.

**2.11    Mandatory Prepayments/Commitment Reductions**. (a) No later than the second Business Day following the date of receipt by Holdings, Company or any of its Subsidiaries of any Net Asset Sale Proceeds from Asset Sales made in accordance with Section 6.7(o), or of any Net Insurance/Condemnation Proceeds, Company shall prepay the Loans and/or the Revolving Loan Commitments shall be permanently reduced in an aggregate amount equal to such Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds, as the case may be; provided, so long as no Event of Default shall have occurred and be continuing, Company may deliver to Administrative Agent a certificate of an Authorized Officer of Company setting forth (1) that portion of such Net Asset Sale Proceeds or Net Insurance/Condemnation Proceeds (such portion being the "***Proposed Reinvestment Proceeds***") that Company or such Subsidiary intends to reinvest within six (6) months of the date of receipt, in non-current assets useful in the

022537-0167-11432-Active.11706310.13

business of Company and its Subsidiaries, which may include, in the case of any Proposed Reinvestment Proceeds which related to Net Insurance/Condemnation Proceeds, the repair, restoration or replacement of the applicable assets of Company or its Subsidiaries (such assets being "*Eligible Assets*") and (2) the proposed use of such Proposed Reinvestment Proceeds and such other information with respect to such reinvestment as Administrative Agent may reasonably request. In the event Collateral Agent shall receive any Net Insurance/Condemnation Proceeds in its capacity as loss payee pursuant to Section 5.5, Company hereby authorizes Collateral Agent to apply an amount equal to all such amounts in accordance with this Section 2.11(a); provided, if Company shall elect to exercise its option to reinvest any such proceeds pursuant to the first sentence of this Section 2.11(a), Company shall give notice to Administrative Agent of such election and Administrative Agent shall pay over to Company such proceeds and Company shall reinvest such proceeds in accordance with the terms of such sentence.

(b)      No later than the second business day following, the date of receipt by Parent, Holdings or Company of the Cash proceeds from the issuance of any equity Securities in a public offering or in a private placement underwritten, placed or initially purchased by an investment bank (it being understood that Sponsor is not an investment bank) of Parent, Holdings, Company or any of its Subsidiaries, Company shall prepay the Loans and/or the Revolving Loan Commitments shall be permanently reduced in an aggregate amount equal to 50% of such proceeds, net of investment banking fees, underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses; provided that no such prepayment or commitment reduction shall be required with respect to an amount equal to such proceeds that are received (y) pursuant to any employee stock or stock option plan and (z) in connection with sales or issuances of equity Securities to (A) the Equity Investors, their Affiliates, related funds and limited partners and (B) other Persons making additional equity investments together with the Equity Investors after the Closing Date.

(c)      On the second Business Day following the date of receipt by Holdings, Company or its Subsidiaries of the Cash proceeds from the issuance of any debt Securities (other than the proceeds of Indebtedness permitted under Section 6.1 (unless indicated otherwise in Section 6.1) of Holdings, Company or its Subsidiaries, Company shall prepay the Loans and/or the Revolving Loan Commitments shall be permanently reduced in an aggregate amount equal to 100% of such proceeds, net, in the case of any such issuance, of investment banking fees, underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(d)      **[Reserved]**.

(e)      Concurrently with any prepayment of the Loans and/or reduction of the Commitments pursuant to Sections 2.11(a) through 2.11(d), Company shall deliver to Administrative Agent a certificate by its Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds that gave rise to such prepayment and/or reduction.

Notwithstanding the foregoing, the provisions of this Section 2.11 shall not require the Revolving Loans Commitments to be reduced below the Letter of Credit Sublimit.

022537-0167-11432-Active.11706310.13

**2.12** **Application of Prepayments and Reductions of Commitments**. (a) Any voluntary prepayments made pursuant to <u>Section 2.10</u> shall be applied as specified by Company in the applicable notice of prepayment; <u>provided</u>, in the event Company fails to specify the Loans to which any such prepayment shall be applied, such prepayment shall be applied <u>first</u> to repay outstanding Swing Line Loans to the full extent thereof; and <u>second</u> to repay outstanding Revolving Loans to the full extent thereof.

(b) Any amount (the "***Applied Amount***") required to be paid pursuant to <u>Section 2.11</u> shall be applied <u>first</u>, to prepay the Swing Line Loans to the full extent thereof and to permanently reduce the Revolving Loan Commitments by the amount of such prepayment, <u>second</u>, to prepay the Revolving Loans to the full extent thereof and to further permanently reduce the Revolving Loan Commitments by the amount of such prepayment, <u>third</u>, to further permanently reduce the Revolving Loan Commitments to the full extent thereof, and <u>fourth</u>, to cash-collateralize any Letters of Credit that are outstanding.

(c) Any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Company pursuant to <u>Section 2.16(c)</u>.

Notwithstanding the foregoing, the provisions of this <u>Section 2.12</u> shall not require the Revolving Loans Commitments to be reduced below the Letter of Credit Sublimit.

**2.13** **Collateral Proceeds; Guaranty Payments**. (a) Except as otherwise provided herein, all proceeds received by Collateral Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral after the occurrence and during the continuance of an Event of Default, may, in the discretion of Collateral Agent, be held by Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by Collateral Agent against, the "***Secured Obligations***" or "***Obligations***" (each as defined in the applicable Collateral Documents) in the following order of priority: <u>first</u>, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Collateral Agent and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Collateral Agent in connection therewith, and all amounts for which Collateral Agent is entitled to indemnification under such Collateral Documents and hereunder and all advances made by Collateral Agent hereunder for the account of the applicable Credit Party, and to the payment of all costs and expenses paid or incurred by Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document or hereunder, all in accordance with the terms hereof; <u>second</u>, to the extent of any excess such proceeds, to the payment of all other such Secured Obligations for the ratable benefit of the holders thereof; and <u>third</u>, to the extent of any excess such proceeds, to the payment to or upon the order of such Credit Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

(b) All payments received by Administrative Agent under the Guaranty shall be applied promptly from time to time by Administrative Agent in the following order of priority: <u>first</u>, to the payment of the costs and expenses of any collection or other realization under the Guaranty, including reasonable compensation to Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by Collateral Agent in connection

46

therewith, all in accordance with the terms of the Guaranty and this Agreement; <u>second</u>, to the extent of any excess such payments, to the payment of all other Obligations for the ratable benefit of the holders thereof; and <u>third</u>, to the extent of any excess such payments, to the payment to the applicable Guarantor or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.14    General Provisions Regarding Payments**. All payments by Company of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, set-off or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 noon (New York City time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Company on the next succeeding Business Day. All payments in respect of the principal amount of any Loan (other than voluntary prepayments of Revolving Loans and Swing Line Loans) shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal. Administrative Agent shall promptly distribute to each Lender, at its primary address set forth on its signature page hereto or at such other address as such Lender may request, its applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable thereto, received by Administrative Agent. Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its applicable Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

**2.15    Ratable Sharing**. Except as otherwise expressly provided herein, the Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), by realization upon security, through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, receive payment or reduction of a proportion of the aggregate amount of principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "*Aggregate Amounts Due*" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (i) notify Administrative Agent and each other Lender of the receipt of such payment and (ii) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them. Company expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may, in accordance with the terms hereof, exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Company to that holder with

47

respect thereto as fully as if that holder were owed the amount of the participation held by that holder directly by Company.

**2.16** **Making or Maintaining Eurodollar Rate Loans.** (a) In the event that Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Adjusted Eurodollar Rate, Administrative Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to Company and each Lender of such determination, whereupon (i) no Loans may be made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Company and the Lenders that the circumstances giving rise to such notice no longer exist, which notice shall be given as soon as reasonably practicable and (ii) any Funding Notice or Conversion/Continuation Notice given by Company with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Company without the necessity of paying any amount under Section 2.16(c), and any Funding Notice previously delivered by Company which requested Eurodollar Rate Loans may be revoked by Company or, failing that, shall be deemed to be converted into a request(s) for borrowing of Base Rate Loans.

(b) In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with Company and Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date hereof which materially and adversely affect the London interbank market or the position of such Lender in that market, then, and in any such event, such Lender shall be an "*Affected Lender*" and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to Company and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). Thereafter (1) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans (the "*Affected Loans*") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Company pursuant to a Funding Notice or a Conversion/Continuation Notice, Company shall have the option, subject to the provisions of Section 2.16(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving notice (by telefacsimile or by

48

telephone confirmed in writing) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.16(b) shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms hereof.

(c)     Company shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding (a) any loss solely attributable to the failure to receive the Applicable Margin on a Eurodollar Rate Loan for any period after (y) the date specified for such Eurodollar Rate Loan in the case of clause (i) below and (z) the date such Eurodollar Rate Loans are prepaid or converted in the case of clause (ii) below) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any prepayment or other principal payment or any conversion of any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Company and (b) any loss, expense or liability with respect to Taxes (and any liabilities relating thereto), the indemnity for which shall be governed solely and exclusively by Section 2.18.

(d)     Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender. In addition, in the case of each Lender that makes, carries or transfers any Eurodollar Rate Loan at, to, or for the account of an office of an Affiliate of such Lender pursuant to this Section 2.16(d), such Lender: (i) shall keep a register, meeting the requirements of Temporary Treasury Regulation Section 5f.103-1(c), relating to each such Affiliate of such Lender, specifying such Affiliate's entitlement to payments of principal and interest with respect to such Loan, and (ii) shall collect, prior to the time such Affiliate receives payments, from each such Lender the appropriate forms, certificates and statements described in Section 2.18 (and updated as required by Section 2.18 as if such Affiliate were a Lender under Section 2.18).

(e)     Calculation of all amounts payable to a Lender under this Section 2.16 and under Section 2.17 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing

49

assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.16 and under Section 2.17.

    **2.17    Increased Costs; Capital Adequacy.** Subject to the provisions of Section 2.18 (which shall be controlling with respect to the Tax matters), in the event that any Lender (which term shall include Issuing Bank for purposes of this Section 2.17) shall reasonably determine (which determination shall, absent demonstrable error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or Governmental Authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other Governmental Authority (whether or not having the force of law): (a) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit (including letters of credit) extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of Adjusted Eurodollar Rate); or (b) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Company shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its reasonable discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.17 which statement shall be conclusive and binding upon all parties hereto absent demonstrable error.

    **2.18    Taxes; Withholding, Etc.** (a) All sums payable by any Credit Party hereunder or any other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender or any Agent), imposed, levied, collected, withheld or assessed by any Governmental Authority, except as set forth in this Section 2.18.

    (b)    If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to Administrative Agent or any Lender under any of the Credit Documents: (i) Company shall notify Administrative Agent of any such requirement or any change in any such requirement as soon as Company becomes aware of it; (ii) Company shall timely pay any such Tax to the relevant Governmental Authority in accordance with applicable laws before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit

Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender, (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment (including a deduction, withholding or payment required to be made with respect to additional sums payable under this clause (iii)), Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty (30) days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, Company shall deliver to Administrative Agent evidence reasonably satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant Governmental Authority; provided, no such additional amount shall be required to be paid to any Lender or any Agent under clause (iii) above with respect to any deductions or withholding taxes imposed on amounts payable to such Lender or Agent as of the date hereof (in the case of each Lender and each Agent listed on the signature pages hereof) or the effective date of the Assignment Agreement pursuant to which such Lender became a Lender or the date on which a successor Lender becomes a Lender, or the date a successor Agent becomes an Agent (in the case of each other Lender or Agent), except to the extent such Lender's assignor or predecessor or such Agent's predecessor (if any) was entitled, as of the effective date of the Assignment Agreement or the date of succession, as applicable, to receive additional amounts from any Credit Party with respect to such withholding tax under clause (iii) above.

(c)     Without limiting the provisions of paragraph (b) above, Company shall timely pay, or, at the option of Administrative Agent, timely reimburse it for the payment of, any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(d)     Each Lender shall indemnify Administrative Agent within 10 days after demand therefor, for the full amount of any Taxes attributable to such Lender that are payable or paid by Administrative Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.

(e)     Each Lender and each Agent that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "*Non-U.S. Lender*") shall deliver to Administrative Agent for transmission to Company, on or prior to the Closing Date (in the case of each Lender and each Agent listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender or on or prior to the date a successor Lender becomes a Lender or on or prior to the date a successor Agent becomes an Agent (in the case of each other Lender and each Agent): (i) two original copies of Internal Revenue Service Form W-8BEN or W-8ECI (or any successor forms), properly completed and duly executed by such Non-U.S. Lender, and such other documentation required under the Internal Revenue Code to establish that such Non-U.S. Lender is completely exempt from or subject to a reduced rate of United States federal withholding tax with respect to any payments to such Non-U.S. Lender of

022537-0167-11432-Active.11706310.13

principal, interest, fees or other amounts payable under any of the Credit Documents, or (ii) if such Non-U.S. Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver either Internal Revenue Service Form W-8BEN or W-8ECI pursuant to clause (i) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any successor form), properly completed and duly executed by such Non-U.S. Lender, and such other documentation required under the Internal Revenue Code to establish that such Non-U.S. Lender is completely exempt from or subject to a reduced rate of United States federal withholding tax with respect to any payments to such Non-U.S. Lender of interest payable under any of the Credit Documents. Each Non-U.S. Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this <u>Section 2.18(e)</u> hereby agrees, from time to time after the initial delivery by such Non-U.S. Lender of such forms, certificates or other evidence to promptly deliver to Administrative Agent for transmission to Company two new original copies of Internal Revenue Service Form W-8BEN or W-8ECI, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8BEN (or successor forms or certificates as shall be adopted from time to time by the relevant United States taxing authority), as the case may be, properly completed and duly executed by such Non-U.S. Lender, and such other documentation required under the Internal Revenue Code to confirm or establish that such Non-U.S. Lender is completely exempt from or subject to a reduced rate of United States federal withholding tax with respect to payments to such Non-U.S. Lender under the Credit Documents, (i) on or before the date that any such previously provided forms, certificates or evidence expires or becomes inaccurate, (ii) whenever a lapse in time or change in circumstances renders such previously provided forms, certificates or other evidence obsolete or inaccurate and (iii) from time to time thereafter if reasonably requested by Company or Administrative Agent, or to notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence. Company and each other Credit Party shall not be required to pay any additional amount to any Non-U.S. Lender under <u>Section 2.18(b)(iii)</u> if such Non-U.S. Lender shall have (x) failed to deliver the forms, certificates or other evidence referred to in this <u>Section 2.18(e)</u>, or (y) notified Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence, as the case may be; <u>provided</u>, if such Non-U.S. Lender shall have satisfied the requirements of the first sentence of this <u>Section 2.18(e)</u> on the Closing Date or on the date of the Assignment Agreement or the date of succession pursuant to which it became a Lender or an Agent, as applicable, nothing in this penultimate sentence of <u>Section 2.18(e)</u> shall relieve Company and each other Credit Party of its obligation to pay any additional amounts pursuant to this <u>Section 2.18</u> in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Non-U.S. Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Non-U.S. Lender is not subject to withholding as described herein. Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(f)     Each Lender and each Agent that is not a Non-U.S. Lender (a "***U.S. Lender***") shall deliver to Administrative Agent and Company two original copies of Internal Revenue Service Form W-9 properly completed and duly executed by such U.S. Lender on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax, or any

successor form. Each U.S. Lender required to deliver any forms, certificates or other evidence with respect to United States backup withholding tax matters pursuant to this Section 2.18(f) hereby agrees, from time to time after the initial delivery by such U.S. Lender of such forms, certificates or other evidence, that such U.S. Lender shall promptly deliver to Administrative Agent for transmission to Company two new original copies of Internal Revenue Service Form W-9, properly completed and duly executed by such U.S. Lender, together with any other certificate or statement of exemption required in order to confirm or establish that such U.S. Lender is exempt from United States backup withholding tax with respect to payments to such U.S. Lender under any of the Credit Documents (i) on or before the date that any such previously provided forms, certificates or other evidence expires or becomes obsolete, (ii) whenever a lapse in time or change in circumstances render such previously provided forms, certificates or other evidence obsolete or inaccurate, and (iii) from time to time thereafter if reasonably requested by Company or Administrative Agent, or shall notify Administrative Agent and Company of its inability to deliver any such forms, certificates or other evidence. Company and each other Credit Party shall not be required to pay any additional amount to any U.S. Lender under Section 2.18(b)(iii) to the extent deduction or withholding is a result of such U.S. Lender's failure to provide an Internal Revenue Service Form W-9 establishing that such U.S. Lender is exempt from United States backup withholding tax; provided, if such U.S. Lender shall have satisfied the requirements of this Section 2.18(f) on the Closing Date or on the date of the Assignment Agreement or on the date of the succession pursuant to which it became a Lender or an Agent, as applicable, nothing in this last sentence of Section 2.18(f) shall relieve Company and each other Credit Party of its obligation to pay any additional amounts otherwise payable pursuant to Section 2.18(b)(iii) in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such U.S. Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such U.S. Lender is not subject to United States backup withholding tax as described herein. If such U.S. Lender fails to deliver such forms, then Company may withhold from any payment to such U.S. Lender an amount equal to the applicable backup withholding tax imposed by the Internal Revenue Code.

(g)     If any Lender or any Agent determines in its sole discretion that it has received a refund in respect of any Taxes as to which additional amounts have been paid to it by Company pursuant to Section 2.18(b)(iii), it shall promptly remit such refund (including any interest included in such refund) to Company, net of all out-of-pocket expenses of such Lender or such Agent, as the case may be; provided however, that Company, upon request of such Lender or such Agent, as the case may be, agrees to promptly return such refund to such party in the event such party is required to repay such refund to the relevant Governmental Authority. This paragraph shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to Company or any other Person.

(f)     For purposes of this Section 2.18, the term "Lender" shall include Issuing Bank.

**2.19    Capital Adequacy Adjustment**. If any Lender (which term shall include Issuing Bank for purposes of this Section 2.19) shall have determined that the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or

022537-0167-11432-Active.11706310.13

administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency, has or would have the effect of materially reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments or Letters of Credit or participations therein or other obligations hereunder with respect to the Loans or the Letters of Credit to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time, within five (5) Business Days after receipt by Company from such Lender of the statement referred to in the next sentence, Company shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction. Such Lender shall deliver to Company (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis of the calculation of such additional amounts, which statement shall be conclusive and binding upon all parties hereto absent demonstrable error.

2.20 **Obligation to Mitigate**. Each Lender (which term shall include Issuing Bank for purposes of this Section 2.20) agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans or Letters of Credit, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.17, 2.18 or 2.19, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts (i) to make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (ii) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.17, 2.18 or 2.19 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments, Loans or Letters of Credit through such other office or in accordance with such other measures, as the case may be, would not otherwise materially adversely affect such Commitments, Loans or Letters of Credit or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.20 unless Company agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described in clause (i) above. A certificate as to the amount of any such expenses payable by Company pursuant to this Section 2.20 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Company (with a copy to Administrative Agent) shall be conclusive absent demonstrable error. With respect to any Lender's claim for compensation under Sections 2.17, 2.18 or 2.19, Company shall not be required to compensate such Lender for any amount incurred more than ninety (90) days prior to the date that such Lender becomes aware of the event that gives rise to such claim.

2.21 **Defaulting Lenders**. Anything contained herein to the contrary notwithstanding, in the event that any Lender (a "**Defaulting Lender**") defaults (a "**Funding Default**") in its

obligation to fund any Revolving Loan (a "***Defaulted Revolving Loan***") as a result of the appointment of a receiver or conservator with respect to such Lender at the direction or request of any regulatory agency or authority, then (a) during any Default Period with respect to such Defaulting Lender, such Defaulting Lender shall be deemed not to be a "Lender" for purposes of voting on any matters (including the granting of any consents or waivers) with respect to any of the Credit Documents; (b) to the extent permitted by applicable law, until such time as the Default Excess with respect to such Defaulting Lender shall have been reduced to zero, (i) any voluntary prepayment of the Revolving Loans shall, if Company so directs at the time of making such voluntary prepayment, be applied to the Revolving Loans of other Lenders as if such Defaulting Lender had no Revolving Loans outstanding and the Revolving Credit Exposure of such Defaulting Lender were zero, and (ii) any mandatory prepayment of the Revolving Loans shall be applied to the Revolving Loans of other Lenders (but not to the Revolving Loans of such Defaulting Lender) as if such Defaulting Lender had funded all Defaulted Revolving Loans of such Defaulting Lender; (c) such Defaulting Lender's Revolving Loan Commitment and outstanding Revolving Loans and such Defaulting Lender's applicable Pro Rata Share of the Letter of Credit Usage shall be excluded for purposes of calculating the commitment fee payable to the Lenders pursuant to Section 2.9 in respect of any day during any Default Period with respect to such Defaulting Lender, and such Defaulting Lender shall not be entitled to receive any commitment fee pursuant to Section 2.9 with respect to such Defaulting Lender's Commitment in respect of any Default Period with respect to such Defaulting Lender; and (d) the Total Utilization of Revolving Loan Commitments as at any date of determination shall be calculated as if such Defaulting Lender had funded all Defaulted Revolving Loans of such Defaulting Lender. No Revolving Loan Commitment of any Lender shall be increased or otherwise affected, and, except as otherwise expressly provided in this Section 2.21, performance by Company of its obligations hereunder and the other Credit Documents shall not be excused or otherwise modified as a result of any Funding Default or the operation of this Section 2.21. The rights and remedies against a Defaulting Lender under this Section 2.21 are in addition to other rights and remedies which Company may have against such Defaulting Lender with respect to any Funding Default and which Administrative Agent or any Lender may have against such Defaulting Lender with respect to any Funding Default.

   **2.22   Removal or Replacement of a Lender**. Anything contained herein to the contrary notwithstanding, in the event that: (a) any Lender (an "***Increased-Cost Lender***") shall give notice to Company that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.17, Section 2.18 or Section 2.19, the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and such Lender shall fail to withdraw such notice within five (5) Business Days after Company's request for such withdrawal; or (b) any Lender shall become a Defaulting Lender, the Default Period for such Defaulting Lender shall remain in effect, and such Defaulting Lender shall fail to cure the default as a result of which it has become a Defaulting Lender within five (5) Business Days after Company's request that it cure such default; or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions hereof as contemplated by Section 10.5(b) or Section 10.5(c), the consent of Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "***Non-Consenting Lender***") whose consent is required shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (the "***Terminated Lender***"), Company may, by giving written

022537-0167-11432-Active.11706310.13

notice to Administrative Agent and any Terminated Lender of its election to do so: (i) (1) elect to terminate the Commitment, if any, of such Terminated Lender upon receipt by such Terminated Lender of such notice, and (2) prepay on the date of such termination any outstanding Loans at par made by such Terminated Lender, together with accrued and unpaid interest thereon and any other amounts payable to such Terminated Lender hereunder pursuant to <u>Sections 2.16(c)</u>, <u>2.17</u> <u>2.18</u> or <u>2.19</u> or otherwise; or (ii) elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Commitment, if any, in full and at par to one or more Eligible Assignees (each a "***Replacement Lender***") in accordance with the provisions of <u>Section 10.6</u> (and no processing or recordation fee shall be payable under <u>Section 10.6</u>); <u>provided</u>, (1) on the date of such assignment, Company shall pay any amounts payable to such Terminated Lender pursuant to <u>Sections 2.16</u>(c), <u>2.17</u>, <u>2.18</u> or <u>2.19</u> or otherwise as if it were a prepayment and (2) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender; <u>provided</u>, (A) Company may not make either of such elections with respect to any Terminated Lender that is also Issuing Bank unless, prior to the effectiveness of such election arrangements reasonably satisfactory to such Issuing Bank (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer reasonably satisfactory to such Issuing Bank or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such Issuing Bank) have been made with respect to each outstanding Letter of Credit issued by such Issuing Bank (or such outstanding Letter of Credit has been cancelled) and (B) the Lender that acts as Administrative Agent may not be replaced hereunder except in accordance with the terms of <u>Section 9.7(a)</u>. Upon the prepayment of all amounts owing to any Terminated Lender and the termination of such Terminated Lender's Commitment, if any, (a) the definition of "Commitments" shall be deemed modified to reflect any corresponding changes in the Commitments, and (b) such Terminated Lender shall no longer constitute a "Lender" for purposes hereof; <u>provided</u>, any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender.

> **2.23    Priority and Liens**. (a) The Debtors hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Debtors hereunder and under the other Credit Documents, and the obligations of the Guarantors pursuant to <u>Section 7</u>, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected First Priority Lien on all Collateral that is otherwise not encumbered by a valid and perfected Lien as of the Petition Date or valid Liens perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien upon all Collateral that is subject to valid, perfected and non-avoidable Liens (other than Liens securing the Debtors' Prepetition Obligations and Liens that are junior to the Liens securing the Debtors' Prepetition Obligations) in existence on the Petition Date or valid Liens perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected First Priority priming Lien upon all Collateral (x) that is subject to a valid Lien or security interest in effect on the Petition Date to secure the Debtors' Prepetition Obligations, (y) that is subject to a Lien granted after the

Petition Date to provide adequate protection in respect of the Debtors' Prepetition Obligations or (z) that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Debtors' Prepetition Obligations, subject and subordinate in each case with respect to subclauses (i) through (iv) above, only to the Carve Out and to Permitted Liens. Notwithstanding anything herein to the contrary, the Carve Out shall not be used to commence or prosecute any Prohibited Claim.

(b) As to all Collateral, each Debtor hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto Administrative Agent, for the benefit of the Lenders and the other Secured Parties, all of the right, title and interest of Company and such Guarantor in all of such Collateral and all proceeds thereof. Company and each Guarantor acknowledge that, pursuant to the Orders, the Liens granted in favor of Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. Company and each Guarantor further agree that Administrative Agent shall have the rights and remedies set forth in the Pledge and Security Agreement and the Orders in respect of the Collateral.

(c) Each Debtor acknowledges and agrees that, pursuant to the Orders, the Prepetition Secured Parties shall receive (i) as adequate protection for, and to the extent of, any diminution in the value of the Prepetition Secured Parties' respective interests in their collateral, whether resulting from the imposition of the automatic stay, the priming described in <u>Section 2.23(a)</u> above, the use of the Prepetition Secured Parties' cash collateral or the use, sale, lease or other diminution in value of the Prepetition Secured Parties' collateral (x) a Superpriority Claim junior only to the Superpriority Claim granted to Administrative Agent and the Lenders; and (y) a replacement Lien on the Collateral having a priority immediately junior to the priming and other Liens granted in favor of Administrative Agent and the Lenders hereunder and under the other Credit Documents and the Orders (in each case, subject and subordinate to (1) the Carve Out, (2) valid and perfected Liens which are senior (after giving effect to the Orders) to the Liens granted to Administrative Agent and the Lenders pursuant to the Orders) and (3) Permitted Liens and (ii) as further adequate protection, the payment on a current basis of the reasonable fees and expenses (but limited in the case of counsel to the reasonable fees and expenses of one (1) counsel and third-party consultants to the Prepetition Agent and the members of the steering committee of the Prepetition Lenders, taken as a whole) incurred by the Prepetition Agent and the members of the steering committee of the Prepetition Lenders (including any unpaid prepetition fees and expenses).

**2.24** **Payment of Obligations**. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Credit Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court, subject to the Orders.

**2.25** **No Discharge; Survival of Claims**. Each Debtor agrees that to the extent that the Termination Date has not occurred, (a) its Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order (and each Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to Administrative Agent and the Lenders pursuant to the Orders and described in

022537-0167-11432-Active.11706310.13

Section 2.23 and the Liens granted to Administrative Agent pursuant to the Orders and described in Section 2.23 shall not be affected in any manner by the entry of a Confirmation Order.

**2.26  Conflicts**. To the extent of any conflict between the provisions of this Agreement and provisions contained in the Interim Order (or the Final Order, as applicable), the provisions of the applicable Order shall govern.

**2.27  Six Month Extension Option**. Company may extend the Maturity Date from the six (6) month anniversary of the Petition Date to the twelve (12) month anniversary of the Petition Date (the "***Six Month Extension Option***") subject to, and the Maturity Date shall be automatically so extended upon the satisfaction of, the following conditions precedent:

(a) Company shall provide written notice to Administrative Agent at least fifteen (15) days prior to the six (6) month anniversary of the Petition Date of its intention to exercise the Six Month Extension Option;

(b) Company shall pay a fee to Administrative Agent, for the account of the Lenders on a pro rata basis, on or before the initial Maturity Date in an amount equal to $150,000;

(c) the Credit Parties shall have filed with the Bankruptcy Court the Reorganization Plan, if not already filed on the Petition Date, providing for the full repayment of the Loans in cash upon consummation thereof; and

(d) no Default or Event of Default shall have occurred and be continuing as of the initial Maturity Date.

Administrative Agent will notify Company and the Lenders upon the effectiveness of the Six Month Extension Option.

## SECTION 3. CONDITIONS PRECEDENT

**3.1  Closing Date**. The obligations of the Lenders to make any Credit Extension during the Revolving Loan Commitment Period are subject to the satisfaction, or waiver in accordance with Section 10.5 of the following conditions on or before the Closing Date:

(a)  **Credit Documents**. Administrative Agent shall have received a copy of (i) this Agreement executed and delivered by Administrative Agent, Holdings, Company, each other Guarantor and each Lender and (ii) the Collateral Documents executed and delivered by Collateral Agent, and each Credit Party party thereto.

(b)  **Organizational Documents, Etc.** Administrative Agent shall have received a copy of each of the following documents, originally executed (where applicable) and delivered by each Credit Party, as applicable: (i) certified copies of the certificate or articles of incorporation (or equivalent charter document) of such Person, together with a good standing certificate from the Secretary of State of its jurisdiction of incorporation or formation, as applicable and, to the extent generally available, a certificate or other evidence of good standing

022537-0167-11432-Active.11706310.13

as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each such jurisdiction, each dated the Closing Date or a recent date prior thereto; (ii) copies of the bylaws (or equivalent operative agreement) of such Person, certified as of the Closing Date by the corporate secretary or an assistant secretary of such Person as being in full force and effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (iii) below; (iii) resolutions of the board of directors (or similar governing body) of such Person approving and authorizing the execution, delivery and performance of the Credit Documents to which it is a party, certified as of the Closing Date by the corporate secretary or an assistant secretary of such Person as being in full force and effect without modification or amendment; and (iv) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party, dated the Closing Date.

     (c)    **[Reserved]**.

     (d)    **Opinions of Counsel to Credit Parties**. Administrative Agent shall have received executed copies of the favorable written opinion of (i) Weil, Gotshal & Manges LLP, in the form of Exhibit D-1 and (ii) Kolesar & Leatham, Chtd., in the form of Exhibit D-2, dated as of the Closing Date.

     (e)    **Fees**. Company shall have paid to Administrative Agent, for distribution (as appropriate) to Agents and the Lenders, the fees payable on the Closing Date referred to in Section 2.9(c) and all expenses of the Agents payable under the Commitment Letter (including the reasonable fees, disbursements and other charges of counsel) for which reasonably detailed invoices have been delivered to Company prior to the Closing Date.

     (f)    **Closing Date Certificate**. The Credit Parties shall have delivered to Administrative Agent a Closing Date Certificate.

     (g)    **[Reserved]**.

     (h)    **Budget**. Administrative Agent shall have received from Company forecasts substantially in the form of Exhibit K hereto.

     (i)    **Cash Flow Forecast**. Administrative Agent shall have received a Cash Flow Forecast.

     (j)    **Lien Searches**. Administrative Agent shall have received the results of a recent search by a Person reasonably satisfactory to Administrative Agent, of the Uniform Commercial Code, judgment and tax lien filings which have been filed with respect to personal property of the Credit Parties in any of the jurisdictions set forth in Schedule 3.1(j), and the results of such search shall not reveal any Liens other than Permitted Liens or Liens discharged on or prior to the Closing Date pursuant to documentation satisfactory to Administrative Agent.

     (k)    **Actions to Perfect Liens**. Administrative Agent shall have received financing statements on Form UCC-1 in each jurisdiction set forth on Schedule 3.1(j), to be filed promptly on or following the Closing Date.

     (l)    **[Reserved]**.

(m)     **Patriot Act.** Administrative Agent and the Lenders shall have received at least two (2) days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, requested by such Person in writing at least five (5) Business Days prior to the Closing Date.

(n)     **Interim Order.** At the time of the making of the initial extension of credit, and in any event no later than five (5) Business Days after the Petition Date (or such later date agreed to by the Requisite Lenders, Administrative Agent shall have received a certified copy of the Interim Order, which Interim Order shall (i) be substantially in the form of Exhibit N hereto and, solely to the extent that any changes to Exhibit N hereto are materially adverse to the interests of the Agents and the Lenders, in their capacities as such, such changes shall be in form and substance reasonably satisfactory to Administrative Agent and the Requisite Lenders and (ii) be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended (in the case of any modification or amendment, in any respect that is materially adverse to the interests of the Agents and the Lenders, in their capacities as such, without the prior written consent of Administrative Agent (such consent not to be unreasonably withheld)).

(o)     **Compliance with Interim Order; No Trustee.** The Debtors shall be in compliance in all material respects with the Interim Order. No trustee or examiner with the power to operate any portion of the Debtors' business shall have been appointed with respect to the Credit Parties or their respective properties.

(p)     **First Day Motion/Orders.** All customary "first day" motions and First Day Orders submitted to the Bankruptcy Court on or about the Petition Date shall be in form and substance reasonably satisfactory to Administrative Agent; it being understood and agreed that the "first day" motions delivered to Administrative Agent prior to the Petition Date are satisfactory.

(q)     **No Material Adverse Change.** Since December 27, 2008, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

Each Agent and Lender, by delivering its signature page to this Agreement, to the extent applicable, shall be deemed to have acknowledged receipt of, and consented to and approved (as long as substantially in the form delivered to such Agent or Lender, as applicable, including any changed pages thereto delivered to such Agent or the Lenders, as applicable), each Credit Document and each other document required to be approved by the Requisite Lenders or the Lenders, as applicable.

**3.2     Final Order Entry Date** The obligations of the Lenders to make any Credit Extension during the Revolving Loan Full Commitment Period are subject to the satisfaction, or waiver in accordance with Section 10.5 of the following additional conditions on or before the Final Order Entry Date:

(a)     **Bankruptcy Court Approval.** Administrative Agent shall have received a certified copy of the Final Order, which Final Order shall (i) be substantially in the form of the

Interim Order and, solely to the extent of any changes to the Interim Order are materially adverse to the interests of the Agents and the Lenders, such changes shall be in form and substance reasonably satisfactory to Administrative Agent and Requisite Lenders, (ii) be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended which, in any event, shall have been entered by the Bankruptcy Court no later than 30 days after the entry of the Interim Order (or such later date agreed to by Administrative Agent and the Requisite Lenders in their reasonable sole discretion) (in the case of any modification or amendment, in any respect that is materially adverse to the interests of the Agents and the Lenders in their capacities as such, without the prior written consent of Administrative Agent and Requisite Lenders) (such consent not to be unreasonably withheld) and (iii) if either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of the making of such extensions of credit, the grant of Liens and Superpriority Claims pursuant to <u>Section 2.23</u> or otherwise hereunder or the performance by Company or any Guarantor of any of their respective obligations under any of the Credit Documents shall be the subject of a presently effective stay pending appeal.

(b)    **[Reserved]**.

(c)    **Fees**. Company shall have paid to Administrative Agent, for distribution (as appropriate) to Agents and the Lenders, the fees payable on the Final Order Entry Date referred to in <u>Section 2.9(c)</u> and all expenses otherwise payable hereunder for which invoices have been presented on or prior to the Final Order Entry Date.

**3.3    <u>Conditions to Each Credit Extension</u>**. The occurrence of the Closing Date and the obligation of each Lender to make any Credit Extension on any Credit Extension Date, including any Credit Extension on the Closing Date, is subject to the following further conditions precedent:

(a)    **Funding Notice/Request for Issuance**. Administrative Agent, Issuing Bank and Swing Line Lender, as the case may be, shall have received a fully executed and delivered Funding Notice or Request for Issuance, as the case may be.

(b)    **Representations and Warranties**. As of such Credit Extension Date, the representations and warranties contained herein and in the other Credit Documents shall be true, correct and complete in all material respects on and as of that Credit Extension Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true, correct and complete in all material respects on and as of such earlier date.

(c)    **No Default of Event of Default**. As of such Credit Extension Date, no event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Funding Notice or Letter of Credit contemplated by such Request for Issuance that would constitute an Event of Default or a Default.

(d)    **Other Information**. On or before the date of issuance of any Letter of Credit, Administrative Agent shall have received all other information required by the applicable

Request for Issuance, and such other documents or information as Issuing Bank may reasonably require in connection with the issuance of such Letter of Credit.

(e) **Availability**. After giving effect to the Loans to be made on such date and the use of proceeds thereof, the aggregate principal amount of all Loans made by all of the Lenders on or prior to such date shall not exceed the aggregate amount of Loans permitted to be borrowed under the Interim Order (or Final Order, as applicable).

Any Notice shall be executed by an Authorized Officer of Company or by the executive officer thereof designated by an Authorized Officer of Company in a writing delivered to Administrative Agent. In lieu of delivering a Funding Notice or Request for Issuance, Company may give Administrative Agent telephonic notice by the required time of any proposed borrowing, conversion/continuation or issuance of a Letter of Credit, as the case may be; provided each such notice or request shall be promptly confirmed in writing by delivery of the applicable Funding Notice or Request for Issuance to Administrative Agent on or before the applicable date of borrowing, continuation/conversion or issuance. Neither Administrative Agent nor any Lender shall incur any liability to Company in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly authorized officer or other person authorized on behalf of Company or for otherwise acting in good faith in connection with any such notice. Upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement or upon funding of Loans by the Lenders in accordance herewith, in either case pursuant to any such telephonic notice, Company shall have effected a conversion or continuation (as the case may be) or shall have effected Loans, respectively, hereunder. Company shall notify Administrative Agent (or Issuing Bank, as the case may be) prior to the funding of any Loans or the issuance of any Letter of Credit in the event that any of the matters to which Company is required to certify in the applicable Notice is no longer true and correct in all material respects as of the applicable Credit Extension Date, and the acceptance by Company of the proceeds of any Loans or the issuance of any Letter of Credit shall constitute a re-certification by Company, as of the applicable Credit Extension Date, as to the matters to which Company is required to certify in the applicable Funding Notice or Request for Issuance.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce Agents, the Lenders and Issuing Bank to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to the Agents and each Lender as follows:

**4.1** **Organization and Powers**. Each Credit Party is a corporation, limited liability company or limited partnership, as applicable, duly organized or formed, as applicable, validly existing and, to the extent such concept applies, in good standing under the laws of its jurisdiction of incorporation or formation, as applicable. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, as applicable), each Credit Party has all requisite corporate or other organizational power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby.

62

**4.2** **Qualification, Good Standing and Compliance with Law**. Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, as applicable), each Credit Party is (a) qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had and could not be reasonably be expected to have a Material Adverse Effect and (b) is in compliance with all applicable Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

**4.3** **Subsidiaries**. As of the Closing Date, all of the Subsidiaries of Holdings are identified in Schedule 4.1. As of the Closing Date, the issued and outstanding capital stock of each of the Subsidiaries of Holdings identified in Schedule 4.1 is duly authorized, validly issued, fully paid and nonassessable and none of such capital stock constitutes Margin Stock. Each of the Subsidiaries of Holdings is a corporation, limited liability company or limited partnership, as applicable, duly organized or formed, as applicable, validly existing, to the extent such concept applies, and in good standing under the laws of its respective jurisdiction of incorporation or formation, as applicable, has all requisite corporate power and authority to own and operate its properties and to carry on its business as now conducted and as proposed to be conducted, and is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, in each case except where failure to be so qualified or in good standing or a lack of such corporate power and authority has not had and could not be reasonably expected to have a Material Adverse Effect. As of the Closing Date, Schedule 4.1 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in each of the Subsidiaries of Holdings identified therein.

**4.4** **Authorization of Borrowing; No Conflict**. Upon entry by the Bankruptcy Court of the Interim Order (or Final Order, as applicable), the execution, delivery and performance of the Credit Documents have been duly authorized by all necessary corporate, limited liability company or limited partnership, as applicable, action on the part of each Credit Party that is a party thereto. Upon entry by the Bankruptcy Court of the Interim Order (or Final Order, as applicable), the execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any Requirement of Law applicable to Holdings or any of its Subsidiaries, the certificate or articles of incorporation or bylaws (or equivalent constituent documents) of Holdings or any of its Subsidiaries or any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries, except to the extent such violation could not be reasonably be expected to have a Material Adverse Effect, (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries entered into on or after the Petition Date, except where such default, individually or in the aggregate, does not have a Material Adverse Effect, (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries under any Contractual Obligation the exercise of remedies under which is not stayed pursuant to the Bankruptcy Code (other than any Liens created under any of the Credit Documents in favor of Collateral Agent on behalf of the Secured Parties or the Orders), or (d) require any approval of stockholders or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Subsidiaries that is not stayed pursuant to the Bankruptcy Code, except for such approvals or

63

consents which will be obtained on or before the Closing Date and disclosed in writing to the Lenders and except for any such consents or approvals the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect.

**4.5**    **Governmental Consents**. The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other Governmental Authority or regulatory body except for (a) those with respect to the Collateral contemplated to be made under the Credit Documents, (b) those otherwise delivered to Collateral Agent for filing and/or recordation, (c) such as have been obtained and are in full force and effect, (d) any such consents or approvals the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (e) entry by the Bankruptcy Court of the Interim Order (or the Final Order, as applicable).

**4.6**    **Binding Obligation**. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, as applicable), each of the Credit Documents has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms and the Interim Order (or the Final Order, as applicable).

**4.7**    **Solvency.**  As of October 31, 2009, each Non-Guarantor Subsidiary is Solvent.

**4.8**    **Financial Condition**. Company has heretofore delivered to the Lenders Historical Financial Statements all of which were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the entities described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments and, in the case of interim financial statements, except for the absence of notes thereto.

**4.9**    **No Material Adverse Change**. Since December 27, 2008, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect (other than disclosed in the first day motions).

**4.10**    **Litigation; Adverse Facts**. Except as set forth on Schedule 4.10 or as may occur in connection with the entry of the Interim Order and the Final Order or have been stayed in connection with the filing of the Cases, there are no Adverse Proceedings, individually or in the aggregate, that could reasonably be expected to result in a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

022537-0167-11432-Active.11706310.13

**4.11** <u>Payment of Taxes</u>. Except in accordance with <u>Section 5.3</u> and to the extent failure to do so is permitted by the Bankruptcy Code or pursuant to the Orders or any other order of the Bankruptcy Court, all Federal and material state and other Tax returns and reports of Company, Holdings and its Subsidiaries required to be filed by any of them have been timely filed, and all Federal and material state and other Taxes due and payable and all assessments, fees and other governmental charges upon Company, Holdings and its Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable except those (a) which are not overdue by more than thirty (30) days, (b) which are being contested by Holdings or such Subsidiary in good faith and by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP or (c) with respect to which the failure to make such filings or payment could not reasonably be expected to have a Material Adverse Effect.

**4.12** <u>Title to Properties; Real Property</u>. Company and its Subsidiaries have, subject to Permitted Liens, (a) good, sufficient and legal title to (in the case of fee interests in real property); (b) valid leasehold interests in (in the case of leasehold interests in real or owned personal property); and (c) sufficient rights to (in the case of all other personal property), all of their respective properties and assets except for defects in title that do not materially interfere with their ability to conduct their businesses or to utilize such assets for their intended purposes or where failure to have such title in the aggregate could not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, <u>Schedule 4.12</u> contains a true, accurate and complete list of all (i) fee interests of any Credit Party in real property, and (ii) all leases or subleases affecting or comprising each real property asset of any Credit Party, regardless of whether such Credit Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease or sublease. Except as specified in <u>Schedule 4.12</u>, as of the Closing Date, (x) each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect, (y) Company does not have knowledge of any default that has occurred and is continuing thereunder, and (z) each such agreement constitutes the legally valid and binding obligation of each applicable Credit Party, enforceable against such Credit Party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles in each case, except to the extent any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

**4.13** <u>Collateral</u>. (a) Except for the security interest created by the Collateral Documents, each Credit Party owns the Collateral owned by such Credit Party free and clear of any Lien other than Permitted Liens. (b) Subject to the entry by the Bankruptcy Court of the Orders and subject to the terms thereof, the execution and delivery of the Collateral Documents by the Credit Parties, together with the actions taken on or prior to the Closing Date pursuant to <u>Section 3</u> and the provisions of the Collateral Documents are effective to create in favor of Collateral Agent for the benefit of the Secured Parties, as security for the respective Secured Obligations (as defined in the Orders), a valid and perfected Lien on all of the Collateral having the priority contemplated by the Orders, and all filings and other actions necessary or desirable to perfect and maintain the perfection and First Priority Lien status of such Liens have been duly made or taken and remain in full force and effect, other than the filing of any UCC financing statements and other filings contemplated to be made on the Closing Date which have been delivered to Collateral Agent for filing (but not yet filed), the filing of any mortgages, the

periodic filing of UCC continuation statements in respect of UCC financing statements filed by or on behalf of Collateral Agent and the entering into of any deposit account and securities account control agreements. (c) Except as required under the Bankruptcy Code and applicable state and federal bankruptcy rules, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required for either (i) the pledge or grant by any Credit Party of the Liens purported to be created in favor of Collateral Agent, for the benefit of Secured Parties, pursuant to any of the Collateral Documents or (ii) the exercise by Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to any of the Collateral Documents or created or provided for by applicable law), except for filings or recordings contemplated by this Section 4.13 and except for consents referred to in Sections 4.4 and 4.5 and except as may be required, in connection with the disposition of any Pledged Collateral, by laws generally affecting the offering and sale of securities and except as may be required in connection with the foreclosure of any mortgage. (d) Except such as may have been filed in favor of Collateral Agent, for the benefit of Secured Parties, as contemplated by this Section 4.13 or have been filed in connection with Permitted Liens, (i) no effective UCC financing statement, fixture filing or other instrument similar in effect covering all or any part of the Collateral is on file in any filing or recording office and (ii) no effective filing covering all or any part of the Collateral which is Intellectual Property is on file in the United States Patent and Trademark Office or the United States Copyright Office or any similar foreign or state office.

**4.14** **Environmental**. Neither Holdings nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or settlement agreement with any Person relating to (a) any Environmental Law, (b) any Environmental Claim, or (c) any Hazardous Materials Activity that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law which could reasonably be expected to have a Material Adverse Effect. There are and, to Company's knowledge, have been no conditions, occurrences, or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Holdings or any of its Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Neither Holdings nor any of its Subsidiaries nor, to Company's knowledge, any predecessor of Holdings or any of its Subsidiaries has treated, stored or disposed of any hazardous waste at any Facility in a manner that could reasonably be expected to have a Material Adverse Effect, and none of Holdings or any of its Subsidiaries' operations involves the treatment, storage or disposal of hazardous waste that, in each case, would require a permit (as opposed to an identification number) under RCRA. Compliance with all current or, to Company's knowledge, reasonably foreseeable future requirements pursuant to or under Environmental Laws will not, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect. Notwithstanding anything in this Section 4.14 to the contrary, no event or condition has occurred or is occurring with respect to Holdings or any of its Subsidiaries relating to any Environmental Law, any Release of Hazardous Materials, or any Hazardous Materials Activity which individually or in the aggregate has had or could reasonably be expected to have a Material Adverse Effect.

022537-0167-11432-Active.11706310.13

**4.15** **No Defaults**. Neither Holdings nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations the exercise of remedies under which is not subject to the automatic stay under the Bankruptcy Code, and no condition exists that, with the giving of notice or the lapse of time or both, would constitute such a default, except, where the consequences, direct or indirect, of such default or defaults, if any, could not be reasonably be expected to have a Material Adverse Effect.

**4.16** **Governmental Regulation**. Neither Holdings nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur the Obligations or which may otherwise render all or any portion of the Obligations unenforceable.

**4.17** **Margin Stock**. Neither Holdings nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.18** **Employee Matters**. There is no strike or work stoppage in existence or threatened involving Holdings or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

**4.19** **Employee Benefit Plans**. Company and each of its ERISA Affiliates are in material compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed in all material respects all their obligations under each Employee Benefit Plan, except for such noncompliance which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Each Employee Benefit Plan which is intended to qualify under Section 401 of the Internal Revenue Code is so qualified or will be qualified by submission, in a timely fashion, to the Internal Revenue Service for a determination of qualification with respect to such Employee Benefit Plan (if not already submitted), and the timely making of such amendments as may be required by the Internal Revenue Service as a condition for issuance of such a favorable determination, except for such non-qualification which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Except as set forth in Schedule 4.19 with respect to an ERISA Event that, as of the date of this Credit Agreement, arose pursuant to or as a direct result of the Cases, no ERISA Event has occurred or as of the date hereof is reasonably expected to occur where such ERISA Event, individually or in the aggregate, would have a Material Adverse Effect. As of the most recent valuation date for any Pension Plan, any amount of Unfunded Benefit Liabilities, individually or in the aggregate for all Pension Plans (except for purposes of such computation any Pension Plans with respect to which assets exceed benefit liabilities), could not reasonably be expected to have a Material Adverse Effect. Neither Company, nor any of its ERISA Affiliates has completely or partially withdrawn from any Pension Plan or Multiemployer Plan, or incurred termination liability to the PBGC or withdrawal liability to any

67

such plan, except for such withdrawal or liability which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. As of the most recent valuation date for each Multiemployer Plan for which the actuarial report is available, the potential liability of Company and its ERISA Affiliates for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, based on information available pursuant to Section 4221(e) of ERISA, could not reasonably be expected to have a Material Adverse Effect.

**4.20    Use of Proceeds.** Company is in compliance with the terms of Section 2.4.

**4.21    Disclosure.** No written information, reports, financial statements, certificates or exhibits (other than any Projections or information of a general economic or industry specific nature) furnished to the Lenders or the Bankruptcy Court by or on behalf of Company or any of its Subsidiaries for use in connection with the transactions contemplated hereby, when taken as a whole, contained any untrue statement of a material fact or omitted to state a material fact (known to Company, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which the same were made. Any projections and pro forma financial information (collectively, the "**Projections**") contained in such materials are based upon good faith estimates and assumptions believed by Company to be reasonable at the time made, it being recognized by the Lenders that such Projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results (and such differences may be material). There are no facts known to Company (other than matters of a general economic or industry specific nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders or the Bankruptcy Court for use in connection with the transactions contemplated hereby.

**4.22    Intellectual Property.** Each of the Credit Parties owns or has the valid right to use all Intellectual Property free and clear of any and all Liens other than Permitted Liens. All registrations therefor are in full force and effect and are valid and enforceable, except as could not be expected to have a Material Adverse Effect. To each Credit Party's knowledge, the conduct of the business of each Credit Party as currently conducted, including, but not limited to, all products, processes, or services, made, offered or sold by each such Credit Party, does not infringe upon, violate, misappropriate or dilute any intellectual property of any third party which infringement is likely to have a Material Adverse Effect. To the Credit Parties' knowledge, no third party is infringing upon the Intellectual Property in any manner which could reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 4.10, there is no pending or, to each Credit Party's knowledge, threatened claim or litigation contesting any Credit Party's right to own or use any Intellectual Property or the validity or enforceability thereof which could reasonably be expected to have a Material Adverse Effect.

**4.23    Regulation H.** No mortgage securing the Obligations encumbers improved real property on which any buildings or other structural improvements are located within an area that has been identified by the Secretary of Housing and Urban Development as an area having

68

special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, or, for any mortgage securing the Obligations encumbering real property not in compliance with the foregoing statement, flood insurance has been obtained as required by the Financial Institutions Reform Recovery and Enforcement Act of 1989.

**4.24  Patriot Act**. To the extent applicable, each Credit Party, to its actual knowledge, is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001). No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.25  The Orders**. The Interim Order or Final Order, as the case may be, is in full force and effect, and has not been reversed, modified, stayed or amended (in the case of any modification or amendment, in any respect that is materially adverse to the Lenders and the Agents, in their capacities as such, without the prior written consent of Administrative Agent) (such consent not to be unreasonably withheld). Upon the Maturity Date (whether by the acceleration or otherwise) of any of the obligations of the Credit Parties hereunder and under the other Credit Documents, the Lenders shall, subject to the provisions of <u>Section 8</u> and the Orders, be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## SECTION 5.  AFFIRMATIVE COVENANTS

Until the Termination Date has occurred, each of Holdings and Company shall, and shall (except in the case of the covenants set forth in <u>Section 5.1</u>) cause each Subsidiary to do the following:

**5.1  Financial Statements and Other Reports**. Company will deliver to Administrative Agent for further distribution (and which Administrative Agent shall promptly distribute) to each Lender, in form and detail reasonably satisfactory to Administrative Agent:

(a)  as soon as available and in any event within twenty-five (25) days after the end of each of the first two (2) months of each Fiscal Quarter ending after the Closing Date (such reports, the "*Monthly Reports*"), (i) the consolidated balance sheet of Company and its Subsidiaries as at the end of such month and the related consolidated statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such month and (ii) for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth beginning with the monthly financial statements for fiscal year 2009, in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a CFO Certification and an MD&A with respect to each of the foregoing;

022537-0167-11432-Active.11706310.13

(b)     as soon as available and in any event within forty-five (45) days after the end of the first three (3) Fiscal Quarters of each Fiscal Year, the consolidated balance sheet of Company and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with (i) a quarterly accounts receivable exposure report for such Fiscal Quarter in the form prepared by management of Company in the ordinary course of business and (ii) a CFO Certification and an MD&A with respect thereto;

(c)     as soon as available and in any event within ninety (90) days after the end of each Fiscal Year, (i) the consolidated balance sheet of Company and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Company and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a CFO Certification and an MD&A with respect thereto and (ii) in the case of such consolidated financial statements, a report thereon of PricewaterhouseCoopers LLP or other independent certified public accountants of recognized national standing selected by Company;

(d)     together with each delivery of financial statements of Company and its Subsidiaries pursuant to Sections 5.1(b) and 5.1(c), a duly executed and completed Compliance Certificate;

(e)     (i) if, as a result of any change in accounting principles and policies from those used in the preparation of the Historical Financial Statements, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to Section 5.1(a), 5.1(b) or 5.1(c) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to Administrative Agent; and (ii) promptly upon receipt thereof (unless restricted by applicable professional standards or confidentiality restrictions), copies of all final management letters submitted to Company by independent certified public accountants in connection with each annual, interim or special audit of the financial statements of Company and its Subsidiaries made by such accountants, including any comment letter submitted by such accountants to management in connection with their annual audit;

(f)     together with each delivery of consolidated financial statements of Company and its Subsidiaries pursuant to Section 5.1(c), a written statement by the independent certified public accountants giving the report thereon stating (i) that their audit examination has included a review of the terms of the Credit Documents, (ii) whether, in connection therewith, any condition or event that constitutes an Event of Default with regard to the Financial Performance Covenant has come to their attention and, if such a condition or event has come to their attention,

70

specifying the nature and period of existence thereof, it being understood that such audit examination was directed primarily at accounting matters; and (iii) that nothing has come to their attention that causes them to believe either or both that the information contained in any Compliance Certificate is not correct or that the matters set forth in such Compliance Certificate are not stated in accordance with the terms hereof;

(g)     promptly upon their becoming available, copies of (i) all financial statements, reports, notices and proxy statements sent or made available generally by Company to its public security holders in such capacity or by any Subsidiary of Company to its security holders other than Company or another Subsidiary of Company, and (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by Company or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority;

(h)     promptly upon any Responsible Officer obtaining knowledge (i) of any condition or event that constitutes a Default or an Event of Default or that notice has been given to Company with respect thereto; (ii) that any Person has given any notice to Company or any of its Subsidiaries or taken any other action with respect to any event or condition set forth in <u>Section 8.1(b)</u>; or (iii) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, a certificate of its Authorized Officers specifying the nature and period of existence of such condition, event or change, or specifying the notice given or action taken by any such Person and the nature of such claimed Event of Default, Default, default, event or condition, and what action Company has taken, is taking and proposes to take with respect thereto;

(i)     promptly upon any Responsible Officer obtaining knowledge of (i) the institution of, or any written threat of, any material Adverse Proceeding not previously disclosed in writing by Company to the Lenders, or (ii) any material development in any Adverse Proceeding that, or seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby (and is not subject to the automatic stay), written notice thereof together with such other information as may be reasonably available to Company to enable the Lenders and their counsel to evaluate such matters;

(j)     (i) promptly but in any event within ten (10) days after Company, any of its Subsidiaries or any of its ERISA Affiliates knows, or has reason to know, that (1) any ERISA Event with respect to an Employee Benefit Plan has occurred or will occur, or (2) Company or any of its ERISA Affiliates has applied for a waiver of the minimum funding standards under Sections 412 or 430 of the Code or Section 302 of ERISA, or (3) the aggregate present value of the Unfunded Benefit Liabilities under all Pension Plans has, in any year, increased to an amount in excess of $1,000,000, or (4) any ERISA Event occurs with respect to a Multiemployer Plan which presents a material risk of a partial or complete withdrawal (as described in Section 4203 or 4205 of ERISA) by Company or any of its ERISA Affiliates from such Multiemployer Plan and such withdrawal is reasonably expected to trigger withdrawal liability payments in any year in excess of $5,000,000, or (5) Company or any of its ERISA Affiliates is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan, or (6) the potential withdrawal liability payment per plan year (as determined in accordance with Title IV of ERISA) of Company or any of its ERISA Affiliates with respect to all Multiemployer

71

Plans has in any year increased to an amount in excess of $5,000,000, or (7) there is an action brought against Company or any of its ERISA Affiliates under Section 502 of ERISA with respect to its failure to comply with Section 515 of ERISA, except for such actions which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, a certificate of the president or chief financial officer of Company setting forth the details of each of the events described in clauses (1) through (7) above as applicable and the action which Company or any of its ERISA Affiliates proposes to take with respect thereto, together with a copy of any notice or filing from the PBGC or which may be required by the PBGC or other agency of the United States government with respect to each of the events described in clauses (1) through (7) above, as applicable;

(ii) As soon as possible and in any event within ten (10) Business Days after the receipt by Company (or to the knowledge of Company, after receipt by any of its respective ERISA Affiliates) of (1) a demand letter from the PBGC notifying Company or any of its ERISA Affiliates of its decision finding liability, a copy of such letter, together with a certificate of the president or chief financial officer of Company setting forth the action which Company or its ERISA Affiliate proposes to take with respect thereto; or (2) copies of any documents described in Sections 101(k) or 101(l) of ERISA, provided that if Company or any of its ERISA Affiliates has not requested such documents or notices from the administrator of the applicable Multiemployer Plan, then, upon reasonable request of Administrative Agent, Company and its ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and Company shall provide copies of such documents and notices to Administrative Agent (on behalf of each requesting Lender) promptly after receipt thereof;

(k) as soon as practicable and in any event no later than sixty (60) days after the beginning of each Fiscal Year, a consolidated plan and financial forecast for such Fiscal Year (a "*Financial Plan*"), including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for such Fiscal Year, together with an explanation of the assumptions on which such forecasts are based, (ii) forecasted consolidated statements of income and cash flows of Company and its Subsidiaries for each month of each Fiscal Year, together with an explanation of the assumptions on which such forecasts are based, and (iii) such other information and projections as any Lender may reasonably request;

(l) at least five (5) days prior to such filing or distribution, copies of all orders, pleadings, motions (which, in the case of any motions that adversely affect the Obligations, must be in form and substance reasonably satisfactory to Administrative Agent), applications, judicial information or financial information that adversely affect the Obligations to be filed by or on behalf of Company or any of its Subsidiaries with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of Company or any of its Subsidiaries to any Committee (other than emergency pleadings, motions or other filings where, despite such Debtor's commercially reasonable efforts, such five-day notice is impracticable);

(m) in the event that (y) any Credit Party acquires rights in Collateral that requires delivery of a Pledge Supplement (as such term is defined in the Pledge and Security Agreement) pursuant to Sections 4.1(b), 4.2(b)(i), 4.3(c), 4.4.1(a)(i), 4.6(b), 4.7(b)(i) and 4.8(b) of the Pledge and Security Agreement, then Company shall deliver to Collateral Agent such Pledge

72

Supplement, concurrently with the delivery of financial statements under clauses (b) and (c) of Section 5.1 with respect to the period in which such Collateral was acquired; and (z) any Credit Party changes its name, type of organization or jurisdiction of organization, it shall comply with the requirements set forth in Section 4.1(b) of the Pledge and Security Agreement;

(n) no later than Wednesday of each calendar week, commencing November 25, 2009, a Cash Flow Forecast, certified by a Responsible Officer of Company as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not, at the time of such certification, aware of (x) any information contained in such Cash Flow Forecast which is false or misleading in any material respect or (y) any omission of information which causes such Cash Flow Forecast to be false or misleading in any material respect (it being understood that any such forecasts are estimates and that actual results may vary materially from such forecasts);

(o) with reasonable promptness, such other information and data with respect to Company or any of its Subsidiaries as from time to time may be reasonably requested by any Lender (through Administrative Agent);

(p) Electronic Delivery. Documents required to be delivered pursuant to clauses (b), (c), (g) and (n) of this Section 5.1 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and, if so delivered, shall be deemed to have been delivered on the date (i) on which Company or Parent posts such documents, or provides a link thereto at website www.simmons.com or (ii) on which such documents are posted on Company's or Parent's behalf on Intralinks®, SyndTrak or other relevant website to which each Lender and Administrative Agent have access (whether a commercial, third-party website or whether sponsored by Administrative Agent) (the "*Platform*"); and

(q) Certification of Public Information. Concurrently with the delivery of any document or notice required to be delivered pursuant to this Section 5.1, Company shall indicate in writing whether such document or notice contains Nonpublic Information. Any document or notice required to be delivered pursuant to this Section 5.1 shall be deemed to contain Nonpublic Information unless Company specifies otherwise. Company and each Lender acknowledges that certain of the Lenders may be "public-side" Lenders (Lenders that do not wish to receive material non-public information with respect to Holdings or its Subsidiaries or their securities) and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through the Platform, any document or notice that contains Nonpublic Information (or is deemed to contain Nonpublic Information) shall not be posted on that portion of the Platform designated for such public side Lenders.

5.2 **Legal Existence, etc.** Except as permitted under Section 6.7, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its legal existence and all rights and franchises material to its business; provided, that neither any Credit Party nor any of its Subsidiaries shall be required to preserve any such right or franchise if the preservation thereof is no longer desirable in the conduct of the business of such Credit Party or such Subsidiary, as the case may be, and that the loss thereof is not disadvantageous in any material respect to such Credit Party, such Subsidiary or the Lenders.

73

**5.3    Payment of Obligations**. Each Credit Party will, and will cause of each of its Subsidiaries to, pay (i) all material obligations arising from Contractual Obligations entered into after the Petition Date and from Contractual Obligations entered into prior to the Petition Date and assumed and which are permitted to be paid subsequent to the Petition Date by order of the Bankruptcy Court that has been entered with the consent of (or non-objection by) Administrative Agent and (ii) all taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty accrues thereon, and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; provided, no such obligation, charge or claim need be paid (a) unless the failure to pay the same could reasonably be expected to have a Material Adverse Effect or (b) if it is being contested in good faith by appropriate proceedings so long as (i) such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, and (ii) in the case of a charge or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such charge or claim.  Company will not, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated, combined or unitary income tax return with any Person (other than Bedding Superholdco, Parent, Holdings or any of Company's Subsidiaries).

**5.4    Maintenance of Properties**. Each Credit Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all material properties used or useful in the business of Company and its Subsidiaries and from time to time during its useful life will make or cause to be made all appropriate maintenance payments, repairs, renewals and replacements thereof in accordance with prudent industry practice.

**5.5    Insurance**. Each Credit Party will and will cause its Subsidiaries to maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of Company and its Subsidiary Guarantors as may customarily be carried or maintained under similar circumstances by Persons engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for Persons similarly situated in the industry. Each such policy of insurance so insuring assets of any Credit Party shall (a) name Administrative Agent for the benefit of the Lenders as an additional insured thereunder as its interests may appear and (b) in the case of each business interruption and casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to Administrative Agent, that names Administrative Agent for the benefit of the Lenders as the loss payee thereunder for any covered loss in excess of $500,000 and provides for at least thirty (30) days (or, in the case of cancellation for non-payment, ten (10) days) prior written notice to Administrative Agent of any cancellation of such policy.

**5.6    Inspection Rights; Lender Meeting; Quarterly Lender Call: Books and Records**. (a) Each Credit Party will, and will cause each of its Subsidiaries to, permit any authorized representatives designated by any Lender to visit and inspect any of the properties of

Company or of any of its Subsidiaries, to inspect, copy and take copies of extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (subject to reasonable requirements of confidentiality) (provided, Company may, if it so chooses, be present at or participate in any such discussion), all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested; provided that the Lenders shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one such time shall be at the Company's expense. Company will, upon the request of Agents or Requisite Lenders, participate in a meeting with Administrative Agent and the Lenders once during each Fiscal Year or, during the continuance of any Default or Event of Default, as reasonably requested by the Agents or the Requisite Lenders, to be held at Company's corporate offices (or at such other location as may be agreed to by Company and Administrative Agent) at such time as may be agreed to by Company and Administrative Agent.

(b) Company will, upon the request of Agents or Requisite Lenders, participate in a conference call with Administrative Agent and the Lenders once during each Fiscal Quarter (commencing with the Fiscal Quarter beginning October 2009) at such time as may be agreed to by Company and Administrative Agent.

(c) Each Credit Party will keep proper books of records and account in which full, true and materially correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities.

**5.7**    **Compliance with Laws, Etc.** Except as otherwise permitted by the Bankruptcy Code or pursuant to any order of the Bankruptcy Court, each Credit Party will comply, and shall cause each of its Subsidiaries and, within its control, shall use its commercially reasonable efforts to cause all other Persons, if any, on or occupying any Facilities to comply, with all Requirements of Law and any of its material Contractual Obligations entered into on or after the Petition Date, noncompliance with which could reasonably be expected to cause, individually or in the aggregate, a Material Adverse Effect.

**5.8**    **Environmental Matters.**

(a)      Company agrees that Administrative Agent may, from time to time and in its reasonable discretion, (i) retain, at Company's expense, an independent professional consultant to review any environmental audits, investigations, analyses and reports relating to Hazardous Materials prepared by or for Company which Administrative Agent has requested and which indicates conditions or circumstances which Administrative Agent reasonably believes may have a significant adverse impact on the business and operations of Company or its Subsidiaries and (ii) in the event (a) Administrative Agent reasonably believes that Company has breached any representation, warranty or covenant contained in Section 4.10, Section 5.7 (as each such section pertains to environmental matters) or Section 4.14 or that there has been a violation of Environmental Laws at any Facility or by Company or any of its Subsidiaries at any other location including the Linden, New Jersey site, which violations would reasonably be expected to result in Company incurring material liabilities or (b) an Event of Default has occurred and is continuing and the repayment of any amount due hereunder has been accelerated, conduct at

75

Company's expense its own investigation of any Facility or violation; provided that, in the case of any Facility leased by Company or any of its Subsidiaries, Company shall only be obligated to use its reasonable efforts to obtain permission for Administrative Agent's professional consultant to conduct an investigation of such Facility. For purposes of conducting such a review and/or investigation, Company hereby grants to Administrative Agent and its agents, employees, consultants and contractors the right to enter into or onto any Facilities currently owned, leased, operated or used by Company or any of its Subsidiaries. Any such investigation of any Facility shall be conducted, unless otherwise agreed to by Company and Administrative Agent, during normal business hours, shall be subject to the terms and conditions of all applicable lease and lease-related documents and to the requirements of landlords and, to the extent reasonably practicable, shall be conducted, after providing reasonable notice to Company and in a manner so as not to interfere with the ongoing operations at such Facility or to cause any damage or loss to any property at such Facility, and shall be conducted by qualified environmental professionals possessing reasonable levels of insurance. Administrative Agent and its agents, employees, consultants and contractors shall not perform any subsurface investigations of soil or ground water without the prior written authorization from Company, which authorization shall not be unreasonably withheld, and, in the case of a leased Facility, without the prior written authorization of the owner of such Facility. Company and Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of Administrative Agent pursuant to this Section 5.8 will be obtained and shall be used by Administrative Agent and the Lenders solely for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Credit Documents. Administrative Agent agrees to deliver a copy of any such report to Company with the understanding that Company acknowledges and agrees that (x) it will indemnify and hold harmless Administrative Agent and each Lender from any costs, losses or liabilities relating to Company's use of or reliance on such report, (y) neither Administrative Agent nor any Lender makes any representation or warranty with respect to such report, and (z) by delivering such report to Company, neither Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report. If requested by Company in writing, Lenders will use reasonable efforts to cause their consultant to issue a reliance letter authorizing Company's reliance on such reports prepared by such consultant.

(b)     Company will deliver to Administrative Agent and the Lenders: (i) as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Company or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Facility which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect (provided Administrative Agent and the Lenders shall make reasonable efforts to assist Company in maintaining any privileges); (ii) promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release required to be reported to any federal, state or local governmental or regulatory agency under any applicable Environmental Laws which could reasonably be expected to have a Material Adverse Effect, (2) any remedial action taken by Company or any other Person in response to (x) any Hazardous Materials Activities the existence of which has a reasonable possibility of resulting in one or

more Environmental Claims having, individually or in the aggregate, a Material Adverse Effect, or (y) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of resulting in a Material Adverse Effect, and (3) Company's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that is reasonably likely to cause such Facility or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws; (iii) as soon as practicable following the sending or receipt thereof by Company or any of its Subsidiaries, a copy of any and all non-privileged written communications of a material nature with respect to (1) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (2) any Release required to be reported to any federal, state or local governmental or regulatory agency which could reasonably be expected to have a Material Adverse Effect, and (3) any request for information from any governmental agency that suggests such agency is investigating whether Company or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity which could reasonably be expected to have a Material Adverse Effect; (iv) prompt written notice describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by Company or any of its Subsidiaries that could reasonably be expected to (x) expose Company or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (y) affect the ability of Company or any of its Subsidiaries to maintain in full force and effect all Governmental Authorizations required under any Environmental Laws for their respective operations, except for such Governmental Authorizations that could not reasonably be expected to have individually or in the aggregate, a Material Adverse Effect and (2) any proposed action to be taken by Company or any of its Subsidiaries to modify current operations in a manner that could reasonably be expected to subject Company or any of its Subsidiaries to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (v) with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent in relation to any matters disclosed pursuant to this <u>Section 5.8</u>.

   **5.9** <u>**Subsidiaries**</u>. In the event that any Domestic Subsidiary which was a Non-Guarantor Subsidiary ceases to be a Non-Guarantor Subsidiary or any Person becomes a Subsidiary of Company after the date hereof Company will promptly notify Administrative Agent thereof and cause such Subsidiary to execute and deliver to Administrative Agent a Counterpart Agreement and to take all such further actions and execute all such further documents, instruments, agreements, opinions and certificates (including those comparable to those described in <u>Section 3.1(b)</u>) as may be reasonably necessary or, in the reasonable opinion of Administrative Agent, desirable to create in favor of Collateral Agent, for the benefit of Lenders, a valid and perfected Lien having the priority or status required by the Orders on substantially all of the personal assets of (and the equity Securities of) such Subsidiary required hereby and the other Credit Documents. With respect to each such Subsidiary, Company shall send to Administrative Agent written notice setting forth with respect to such Person (a) the date on which such Person became a Subsidiary of Company, and (b) all of the data required to be set forth in <u>Schedule 4.1</u> with respect to all Subsidiaries of Company. Notwithstanding the foregoing, Company shall not be required to deliver a Counterpart Agreement or any of the other documents described in this Section with respect to (x) any Domestic Subsidiary which is not a Material Subsidiary, (y) the Co-Op Subsidiary or (z) any Foreign Subsidiary; <u>provided</u>, <u>however</u>,

that notwithstanding the foregoing at no time shall (i) the aggregate amount of consolidated revenues of the Non-Guarantor Subsidiaries (other than Persons referred to in clauses (y) and (z) above) for the most recent Fiscal Quarter account for more than 5% of the consolidated revenues of Company and its Subsidiaries for such Fiscal Quarter or (ii) the aggregate amount of consolidated assets owned by the Non-Guarantor Subsidiaries (other than Persons referred to in clauses (y) and (z) above) at the end of the most recent Fiscal Quarter account for more than 5% of the consolidated assets of Company and its Subsidiaries at the end of such Fiscal Quarter, and if either such case shall occur, Company shall promptly come into compliance with this Section 5.9 by notifying Administrative Agent of the identity of a sufficient number of Non-Guarantor Subsidiaries who are Domestic Subsidiaries (who shall cease to be Non-Guarantor Subsidiaries) and causing such Domestic Subsidiaries to execute and deliver to Administrative Agent a Counterpart Agreement and to take all such further actions and execute all such further documents, instruments, agreements, opinions and certificates (including those comparable to those described in Section 3.1(b)) as may be reasonably necessary or, in the reasonable opinion of Administrative Agent, desirable to create in favor of Administrative Agent, for the benefit of the Lenders, a valid and perfected Lien having the priority or status required by the Orders on substantially all of the personal assets of such Subsidiary required hereby and the other Credit Documents or (iii) with respect to any Foreign Subsidiary that is in existence on the Closing Date or hereafter acquired or formed, (x) more than 65% of the total outstanding voting capital stock of any Foreign Subsidiary, the equity Securities of which are held directly by a Credit Party, be required to be so pledged to secure the Obligations of any Credit Party and (y) any Foreign Subsidiary be required to pledge assets or provide guarantees under this Agreement or any other Credit Document.

**5.10    [Reserved].**

**5.11    Full Cash Dominion.** After the Revolving Loan Initial Commitment Period, if Excess Availability is less than $10,000,000 for three (3) consecutive days, Company shall use commercially reasonable efforts to within fifteen (15) Business Days following the third consecutive day that Excess Availability is less than $10,000,000, enter into Control Agreements reasonably satisfactory to Administrative Agent in its sole discretion, including full cash dominion and daily cash sweeps to the Concentration Account. Upon the occurrence and continuance of an Event of Default and upon written notice from Administrative Agent, all of the available collections and available account balances of the Credit Parties and their Subsidiaries shall be swept on a daily basis into the Concentration Account.

**5.12    [Reserved]**

**5.13    Further Assurances.** Each of Holdings and Company shall take, and cause each of its Subsidiaries to take, such actions as Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, control agreements, mortgages on fee owned real property, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in fee owned real property, the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession and if requested by Administrative Agent, customary opinions of counsel in form and substance, and from counsel, reasonably satisfactory to

78