Administrative Agent) to ensure that the Obligations are guarantied by Guarantors and are secured by substantially all of the assets of Holdings and the Credit Parties; provided that the Credit Parties shall be required to use their commercially reasonable efforts to obtain control agreements. In the event that any Credit Party creates a new Subsidiary, all of the equity Securities of such new Subsidiary shall, to the extent required by Section 5.9, be duly and validly pledged to Collateral Agent for the benefit of the Secured Parties pursuant to the Collateral Documents, subject to no other Liens (other than Permitted Encumbrances and Liens permitted by Section 6.2). Notwithstanding the foregoing, Collateral Agent shall not take a security interest in those assets as to which Collateral Agent shall determine, in its reasonable discretion, that the cost of obtaining such Lien (including any mortgage, stamp, intangibles or other tax) are excessive in relation to the benefit to the Lenders of the security afforded thereby.

## SECTION 6. NEGATIVE COVENANTS

Until the Termination Date has occurred, Holdings and Company shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly:

**6.1    Indebtedness**. Create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)    each of the Credit Parties may become and remain liable with respect to its respective Obligations;

(b)    Company and its Subsidiaries, as applicable, may remain liable with respect to Indebtedness described in Schedule 6.1 annexed hereto;

(c)    **[Reserved]**;

(d)    Company and its Subsidiaries may become and remain liable with respect to Indebtedness under Capital Leases and purchase money Indebtedness; provided, that the aggregate amount of all Indebtedness outstanding under this clause (d) at any time shall not exceed $5,000,000;

(e)    Indebtedness of (i) any Credit Party owing to any other Credit Party (other than Indebtedness owed to Holdings), (ii) any Non-Guarantor Subsidiary owing to any other Non-Guarantor Subsidiary, (iii) any Non-Guarantor Subsidiary owing to any Credit Party, (iv) any Credit Party owing to any Non-Guarantor Subsidiary in respect of an Investment permitted by Section 6.3(a)(iv); provided, that any Indebtedness pursuant to this clause (iv) shall have no scheduled amortization or payments of principal prior to the date that is six (6) months after the Maturity Date, and (v) Holdings owed to any of its Subsidiaries in lieu of, and not in excess of the amount of Restricted Junior Payments to the extent permitted to be made to Holdings in accordance with Section 6.5; provided, that all such Indebtedness of any Credit Party pursuant to clause (e)(iv) must be expressly subordinated to the Obligations on terms not materially less favorable than those set forth in Article 10 of the Senior Subordinated Note Indenture;

(f)    unsecured Indebtedness incurred in respect of corporate credit card programs maintained in the ordinary course of business;

79

(g)     [**Reserved**];

(h)     [**Reserved**];

(i)     [**Reserved**];

(j)     Indebtedness of Company and its Subsidiaries in connection with workmen's compensation obligations and insurance premiums of Company and its Subsidiaries;

(k)     Indebtedness (other than for borrowed money) of Holdings and its Subsidiaries under clause (h) of the definition thereof to the extent the Lien related thereto is permitted by Section 6.2;

(l)     Indebtedness of Holdings and its Subsidiaries representing deferred compensation to (i) employees, directors or officers of Holdings and its Subsidiaries or (ii) consultants retained in connection with the restructuring of Holdings and its Subsidiaries;

(m)     Indebtedness incurred by Holdings and its Subsidiaries to current or former directors, officers and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Capital Stock of Parent or Holdings permitted by Section 6.5.

(n)     Indebtedness incurred by Holdings or its Subsidiaries in an Asset Sale with respect to the adjustment of the purchase price or similar adjustments;

(o)     Indebtedness of Holdings or its Subsidiaries in respect of netting services, overdraft protection and similar arrangements in each case in connection with deposit accounts;

(p)     [**Reserved**];

(q)     Company and its Subsidiaries may become and remain liable with respect to Contingent Obligations under Hedge Agreements permitted hereunder;

(r)     Indebtedness constituting Contingent Obligations if the incurrence of the primary obligation is otherwise permitted by this Section 6.1 (other than Contingent Obligations by Company and its Subsidiaries with respect to Indebtedness of Holdings);

(s)     [**Reserved**];

(t)     Indebtedness incurred in the ordinary course of business consisting of customary trade arrangements with customers; and

(u)     Indebtedness of Company and its Subsidiaries not otherwise permitted by this Section 6.1 in an aggregate principal amount at any time outstanding not exceeding (i) $1,000,000 for all Debtors and (ii) $1,000,000 for all Non-Guarantor Subsidiaries.

Notwithstanding the foregoing, the Credit Parties may incur Indebtedness to Subsidiaries of Holdings which are not Credit Parties in excess of the amounts otherwise permitted in this Section 6.1 solely to permit compliance with Section 4.5(b)(iv) of the Pledge and Security

022537-0167-11432-Active.11706310.13

Agreement; <u>provided</u> that, such Indebtedness shall be in compliance with the second proviso set forth in <u>Section 6.1(e)</u>.

**6.2**    **Liens**. Create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind, whether now owned or hereafter acquired, or file or authorize the filing of, any financing statement under the UCC of any State or under any similar recording or notice statute, except:

(a)    Permitted Encumbrances;

(b)    Liens in existence on the Closing Date and described in <u>Schedule 6.2</u> annexed hereto and modifications, replacements, renewals or extensions thereof; <u>provided</u>, that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed to or incorporated in the property covered by such Lien or financed by Indebtedness permitted under <u>Section 6.1(d)</u>, (B) the proceeds and products thereof, (C) pursuant to the Orders for purposes of providing "adequate protection" under the Bankruptcy Code and (ii) in the case of any Liens on assets of the Credit Parties securing the Prepetition Obligations, such Liens are subordinated to the Liens securing the Obligations pursuant to or except as otherwise set forth in the Interim Order (or the Final Order, as applicable);

(c)    purchase money Liens (including mortgages, conditional sales, Capital Leases and any other title retention or deferred purchase devices) in real or tangible personal property of Company or any of its Subsidiaries existing or created at the time of acquisition thereof or, in the case of tangible and personal property, within sixty (60) days thereafter, or in the case of real property, within one hundred twenty (120) days thereafter and the modification, refinancing, refunding, renewal or extension of any such Liens; <u>provided</u>, that the Indebtedness secured by or benefited by such Lien is permitted by <u>Section 6.1</u> hereof;

(d)    Liens granted pursuant to the Credit Documents and/or the Orders;

(e)    Liens on property of any of Company's Foreign Subsidiaries created solely for the purpose of securing Indebtedness of any Foreign Subsidiary permitted by <u>Section 6.1</u>;

(f)    [**Reserved**];

(g)    Liens on documents of title and the property covered thereby securing Indebtedness in respect of commercial letters of credit;

(h)    Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted by <u>Section 6.3</u> to be applied against the purchase price thereof and (ii) consisting of a definitive agreement to dispose of property in an Asset Sale permitted under <u>Section 6.7</u>;

(i)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by Company and its Subsidiaries in the ordinary course of business and permitted hereby;

(j)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 6.3;

(k)     Liens in connection with workmen's compensation obligations and general liability exposure of Company and its Subsidiaries; and

(l)     Liens on assets of Company and its Subsidiaries not otherwise permitted under this Section 6.2, securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not in excess of (i) $1,000,000 for all Debtors and (ii) $1,000,000 for all Non-Guarantor Subsidiaries.

Except with respect to (a) this Agreement, (b) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to an Asset Sale, (c) the agreements entered into with NetJet Sales, Inc. for the purchase of fractional interests in a corporate jet by Company, (d) customary restrictions contained in leases, subleases, licenses and sublicenses permitted hereunder and (e) documents evidencing any Indebtedness permitted by Section 6.1(d) hereby, no Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired to secure the Obligations.

**6.3    Investments**. Make or own any Investment in any Person, including any Joint Venture, except:

(a)     Investments (i) by any Credit Party in any other Credit Party (but, in the case of Investments by a Credit Party in Holdings only to the extent set forth in Section 6.1(e)), (ii) by any Non-Guarantor Subsidiary in any Non-Guarantor Subsidiary, (iii) by any Non-Guarantor Subsidiary in Holdings or any of its Subsidiaries and (iv) by any Credit Party in any Non-Guarantor Subsidiary in an aggregate amount pursuant to this clause (iv) not to exceed $2,000,000 at any one time outstanding (net of any dividends or distributions, or prepayments or payments of interest by such Subsidiaries);

(b)     Investments existing on the Closing Date and set forth on Schedule 6.3 and any modification, replacement, renewal or extension thereof; provided that the amount of the original Investment is not increased, except as otherwise permitted by this Section 6.3;

(c)     Company and its Subsidiaries may make and own Investments in Cash Equivalents;

(d)     Company and its Subsidiaries may make Consolidated Capital Expenditures permitted hereunder;

(e)     [**Reserved**];

(f)     Holdings and its Subsidiaries may make loans and advances to employees, directors, officers or consultants of Parent and its Subsidiaries in an aggregate amount not to exceed $250,000 outstanding at any time;

(g)     Company and its Subsidiaries may make and own Investments consisting of notes and other non-Cash consideration received in connection with any Asset Sale permitted by Section 6.7(k) and (o);

(h)     Company and its Subsidiaries may make and own Investments received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, suppliers and customers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to a secured Investment;

(i)     [**Reserved**];

(j)     Investments constituting Indebtedness permitted to be incurred under Sections 6.1, 6.5 and 6.7;

(k)     Investments in Hedge Agreements permitted hereunder;

(l)     [**Reserved**];

(m)     Investments in the ordinary course of business consisting of (i) endorsements for collection or deposit and (ii) customary trade arrangements with customers;

(n)     loans and advances to Holdings (and by Holdings to Parent) in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances, or Restricted Junior Payments in respect thereof) Restricted Junior Payments to the extent permitted to be made to Holdings (and by Holdings to Parent) in accordance with Section 6.5;

(o)     Holdings may repurchase Holdings' Securities to the extent permitted by Section 6.5;

(p)     [**Reserved**]; and

(q)     Holdings and its Subsidiaries may make and own other Investments not otherwise permitted under this Section 6.3 in an aggregate principal amount at any time outstanding not exceeding (i) $1,000,000 for all Debtors and (ii) $1,000,000 for all Non-Guarantor Subsidiaries; provided that if such Investment is consummated by Holdings, Holdings shall, immediately following the closing thereof, cause the assets or Securities acquired to be contributed to Company or its Subsidiaries or the merger of Company or its Subsidiaries with the Person formed to consummate or acquire such Investment.

Notwithstanding the foregoing, the Credit Parties may make Investments in Subsidiaries of Holdings which are not Credit Parties in excess of the amounts otherwise permitted in this Section 6.3 solely to permit compliance with Section 4.5(b)(iv) of the Pledge and Security Agreement.

**6.4     [Reserved].**

022537-0167-11432-Active.11706310.13

**6.5    Restricted Junior Payments**. Declare, order, pay, make or set apart any sum for any Restricted Junior Payment, except:

(a)    (i) any Non-Guarantor Subsidiary may make Restricted Junior Payments to Holdings, Company and any other Subsidiary and (ii) any Credit Party may make Restricted Junior Payments to any other Credit Party (other than Holdings);

(b)    Company may make Restricted Junior Payments to Holdings, the proceeds of which will be used (i) to permit Holdings to pay (or to make a Restricted Junior Payment to Parent to enable it or its parent to pay) ordinary operating expenses (including, without limitation, directors' fees, indemnification obligations, professional fees and expenses, the administrative fees and expenses of (A) the trustee in respect of the Parent Notes and (B) the administrative agent under the Bedding Superholdco Credit Agreement) in an aggregate amount not to exceed $600,000 in any Fiscal Year; (ii) by Holdings to pay (or to make a Restricted Junior Payment to Parent to enable it or its parent to pay) its tax liability for the relevant jurisdiction(s) in respect of consolidated, combined, unitary or affiliated returns for the relevant jurisdiction of Holdings or Parent, as applicable, determined as if Company and its Subsidiaries filed separate returns; (iii) by Holdings to pay (or to make a Restricted Junior Payment to Parent or its parent to enable it to pay) its franchise or similar taxes; (iv) by Holdings to pay (or to make a Restricted Junior Payment to Parent or its parent to enable it to pay) fees and expenses in connection with the restructuring, liquidation or winding up of Parent or its parent, as applicable; and (v) by Holdings to pay (or to make a Restricted Junior Payment to Parent or its parent to enable it to pay) any deductible or premium required under any directors and officers insurance policy;

(c)    Company may make Restricted Junior Payments to Holdings (and Holdings may make Restricted Junior Payments to Parent) to the extent required for such Person to repurchase its capital stock from deceased or retired employees and from employees whose employment with Parent or any of its Subsidiaries has terminated for any other reason but only to the extent mandatorily required by the Internal Revenue Code or ERISA;

(d)    Company may make Restricted Junior Payments to Holdings to finance any Investment by Holdings to the extent permitted to be made pursuant to Section 6.3; provided, that such Restricted Junior Payment shall be made concurrently with the closing of such Investment;

(e)    to the extent they constitute Restricted Junior Payments, Company and its Subsidiaries may enter into the transactions contemplated by Sections 6.7 and 6.10;

(f)    Holdings and its Subsidiaries may make repurchases of Securities deemed to occur upon the non-cash exercise of stock options and warrants; and

(g)    Restricted Junior Payments to Holdings (and by Holdings to Parent), the proceeds of which will be used to make cash payments in lieu of issuing fractional shares of Holdings (or Parent) in an aggregate amount not to exceed $10,000.

Any Restricted Junior Payments by Company to Holdings permitted under this Section 6.5 shall be applied by Holdings for the purposes specified in this Section 6.5.

022537-0167-11432-Active.11706310.13

### 6.6    Financial Covenant.

(a) **Minimum Cumulative Consolidated EBITDA.** Permit Consolidated Adjusted EBITDA cumulative for the twelve month period ending on any date set forth below, to be less than the amount set forth below opposite such date:

| Date | Cumulative Consolidated Adjusted EBITDA |
|---|---|
| November 30, 2009 | $133,400,000 |
| December 31, 2009 | $132,300,000 |
| January 31, 2010 | $122,900,000 |
| February 28, 2010 | $117,700,000 |
| March 31, 2010 | $109,100,000 |
| April 30, 2010 | $106,800,000 |
| May 31, 2010 | $107,400,000 |
| June 30, 2010 | $103,000,000 |
| July 31, 2010 | $96,700,000 |
| August 31, 2010 | $94,300,000 |
| September 30, 2010 | $93,100,000 |
| October 31, 2010 | $88,100,000 |

(b)    **Certain Calculations.** With respect to any period during which a PF Asset Sale has occurred, for purposes of determining compliance with the financial covenant set forth in this Section 6.6, Consolidated Adjusted EBITDA shall be calculated with respect to such period on a Pro Forma Basis giving effect to such PF Asset Sale.

### 6.7    Fundamental Changes; Asset Sales.
Except to the extent otherwise permitted under this Agreement, the Plan Sponsor Agreement or as required by the Bankruptcy Code, alter the corporate, capital or legal structure (except in a way that does not have a Material Adverse Effect) of Holdings, Company or any of its Subsidiaries, consummate any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), or consummate any Asset Sale except:

(a)    (i) Holdings, Company and any of their Subsidiaries may be merged with or into any Credit Party, or be liquidated, wound up or dissolved into, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to any Debtor; and (ii) any Non-Guarantor Subsidiary may be merged with or into any Non-Guarantor Subsidiary, or be liquidated, wound up or dissolved into, or all or any part of its business, property or assets may be conveyed, sold, leased, transferred or otherwise disposed of, in one transaction or a series of transactions, to any Non-Guarantor Subsidiary; provided that, (1) in the case of such a merger involving Company, Company shall be the continuing or surviving Person or the surviving Person shall be a Person organized under the laws of the United States of America and expressly assume the obligations of Company pursuant to documents reasonably acceptable to Administrative Agent, (2) when any Guarantor is merging with any other Subsidiary (A) a Guarantor shall be the surviving

022537-0167-11432-Active.11706310.13

Person or (B) such transaction shall constitute an Investment which Investment must otherwise be permitted under Section 6.3 and (3) in the case of any Asset Sale, such assets shall be transferred to Company or its Subsidiaries or such transaction shall constitute an Investment which Investment must otherwise be permitted under Section 6.3;

(b)     any Subsidiary may merge with any other Person in order to effect an Investment permitted under Section 6.3, provided that (i) the surviving Person shall be a Subsidiary which, to the extent required, shall have complied with Section 5.9 or (ii) to the extent constituting an Investment, such Investment must otherwise be permitted under Section 6.3;

(c)     any merger, consolidation, liquidation, wind-up or dissolution, the purpose of which is to effect a disposition otherwise permitted by this Section 6.7;

(d)     inventory sold in the ordinary course of business;

(e)     (i) obsolete, worn out or surplus property sold in the ordinary course of business, (ii) property that is no longer useful or necessary in Company's or its Subsidiaries business, whether now used or hereafter acquired, sold in the ordinary course of business and (iii) the sale of a corporate jet by Company;

(f)     property sold, transferred or disposed of, to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such property is promptly applied to the purchase price of such replacement property;

(g)     sales and transfers permitted by Section 6.5 with respect to issuances of Securities of Holdings;

(h)     the sale, transfer or disposition of Cash Equivalents;

(i)     the sale, transfer or disposition of accounts in connection with the collection or compromise thereof in the ordinary course of business;

(j)     the licensing or sublicensing of Intellectual Property in the ordinary course of business on customary terms;

(k)     Asset Sales (i) by and among Credit Parties in the ordinary course of business, (ii) by and among Non-Guarantor Subsidiaries in the ordinary course of business, (iii) by Non-Guarantor Subsidiaries to Credit Parties in the ordinary course of business and (iv) by Credit Parties to Non-Guarantor Subsidiaries in the ordinary course of business; provided, that with respect to any Asset Sale by a Credit Party to a Non-Guarantor Subsidiary, not less than 75% of the consideration received therefor shall be Cash;

(l)     leases, subleases, licenses or sublicenses of property in the ordinary course of business and which do not materially interfere with the business of Holdings and its Subsidiaries;

(m)     consignment or similar arrangements for the sale of assets in the ordinary course of business;

(n)     any rejection of leases permitted by an order of the Bankruptcy Court;

(o)     Company and its Subsidiaries may make Asset Sales in any single Fiscal Year of assets that have, in the aggregate, a fair market value not in excess of (i) in the case of Asset Sales by the Debtors, $1,000,000 in the aggregate for all Debtors, and (ii) in the case of Asset Sales by Non-Guarantor Subsidiaries, $3,000,000 in the aggregate for all Non-Guarantor Subsidiaries; provided that (x) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof; (y) not less than 75% of the consideration received therefor shall be Cash; and (z) the proceeds of such Asset Sales shall be applied as required by Section 2.11(a); and

(p)     Company may contribute that certain Promissory Note, dated as of November 14, 2006, evidencing a CDN $85,000,000 loan from Company to SCI Bedding ULC, an unlimited liability company formed under the laws of Nova Scotia.

**6.8     Consolidated Capital Expenditures**. Make or incur Consolidated Capital Expenditures during any Fiscal Year in an aggregate amount in excess of (i) $15,200,000 in the case of Debtors and (ii) $1,700,000 in the case of Non-Guarantor Subsidiaries.

**6.9     Sales and Lease-Backs**. Become or remain liable as lessee with respect to any lease, entered into after the date hereof, whether an Operating Lease or a Capital Lease, of any property (whether real, personal or mixed), which Company or any of its Subsidiaries has sold or transferred or is to sell or to transfer to any other Person (other than Company or any of its Subsidiaries); provided, Company and its Subsidiaries may become and remain liable as lessee with respect to any such lease if and to the extent that Company or any of its Subsidiaries would be otherwise permitted to enter into (or not otherwise be prohibited from), and remain liable under, such lease hereunder.

**6.10     Transactions with Shareholders and Affiliates**. Enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Company, on terms that are less favorable to Holdings, Company or that Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such an Affiliate; provided, the foregoing restriction shall not apply, subject to the other covenants contained hereunder, (a) to any transaction exclusively among any Debtors, (b) to any transaction exclusively among any Non-Guarantor Subsidiaries, (c) to the payment of reasonable and customary fees paid to members of the Boards of Directors of Parent (or its parent) and its Subsidiaries and reimbursement of reasonable out-of-pocket expenses of directors, (d) in respect of employment and severance arrangements with directors, officers, employees and members of management of Parent (or its parent) or any of its Subsidiaries in the ordinary course of business, (e) transactions between Holdings and any of its Subsidiaries with Co-Op Subsidiary and (f) to any transaction consummated in accordance with the terms of the agreements set forth on Schedule 6.10 except to the extent such agreements provide for the payment any dividend, distribution or fees (but excluding for the avoidance of doubt reasonable out-of-pocket costs and expenses payable thereunder).

**6.11     Amendments or Waivers of Certain Documents.**

022537-0167-11432-Active.11706310.13

(a)     **Amendments of Organizational Documents, and Management Agreement**. Except as contemplated by the Reorganization Plan, (i) amend any of the organizational or constituent documents of any Credit Party in a manner materially adverse to Administrative Agent or the Lenders; and (ii) amend, modify or supplement the Management Agreement or waive or otherwise consent to any change or departure from any of the terms or conditions of the Management Agreement, in each case, in any manner that increases the fees or other amounts payable thereunder.

(b)     **Amendments to the Senior Subordinated Note Documents**. Amend or otherwise change the redemption, prepayment, repurchase or defeasance provisions of the Senior Subordinated Note Documents, change the subordination provisions thereof (or of any guaranty thereof), or amend or change any other term if the effect of such amendment or change, together with all other amendments or changes made, is to increase materially the obligations of the obligor thereunder or to confer any additional rights on the holders of the Indebtedness governed thereby (or trustee or other representative on their behalf) which would be materially adverse to Company or the Lenders (other than the execution and delivery by Holdings and/or any of its Subsidiaries of a supplemental agreement pursuant to which such Subsidiary becomes a guarantor thereunder so long as such Subsidiary is also a Guarantor hereunder).

(c)     **Preferred Stock**. Without the prior written approval of Requisite Lenders, issue any preferred stock or permit any of its Subsidiaries to issue any preferred stock; <u>provided</u>, <u>however</u>, that Holdings or Company shall be permitted to issue preferred stock which does not provide for any payment or redemption with respect thereto prior to the date of the final payment in full in Cash of all of the non-contingent Obligations under this Agreement, <u>provided</u> that immediately prior to and immediately after the issuance of such preferred stock no Event of Default or Default under <u>Section 8.1(k)</u> shall have occurred and be continuing.

**6.12     Conduct of Company Business**. From and after the Closing Date, Company shall not, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by Company and its Subsidiaries on the Closing Date and any businesses reasonably related or ancillary thereto.

**6.13     Special Covenants of Holdings**. From and after the Closing Date, Holdings shall:

(a)     engage in no business or activities other than (i) owning 100% of the issued and outstanding capital stock of Company, (ii) holding Cash and Cash Equivalents, (iii) activities incidental thereto, (iv) as otherwise required by mandatory provisions of law, (v) the transactions contemplated by the Related Agreements, (vi) entering into the Related Agreements to which it is a party, and (vii) as otherwise specifically permitted hereunder; and

(b)     not own or acquire any assets other than (i) 100% of the issued and outstanding equity Securities of Company and (ii) as specifically permitted hereunder.

**6.14     Fiscal Year**. Change its Fiscal Year-end from the final Saturday in the calendar year, <u>provided</u>, <u>however</u>, that Company may change its Fiscal Year-end to December 31.

**6.15     Securities of Company and Subsidiaries; Restrictions on Subsidiaries.**

022537-0167-11432-Active.11706310.13

(a) Create, incur, assume or suffer to exist any Lien on any equity Securities of Company (other than non-consensual Liens arising solely by operation of law, the Liens contemplated by the Credit Documents and the Liens contemplated by the Prepetition Credit Documents).

(b) Create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any such Subsidiary to (w) pay dividends or make any other distributions on any of such Subsidiary's equity Securities owned by Company or any other Subsidiary of Company, (x) repay or prepay any Indebtedness owed by such Subsidiary to Company or any other Subsidiary of Company, (y) make loans or advances to Company or any other Subsidiary of Company, or (z) transfer any of its property or assets to Company or any other Subsidiary of Company except for any agreement (A) in effect on the Closing Date, (B) in existence at the time a Subsidiary becomes a Subsidiary of Company so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary, (C) in existence at the time any assets were acquired by Company or any Subsidiary of Company so long as such agreement was not entered into solely in contemplation of the acquisition of such assets, (D) representing Indebtedness which is permitted by Section 6.1; (E) in connection with any Asset Sale or other sale of assets permitted hereunder, or (F) customary restrictions contained in leases, subleases, licenses and sublicenses permitted hereunder.

**6.16** **Hedge Agreements**. Unless otherwise approved by Administrative Agent in its sole discretion, enter into any Hedge Rate Agreement, except (a) Hedge Agreements entered into to hedge or mitigate risks to which Company or any Subsidiary has actual exposure (other than those in respect of capital stock) and (b) Hedge Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of Company or any Subsidiary.

**6.17** **Right of Subrogation among Credit Parties**. Assert (or apply to the Bankruptcy Court for authority to assert) any right of subrogation against any other Credit Party until the Termination Date has occurred.

## SECTION 7. GUARANTY

**7.1** **Guaranty of the Obligations**. Guarantors jointly and severally hereby irrevocably and unconditionally guaranty the due and punctual payment in full of all Obligations (including Hedge Agreements) of Company when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (the "*Guaranteed Obligations*").

**7.2** **Payment by Guarantors**. Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Company to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in Cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all

89

Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.3** **Liability of Guarantors Absolute**. Each Guarantor agrees that, to the maximum extent permitted by applicable law, its obligations hereunder are irrevocable, absolute, independent and unconditional, and constitute primary obligations of such Guarantor and not a contract of surety, and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in Cash of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees that, to the maximum extent permitted by applicable law,

(a)     this Guaranty is a guaranty of payment when due and not of collectibility;

(b)     the obligations of each Guarantor hereunder are independent of the obligations of Company and the obligations of any other guarantor (including any other Guarantor) of the obligations of Company, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Company or any of such other guarantors and whether or not Company is joined in any such action or actions;

(c)     payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(d)     any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment of this Guaranty or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations (provided that no Credit Document to which such Guarantor is a party may be amended without its written consent); (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect of this Guaranty or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in

90

each case as such Beneficiary in its discretion may determine consistent with this Agreement or the applicable Hedge Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Company or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or the applicable Hedge Agreements; and

(e) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in Cash of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or the Hedge Agreements, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) of this Agreement, any of the other Credit Documents, any of the Hedge Agreements or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms of this Agreement or such Credit Document, such Hedge Agreement or any agreement relating to such other guaranty or security (provided that no Credit Document to which such Guarantor is a party may be amended without its written consent); (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or any of the Hedge Agreements or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Company or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Company may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

**7.4     Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of Beneficiaries, to the maximum extent permitted by applicable law: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against

91

Company, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Company, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any deposit account or credit on the books of any Beneficiary in favor of Company or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Company including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Company from any cause other than payment in full in Cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in administration of the Guaranteed Obligations, except behavior which amounts to gross negligence or willful misconduct or bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default under this Agreement, the Hedge Agreements or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Company and notices of any of the matters referred to in <u>Section 7.3</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof (other than payment in full in Cash of the Guaranteed Obligations).

     **7.5**   <u>**Guarantors' Rights of Subrogation, Contribution, Etc.**</u> Each Guarantor hereby waives, until the Termination Date, any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Company or any of its assets in connection herewith or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Company, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Company, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Termination Date, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Company or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have

against Company, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when the Termination Date shall not have occurred, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof

7.6 **Subordination of Other Obligations**. Any Indebtedness of Company or any Guarantor now or hereafter held by any Guarantor (the "***Obligee Guarantor***") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.7 **Continuing Guaranty**. This Guaranty is a continuing guaranty and shall remain in effect until the Termination Date. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.8 **Authority of Guarantors or Company**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Company or the officers, directors or any agents acting or purporting to act on behalf of any of them.

7.9 **Financial Condition of Company and Guarantors**. Any Credit Extension may be granted to Company or continued from time to time, and any Hedge Agreements may be entered into from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Company or any other Guarantor at the time of any such grant or continuation or at the time such Hedge Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Company or any other Guarantor. Each Guarantor has adequate means to obtain information from Company and each other Guarantor on a continuing basis concerning the financial condition of Company or such other Guarantor and its ability to perform its obligations under the Credit Documents and the Hedge Agreements, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Company and each other Guarantor and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Company or any other Guarantor now known or hereafter known by any Beneficiary.

7.10 **Discharge of Guaranty Upon Sale of Guarantor**. If all of the stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in an Asset Sale not prohibited by this Agreement or otherwise consented to by Requisite Lenders, the Guaranty of such Guarantor or such successor

022537-0167-11432-Active.11706310.13

in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.11    Reinstatement**. The guaranty contained in this <u>Section 7</u> shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Credit Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Credit Party or any substantial part of its property, or otherwise, all as though such payments had not been made.

## SECTION 8.   EVENTS OF DEFAULT

**8.1    Events of Default**. If any one or more of the following conditions or events shall occur:

(a)    failure by Company to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; (ii) when due any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit; or (iii) any interest on any Loan or any fee or any other amount due hereunder within five (5) days after the date due; or

(b)    (i) failure of Holdings, Company or any of its Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in <u>Section 8.1(a)</u>) with an aggregate principal amount of $5,000,000 or more beyond the end of any grace period provided therefor; or (ii) breach or default by Holdings, Company or any of its Subsidiaries with respect to any other material term of (1) one or more items of Indebtedness in the aggregate principal amount referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, if the effect of such breach or default is to cause, or to permit the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders) to cause, that Indebtedness to become or be declared due and payable prior to its stated maturity (upon the giving or receiving of notice, lapse of time, both, or otherwise); <u>provided</u> that all references to "Indebtedness" contained in this clause (b), when referring to Indebtedness of any Debtor, shall mean any Indebtedness incurred after the Petition Date; or

(c)    failure of Company to perform or comply with any term or condition contained in <u>Section 2.4</u>, <u>Section 5.1(h)</u>, <u>Section 5.2</u> (with respect to Holdings or Company only), <u>Section 5.3</u> or <u>Section 6</u> hereof; or

(d)    any representation, warranty or certification made or deemed made by Holdings, Company or any of its Subsidiaries in any Credit Document or in any statement or certificate at any time given by Holdings, Company or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect on the date as of which made or deemed made; or

94

(e)     any Credit Party shall default in the performance of or compliance with any term contained herein or in any of the other Credit Documents, other than any such term referred to in any other provision of this Section 8.1, and such default shall not have been remedied or waived within ten (10) days after receipt by Company of a written notice from Administrative Agent or any Lender of such default; provided that the failure to comply with the requirements of the first sentence of Section 5.1(q) shall not constitute an Event of Default hereunder; or

(f)     [**Reserved**]; or

(g)     [**Reserved**]; or

(h)     any money judgment, writ or warrant of attachment or similar process involving individually or in the aggregate at any time an amount in excess of $5,000,000 (in either case not adequately covered by insurance as to which the insurance company has not denied coverage) shall be entered or filed against Holdings, Company or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed pending appeal or not subject to the automatic stay for a period in excess of sixty (60) days from the date of entry; or

(i)     any order, judgment or decree shall be entered against Holdings, Company or any of its Subsidiaries (other than Windsor Bedding Co., LLC) decreeing the dissolution or split-up of Holdings, Company or that Subsidiary and such order shall remain undischarged or unstayed pending appeal or not subject to the automatic stay for a period in excess of forty-five (45) days from the date of entry; or

(j)     (i) Company or any of its ERISA Affiliates is required to contribute or pay during any year an aggregate amount to one or more Multiemployer Plans which could reasonably be expected to have a Material Adverse Effect; (ii) except for any ERISA Event set forth in Schedule 4.19, there shall occur one or more ERISA Events (other than any ERISA Events with respect of Multiemployer Plans) which individually or in the aggregate result in liability of Company or any of its ERISA Affiliates in excess of $5,000,000 during the term hereof; (iii) there shall exist an amount of Unfunded Benefit Liabilities individually or in the aggregate for all Pension Plans (excluding for purposes of such computation any Pension Plans with respect to which assets exceed liabilities), which exceeds $5,000,000; or (iv) circumstances exist which may reasonably give rise to a lien under ERISA with respect to any Pension Plan; and in each case in clauses (i) through (iv) above, such event or condition, together with all other such events or conditions, if any, could, in the sole reasonable judgment of Administrative Agent, reasonably be expected to result in a Material Adverse Effect; or

(k)     a Change of Control shall have occurred; or

(l)     at any time after the execution and delivery thereof and subject to the entry of the Interim Order (or Final Order, as applicable), (i) the Guaranty, for any reason other than the occurrence of the Termination Date, ceases to be in full force and effect or is declared to be null and void or any Credit Party denies in writing that it has any further liability, including with respect to future advances by the Lenders, under any Credit Document to which it is a party, or (ii) any Collateral Document shall cease to be in full force and effect (other than by reason of a

95

release of Collateral thereunder in accordance with the terms hereof or thereof, the occurrence of the Termination Date or any other termination of such Collateral Document in accordance with the terms hereof or thereof) or shall be declared null and void; or the validity or enforceability thereof shall be contested in writing by any Credit Party; or Collateral Agent shall not have or shall cease to have a valid security interest in any Collateral purported to be covered thereby, perfected and with the priority required by the relevant Collateral Document subject to Permitted Liens, for any reason other than the failure of Collateral Agent or any Lender to take any action within its control, subject only to Permitted Liens; or

(m)     [**Reserved**]; or

(n)     any of the Cases of Holdings, Company or any Material Subsidiary shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Cases; or

(o)     (i) an order of the Bankruptcy Court shall be entered granting another Superpriority Claim or Lien pari passu with or senior to that granted (x) to the Lenders and Agent pursuant to this Agreement, the Collateral Documents and the Interim Order (or the Final Order, as applicable), or (y) to the Prepetition Secured Parties pursuant to the Interim Order (or the Final Order, as applicable), in either case, other than the Carve Out or otherwise as permitted under the terms of the Orders or this Agreement; (ii) an order of the Bankruptcy Court shall be entered, staying or a period in excess of five days, vacating or otherwise amending, supplementing or modifying the Interim Order (or the Final Order, as applicable) (in the case of any amendment or modification, in any manner that is materially adverse to the interests of the Lenders and the Agents in their capacities as such) without the written consent of Administrative Agent and the Requisite Lenders; (iii) an order of the Bankruptcy Court shall be entered under Section 1106(b) of the Bankruptcy Code in any of the Cases appointing an examiner having the power to operate the Debtors' businesses and such order shall not be reversed or vacated within 30 days after the entry thereof; (iv) an order of a court of competent jurisdiction shall be entered terminating the use of the Prepetition Secured Parties' Cash Collateral; (v) the Final Order Entry Date shall not have occurred by the date that is forty-five (45) days following the date of entry of the Interim Order (or such later date as Administrative Agent may agree in its sole discretion); or (vi) a plan shall be confirmed in any of the Cases of Holdings or Company that does not provide for the Termination Date to occur on the Effective Date or on terms and condition otherwise reasonably acceptable to Administrative Agent or any order shall be entered which dismisses any of the Cases of the Holdings, Company or any Material Subsidiary and which order does not provide for the Termination Date to occur; or

(p)     any Debtor shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Interim Order (or the Final Order, as applicable), (ii) in respect of and in accordance with, and to the extent authorized by, a First Day Order or other order reasonably satisfactory to Administrative Agent and (iii) as otherwise permitted under this Agreement, including pursuant to the Orders or any other order of the Bankruptcy Court that is reasonably acceptable to Administrative Agent and in connection with adequate protection payments described in Section 2.23(c); or

022537-0167-11432-Active.11706310.13

(q)      the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any property of any Debtor which has a value in excess of $5,000,000 in the aggregate; or

(r)      any Debtor shall fail to comply with the Interim Order or the Final Order and such failure to comply is (a) materially adverse to the interests of the Lenders of the Agents, taken as a whole and (b) not waived by the Requisite Lenders; or

(s)      the filing of any pleading by any Credit Party seeking, or otherwise consenting to, any of the matters set forth in paragraphs (n), (o), (p), (q) or (r) above in this Section; or

(t)      [**Reserved**]; or

(u)      there shall be rendered against the Credit Parties or any other Subsidiaries a nonmonetary judgment with respect to a post-Petition Date event which causes or would reasonably be expected to have a Material Adverse Effect and such judgment shall remain undischarged, unvacated, unbonded or unstayed pending appeal for a period in excess of twenty-five (25) days from the date of entry; or

(v)      any proceeding shall be commenced by Parent, any Credit Party or any Subsidiary of any Credit Party seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(w)      [**Reserved**]; or

(x)      the Orders shall cease, for any reason, to be in full force and effect for any Credit Party; or

(y)      Parent, any Credit Party or any Subsidiary of any Credit Party shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of any such Credit Party) any other Person's opposition of, any motion made in the Bankruptcy Court by Administrative Agent, any Lender or Prepetition Lender or Prepetition Agent seeking confirmation of the amount of Administrative Agent's, such Lender's or Prepetition Lender's or Prepetition Agent's claim or the validity or enforceability of the Liens in favor of Administrative Agent or the Liens securing the obligations under the Prepetition Credit Agreement, except with regard to good faith disputes over the payment of expenses and fees; or

(z)      any Credit Party shall seek or affirmatively support in writing or on the record any motion to (i) equitably subordinate or recharacterize in whole or in part the claim of Administrative Agent or any Lender in respect of the Obligations, or (ii) require Administrative Agent or any Lender to marshal any assets in payment of any or all of the Obligations.

**THEN** Administrative Agent shall, upon the written request or with the written consent of Requisite Lenders, by written notice to Company (with a copy to the Prepetition Agent, counsel for any statutory committee appointed in the Cases and to the United States Trustee) and subject to the terms of the Orders, take one or more of the following actions, at the same or different

times: (i) declare all or any portion of each of (A) the unpaid principal amount of and accrued interest on the Loans, (B) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (whether or not any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letter of Credit), and (C) all other Obligations, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan, the obligation of Issuing Bank to issue any Letter of Credit and the right of any Lender to issue any Letter of Credit hereunder shall thereupon terminate; <u>provided</u>, the foregoing shall not affect in any way the obligations of the Lenders under <u>Section 2.2</u> or the obligations of the Lenders to purchase participations in any unpaid Swing Line Loans as provided in <u>Section 2.1(c)</u>; (ii) set-off amounts in any accounts of the Credit Parties and apply such amounts to the Obligations of the Credit Parties hereunder and under the other Credit Documents in accordance with the Pledge and Security Agreement; and (iii) exercise any and all remedies under this Agreement, the Orders, and applicable law available to Administrative Agent and the Lenders.

Company shall at such time deposit any amounts described in clause (B) above in one or more cash collateral accounts opened by Administrative Agent. Company hereby grants to Administrative Agent, for the benefit of the Issuing Bank and each Lender with a participation in such Letters of Credit, a security interest in such cash collateral to secure all Obligations. Any amounts held in such cash collateral account shall be applied by Administrative Agent to the payment of drafts drawn under such Letters of Credit issued for the account of Company, and the unused portion thereof after all such Letters of Credit shall have expired, been fully drawn upon or back-stopped, if any, shall (i) to the extent an Event of Default then exists, be applied to repay the other Obligations or (ii) shall otherwise be immediately returned to Company. After all such Letters of Credit shall have expired, been fully drawn upon or back-stopped and all non-contingent Obligations shall have been satisfied and paid in full in Cash, the balance, if any, in such cash collateral account shall be returned to Company. Company shall execute and deliver to Administrative Agent, for the account of the relevant Issuing Bank and the Lenders with participations in such Letters of Credit, such further documents and instruments as Administrative Agent may request to evidence the creation and perfection of the within security interest in such cash collateral account.

**8.2    Certain Option of Lenders**. Notwithstanding anything contained in <u>Section 8.1</u>, if at any time within sixty (60) days after an acceleration of the Loans pursuant to such Section, Company shall pay all arrears of interest and all payments on account of principal which shall have become due otherwise than as a result of such acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Events of Default and Defaults (other than non-payment of the principal of and accrued interest on the Loans, in each case which is due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to <u>Section 10.5</u>, then Requisite Lenders, by written notice to Company, may at their option rescind and annul such acceleration and its consequences; but such action shall not affect any subsequent Event of Default or Default or impair any right consequent thereon. The provisions of this <u>Section 8.2</u> are intended merely to bind the Lenders to a decision which may be made at the election of Requisite Lenders and are not intended, directly or indirectly, to benefit Company, and such provisions shall not at any time be construed so as to grant Company the right to require Lenders to rescind or annul any acceleration hereunder or to preclude

Administrative Agent or the Lenders from exercising any of the rights or remedies available to them under any of the Credit Documents, even if the conditions set forth in this <u>Section 8.2</u> are met.

## SECTION 9.  AGENTS

**9.1** <u>**Appointment of Agents**</u>. DBSI is hereby appointed Lead Arranger hereunder, and each Lender hereby authorizes Lead Arranger to act as its agent in accordance with the terms hereof and the other Credit Documents.  DBTCA is hereby appointed Administrative Agent and Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes Administrative Agent to act as its agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act upon the express conditions contained herein and in the other Credit Documents, as applicable. The provisions of this <u>Section 9</u> are solely for the benefit of Agents and the Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof, except as provided in <u>Sections 9.7</u> and <u>9.8</u>. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings, Company or any of their respective Subsidiaries, except as provided in <u>Section 2.5</u> as to Administrative Agent with respect to maintaining the Register. As of the Closing Date, DBSI, in its capacity as Lead Arranger, shall not have any obligations, but shall be entitled to all benefits of this <u>Section 9</u>.

**9.2** <u>**Powers and Duties**</u>. Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified herein and in the other Credit Documents. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason hereof or of any of the other Credit Documents, a fiduciary relationship in respect of any Lender, and nothing herein or in any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect hereof or of any of the other Credit Documents except as expressly set forth herein or therein.

**9.3** <u>**General Immunity**</u>. (a)  No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency hereof or of any other Credit Document or for any representations, warranties, introductory statements or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to any Lender or by or on behalf of Company to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default. Anything contained herein

99

to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

(b)     None of Agents nor any of their respective officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or with any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until such Agent shall have received instructions in respect thereof from Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5) and, upon receipt of such instructions from Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Company and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or under any of the other Credit Documents in accordance with the instructions of Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5).

**9.4     Agent Entitled to Act as Lender**. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans and the Letters of Credit, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not performing the duties and functions delegated to it hereunder, and the term "Lender" or "Lenders" or any similar term shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with Company or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Company for services in connection herewith and otherwise without having to account for the same to the Lenders.

**9.5     Lenders' Representations and Warranties.**

(a)     Each Lender, by delivering its signature page to this Agreement and funding its Revolving Loans on the Closing Date shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable on the Closing Date.

022537-0167-11432-Active.11706310.13

(b)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Company and its Subsidiaries in connection with the Credit Extensions thereof hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Company and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of the Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.

**9.6     Right to Indemnity.** Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by Company, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out hereof or of the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence or willful misconduct. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7     Successor Administrative Agent and Swing Line Lender.** (a)  Administrative Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Lenders and Company, and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Company and Administrative Agent and signed by Requisite Lenders. Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five (5) Business Days' notice to Company, to appoint a successor Administrative Agent. Upon the approval by Company (if required hereunder) acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. After any retiring or removed Administrative Agent's resignation or removal hereunder as Administrative Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent hereunder.

101

(b)     Swing Line Lender may resign at any time by giving 30 days' prior written notice thereof to the Lenders and Company. Upon any such notice of resignation Administrative Agent shall have the right, upon five Business Days' notice to Company, to appoint a successor Swing Line Lender from among the Lenders. Upon the acceptance of any appointment as Swing Line Lender hereunder by a successor Swing Line Lender, that successor Swing Line Lender shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Swing Line Lender and the retiring Swing Line Lender shall be discharged from its duties and obligations hereunder. In such event (i) Company shall prepay any outstanding Swing Line Loans made by the retiring Swing Line Lender, (ii) upon such prepayment, the retiring Swing Line Lender shall surrender the Swing Line Note held by it to Company for cancellation, and (iii) Company shall issue a new Swing Line Note to the successor Swing Line Lender, in the principal amount of the Swing Line Loan Commitment then in effect and with other appropriate insertions.

**9.8     Collateral Documents and Guaranties**. (a)  Each Lender hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to enter into each Collateral Document as secured party and to be the agent for and representative of the Lenders with respect to the Guaranty and the Collateral, and each Lender agrees to be bound by the terms of each Collateral Document. Subject to Section 10.5, without further written consent or authorization from the Lenders, Administrative Agent or Collateral Agent, as applicable, may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented or (ii) release any Subsidiary Guarantor from the Guaranty if any of the capital stock of such Subsidiary Guarantor is sold to any Person (other than an Affiliate of Company) pursuant to a sale or other disposition permitted hereunder or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented and as a result such Person ceases to be a Subsidiary hereunder or (iii) subordinate any Lien on any property granted to or held by Collateral Agent under the Credit Documents to the holder of any Lien on such property that is permitted under (x) Section 6.2(c) and (y) any other subsection of Section 6.2, so long as such Lien is granted in connection with the issuance or incurrence Indebtedness permitted by Section 6.1 and the proceeds of such Indebtedness are used to purchase assets (including by means of a Capital Lease) or to refinance Indebtedness which was previously used to purchase assets (including any Capital Lease); provided that such subordination shall only cover the respective property so acquired and the proceeds and products thereof.

(b)     Anything contained in any of the Credit Documents to the contrary notwithstanding, Company, Administrative Agent, Collateral Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under the Collateral Documents may be exercised solely by Administrative Agent for the benefit of the Lenders in accordance with the terms hereof, and (ii) in the event of a foreclosure by Collateral Agent on any of the Collateral pursuant to a public or private sale, Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Collateral Agent, as agent for and representative of the Lenders (but not any Lender or

102

Lenders in its or their respective individual capacities unless Requisite Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale.

(c)     It is the purpose hereof and of the other Credit Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation hereunder or under any of the other Credit Documents, and in particular in case of the enforcement of any of the Credit Documents, or in case Collateral Agent deems that by reason of any present or future law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Credit Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (a "***Supplemental Collateral Agent***"). In the event that Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended hereby or by any of the other Credit Documents to be exercised by or vested in or conveyed to Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Credit Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 9 and of Sections 11.2 and 11.3 that refer to Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to Collateral Agent shall be deemed to be references to Collateral Agent and/or such Supplemental Collateral Agent, as the context may require. Should any instrument in writing from Company or any other Credit Party be required by any Supplemental Collateral Agent so appointed by Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, Company shall, or shall cause such Credit Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by Collateral Agent. In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by Administrative Agent until the appointment of a new Supplemental Collateral Agent.

(d)     Company and each Guarantor hereby authorize Collateral Agent to file any financing statements or continuation statements, and amendments to financing statements in any jurisdictions and with any filing offices as Collateral Agent may determine, in its sole discretion, are necessary or advisable to perfect or to maintain the perfection of the First Priority security interest granted to Collateral Agent under any of the Credit Documents and/or the Orders. Such financing statements may describe the Collateral in the same manner as described in the Pledge and Security Agreement and/or the Orders or may contain an indication or description of collateral that describes such property in any other manner as Collateral Agent may determine, in

103

its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to Collateral Agent under any of the Credit Documents and/or the Orders, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired." Collateral Agent will provide Company with file-stamped copies of any such filings made by it.

## SECTION 10. MISCELLANEOUS

**10.1    Notices**. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telexed or sent by telefacsimile or electronic mail (and confirmed by telephone) or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service, upon receipt of telefacsimile or electronic mail (and confirmed by telephone or by confirmatory electronic mail) or telex, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided, notices to Agents shall not be effective until received. For the purposes hereof, the address of each party hereto shall be as set forth under such party's name on the signature pages hereof or (i) as to Company and Administrative Agent, such other address as shall be designated by such Person in a written notice delivered to the other parties hereto and (ii) as to each other party, such other address as shall be designated by such party in a written notice delivered to Administrative Agent and Company.

**10.2    Expenses**. Whether or not the transactions contemplated hereby shall be consummated, Company agrees to pay, within ten (10) Business Days following receipt of a reasonably-detailed invoice (redacted for privilege or work product) therefor, (a) all the actual reasonable out-of-pocket costs and expenses of Administrative Agent in connection with the preparation of the Credit Documents, the Orders and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable out-of-pocket costs of furnishing all opinions by counsel for Company (including any opinions requested by the Lenders as to any legal matters arising hereunder) and of monitoring Company's performance of and compliance with all agreements and conditions on its part to be performed or complied with hereunder and under the other Credit Documents or the Orders, including with respect to confirming compliance with environmental and insurance requirements; (c) the reasonable out-of-pocket fees, expenses and disbursements of a single law firm acting as counsel to Agents, and if necessary, one (1) local counsel in each relevant jurisdiction and, in the case of a conflict of interest, one additional counsel to the Lenders taken as a whole, in connection with the negotiation, preparation, execution and administration of the Credit Documents, the Orders and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Company; (d) all the actual reasonable out-of-pocket costs and expenses of Collateral Agent in connection with creating and perfecting Liens in favor of Collateral Agent on behalf of the Secured Parties pursuant to the Collateral Documents and pursuant hereto, including filing and recording fees, expenses and stamp or documentary taxes or similar taxes, search fees and title insurance premiums, if any, and the reasonable out-of-pocket fees, expenses and disbursements of one (1) counsel to Agents; (e) all the actual costs and reasonable expenses (including the reasonable out-of-pocket fees, expenses and disbursements) of any auditors, consultants, accountants, agents, financial advisors or appraisers retained by Administrative Agent with the prior written consent of Company (not to be unreasonably withheld); (f) all the

104

actual reasonable costs and expenses (including the reasonable fees, expenses and disbursements of any consultants, advisors and agents employed or retained by Collateral Agent and its counsel of Collateral Agent in connection with the custody or preservation of any of the Collateral; (g) all other actual reasonable out-of-pocket costs and expenses incurred by Lead Arranger or Administrative Agent in connection with the syndication of the Commitments and the negotiation, preparation, execution of the Credit Documents, the Orders and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of an Event of Default, all reasonable costs and expenses (including reasonable attorneys' fees of a single counsel to Agents and the Lenders, and if necessary, one local counsel in each relevant jurisdiction and, in the case of a conflict of interest, one additional counsel to the Lenders taken as a whole) and reasonable out-of-pocket costs of settlement, incurred by Administrative Agent and the Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy proceedings.

     **10.3**    **Indemnity**. (a) In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, Company and each Guarantor agree to defend (subject to Indemnitees' selection of counsel, which shall be reasonably satisfactory to Company), indemnify, pay and hold harmless Agents and the Lenders, and the officers, partners, directors, trustees, employees, agents and affiliates of any of Agents and the Lenders (each, an "***Indemnitee***"), from and against any and all Indemnified Liabilities; provided, neither Company nor any Guarantor shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities (i) to the extent such Indemnified Liabilities arise from the bad faith, gross negligence or willful misconduct of that Indemnitee as determined by a final judgment of a court of competent jurisdiction or (ii) to the extent such Indemnified Liabilities relate to Taxes (and any liabilities related thereto), the indemnity for which shall be governed solely and exclusively by Section 2.18. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, Company and the Guarantors shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

     (b)    Company and each Guarantor agree that neither it nor any of its Subsidiaries will settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification or contribution could be sought under subsection (a) of this section (whether or not any Indemnitee is an actual or potential party to such claim, action or proceeding) without the prior written consent of the applicable Indemnitees, unless such settlement, compromise or consent includes an unconditional release of such Indemnitee from all liability arising out of such claim, action or proceeding, which consent shall not be unreasonably withheld or delayed.

(c)    If an Indemnitee is requested or required to appear as a witness in any action brought by or on behalf of or against Company, any Guarantor or any Affiliate thereof in which such Indemnitee is not named as a defendant, Company agrees to reimburse such Indemnitee for all reasonable out-of-pocket expenses incurred by it in connection with such Indemnitee's appearing and preparing to appear as such a witness, including, without limitation, the reasonable fees and disbursements of one (1) legal counsel as provided above.

**10.4    Set-Off**. Subject to (i) the Carve Out and (ii) the Interim Order (or the Final Order, as applicable), after giving of the notice described in Section 8, notwithstanding the provisions of Section 362 of the Bankruptcy Code, in addition to or for the rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent, without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other indebtedness at any time held or owing by such Lender to or for the credit or the account of such Credit Party against and on account of the obligations and liabilities of such Credit Party to such Lender hereunder, the Letters of Credit and participations therein and the other Credit Documents, including all claims of any nature or description arising out of or connected herewith, the Letters of Credit and participations therein or any other Credit Document, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although said obligations and liabilities, or any of them, may be contingent or unmatured. Each Lender agrees promptly to notify Company and Administrative Agent after any such set-off and application made by such Lender; provided, however, that the failure to give such notice shall not affect the validity of such set-off and application. Each Credit Party hereby further grants to Administrative Agent and each Lender a security interest in all deposits and accounts (other than trust accounts) maintained with Administrative Agent or such Lender as security for the Obligations.

**10.5    Amendments and Waivers**. (a)  Subject to Section 10.5(b), Section 10.5(c) and Section 10.5(d), no amendment, modification, supplement or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of Requisite Lenders; provided, however, that only the written concurrence of Administrative Agent shall be required in connection with any amendment, modification, supplement or waiver of any provision of the Orders (or any combination thereof), unless provided otherwise in the Orders.

(b)    No amendment, modification, supplement or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall extend the scheduled final maturity of any Loan or Note (except as provided in Section 2.27) or extend the stated expiration date of any Letter of Credit beyond the Revolving Loan Commitment Termination Date (except as provided in Section 2.27), or postpone the scheduled date of expiration of any Commitment (except as provided in Section 2.27) or reduce the rate of interest

106

on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.8) or any commitment fees or letter of credit fees payable hereunder, or extend the time for payment of any such interest or fees, or reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit, or shall amend any provision of the Credit Documents providing for pro rata treatment of Lenders in any such case without the written consent of each Lender with Obligations affected thereby.

(c)     No amendment, modification, supplement or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall (i) amend, modify, supplement or waive any provision of this Section 10.5, (ii) reduce the percentage specified in the definition of "Requisite Lenders" or the definition of "Pro Rata Share" (it being understood that, with the consent of Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of "Requisite Lenders" and "Pro Rata Share" on substantially the same basis as the Revolving Loan Commitments and the Revolving Loans are included on the Closing Date), (iii) release all or substantially all of the Collateral or Holdings or all or substantially all of the other Guarantors from the Guaranty except as expressly provided in the Credit Documents, (iv) amend, modify, supplement or waive the Superpriority Claim status of the Agents and the Lenders contemplated by Section 2.23, or (v) consent to the assignment or transfer by Company of any of its rights and obligations hereunder, in each case without the written consent of each Lender.

(d)     No amendment, modification, supplement or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall: (i) increase the Commitments of any Lender over the amount thereof then in effect for such Lender without the consent of such Lender (it being understood that no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default, and no increase in the available portion of any Commitment of any Lender or the rescission of any acceleration pursuant to Section 8.2, shall constitute an increase in the Commitment of any Lender); (ii) amend, modify, terminate or waive any provision hereof relating to the Swing Line Loan Commitment or the Swing Line Loans without the consent of Swing Line Lender; (iii) amend, modify, terminate or waive any obligation of the Lenders relating to the purchase of participations in Letters of Credit as provided in Section 2.2(e) without the written consent of Administrative Agent and of Issuing Bank; or (vi) amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent without the consent of such Agent.

Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.6    Successors and Assigns; Participations**. (a) This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit

of the parties hereto and the successors and assigns of the Lenders. Neither any Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.

(b)     No assignment or transfer of any Commitment or Loan shall be effective, in each case unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been accepted by Administrative Agent and recorded in the Register. Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)     Each Lender shall have the right at any time to sell, assign or transfer, in whole or in part, any Commitment, Loan, Letter of Credit or any other Obligation: (i) upon the giving of notice to Administrative Agent, to another Lender, or to an Affiliate of the assigning Lender (or if such assigning Lender is a fund that invests in commercial or bank loans, another such investment fund managed or advised by the same investment advisor or an Affiliate thereof) or another Lender; or (ii) with the consent of Administrative Agent (which consent of Administrative Agent shall not be unreasonably withheld or delayed) to any other Eligible Assignee (treating any two or more investment funds that invest in commercial loans and that are managed or advised by the same investment advisor or by an Affiliate of such investment advisor as a single Eligible Assignee), in an aggregate amount of not less than $5,000,000 (or such lesser amount as shall constitute the aggregate amount of the Commitments, Loans, Letters of Credit and participations therein, and other Obligations of the assigning Lender). Notwithstanding the foregoing, the Swing Line Loan Commitment and the Swing Line Loans of Swing Line Lender may not be sold, assigned or transferred except to the extent contemplated by Section 9.7(b).

(d)     The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with a processing and recordation fee of $3,500 (treating any two or more investment funds that invest in commercial loans and that are managed or advised by the same investment advisor or by an Affiliate of such investment advisor as a single Eligible Assignee) and such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to Section 2.18(e) and Section 2.18(f); provided, that notwithstanding the foregoing, no processing fee shall be required to be paid with respect to assignments made pursuant to clause (ii) of the definition of "Eligible Assignee." Subject to Section 10.6(b), upon its receipt of a duly executed and completed Assignment Agreement, together with the processing and recordation fee referred to herein and any forms, certificates or other evidence that such assignee may be required hereunder to deliver to Administrative Agent, Administrative Agent shall, if Administrative Agent has consented to the assignment evidenced thereby (in each case to the extent such consent is required hereunder), (i) accept such Assignment Agreement by executing a counterpart thereof as provided therein (which acceptance shall evidence any required consent of Administrative Agent to such assignment), (ii) record the information contained therein in the Register, and (iii) give prompt notice thereof to Company. Administrative Agent shall maintain a

108

copy of each Assignment Agreement delivered to and accepted by it as provided in this <u>Section 10.6(d)</u>. Anything contained herein to the contrary notwithstanding, in the case of an assignment to an Affiliate of the assigning Lender, such assignment shall be effective between such assigning Lender and its Affiliate immediately without compliance with the conditions for assignment under <u>Sections 11.6(b)</u> through <u>(d)</u>, but shall not be effective with respect to any Credit Party, Administrative Agent, any other Agent, any Issuing Bank, any Swing Line Lender or any Lender, and each Credit Party, Administrative Agent, each other Agent, each Issuing Bank, each Swing Line Lender and each Lender shall be entitled to deal solely and directly with such assigning Lender under any such assignment, in each case, until the conditions for assignment under <u>Sections 11.6(b)</u> through <u>(d)</u> have been complied with.

(e)     Each Lender listed on the signature pages hereof hereby represents and warrants, and each Lender executing and delivering an Assignment Agreement shall be deemed to represent and warrant as of the effective date of such Assignment Agreement, that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making or purchasing of loans such as the Loans; and (iii) it will make or purchase, as the case may be, its Loans for its own account in the ordinary course of its business and without a view to distribution of such Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this <u>Section 10.6</u>, the disposition of such Loans or any interests therein shall at all times remain within its exclusive control).

(f)     Subject to the terms and conditions of this <u>Section 10.6</u>, as of the effective date specified in such Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under <u>Section 10.8</u>) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; <u>provided</u>, anything contained in any of the Credit Documents to the contrary notwithstanding, Issuing Bank shall continue to have all rights and obligations as Issuing Bank with respect to Letters of Credit issued by it until the cancellation or expiration of such Letters of Credit and the reimbursement of any amounts drawn thereunder); (iii) the Commitments shall be modified to reflect the Commitment of such assignee and any remaining Commitment of such assigning Lender; and (iv) if any such assignment occurs after the issuance of the Notes hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon new Notes shall be issued to the assignee and/or to the assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(g)     In addition to the assignments and participations permitted under the provisions of this <u>Section 10.6</u>, any Lender may assign and pledge all or any portion of its Loans, the other Obligations owed to such Lender, and its Notes to any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank, and any Lender which is an

109

investment fund may pledge all or any portion of its Notes or Loans to its trustee (unless such trustee is any Disqualified Institution or any of its Affiliates or Subsidiaries) in support of its obligations to such trustee or to its indenture trustee in support of its obligations to noteholders on whose behalf such indenture trustee is acting; provided, (i) no Lender shall, as between Company and such Lender, be relieved of any of its obligations hereunder as a result of any such assignment and pledge and (ii) in no event shall such Federal Reserve Bank or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

(h)     Each Lender shall have the right at any time to sell one or more participations to any Person (other than any Disqualified Institution or any of its Affiliates or Subsidiaries) in, all or any part of its Commitments, Loans or Letters of Credit or participations therein or any other interest herein or in any other Obligation. The holder of any participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except action directly affecting (i) the extension of the regularly scheduled maturity of any portion of the principal amount of or interest on any Loan or fees allocated to such participation or (ii) a reduction of the principal amount of or the rate of interest payable on any Loan or fees (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.8) allocated to such participation, and all amounts payable by any Credit Party hereunder (including amounts payable to such Lender pursuant to Section 2.16(c), Section 2.17 or Section 2.18) shall be determined as if such Lender had not sold such participation. Each Credit Party and each Lender hereby acknowledge and agree that, solely for purposes of Sections 2.15 and Section 10.4, (1) any participation will give rise to a direct obligation of each Credit Party to the participant and (2) the participant shall be considered to be a "Lender".

**10.7    Independence of Covenants**. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.8    Survival of Representations, Warranties and Agreements**. All representations, warranties and agreements made herein, in the other Credit Documents and in any document, certificate or statement delivered hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.16(c), 2.17, 2.18, 10.2, 10.3 and the agreements of the Lenders set forth in Sections 2.15, 9.3, 9.6 and 10.18 shall survive the Termination Date.

**10.9    No Waiver; Remedies Cumulative**. No failure or delay on the part of Administrative Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to Beneficiaries hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue

110

of any statute or rule of law or in any of the other Credit Documents or in any of the Hedge Agreements. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10  Marshalling; Payments Set Aside**. Neither Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or the Lenders (or to Administrative Agent for the benefit of the Lenders), or Administrative Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred, provided that with respect to calculating interest on any Obligation that is so reinstated, interest shall accrue from the date that such Obligation is first reinstated and not from the previous date of payment.

**10.11  Severability**. In case any provision herein or obligation hereunder or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.12  Obligations Several; Independent Nature of Lenders' Rights**. The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and, subject to Section 9.8(b), each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.13  Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14  APPLICABLE LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (INCLUDING NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1401), AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

022537-0167-11432-Active.11706310.13

**10.15** <u>**CONSENT TO JURISDICTION AND SERVICE OF PROCESS**</u>. ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS THEREUNDER, SHALL BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT. EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*; (c) AGREES THAT SERVICE OF ALL PROCESS UPON ANY CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE UPON SUCH CREDIT PARTY BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 10.1</u>; (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (e) AGREES THAT LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION TO ENFORCE ANY JUDGMENT OBTAINED IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT LOCATED IN NEW YORK COUNTY OR ANY APPELLATE COURT FROM ANY THEREOF; AND (f) AGREES THAT THE PROVISIONS OF THIS SECTION RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER THE BANKRUPTCY CODE OR NEW YORK GENERAL OBLIGATIONS LAW SECTION 5-1402 OR OTHERWISE.

**10.16** <u>**WAIVER OF JURY TRIAL**</u>. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/COMPANY RELATIONSHIP THAT IS BEING ESTABLISHED. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 10.16</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS,

RESTATEMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**10.17** **[Reserved].**

**10.18** **Confidentiality.** Each Lender, Issuing Bank and Agent shall hold all non-public information obtained pursuant to the terms hereof in accordance with such Lender's customary procedures for handling confidential information of such nature and in accordance with prudent lending or investing practices, it being understood and agreed by Company that in any event a Lender may make disclosures to Affiliates of such Lender and such Lender's and Affiliates' directors, officers, employees, attorneys, accountants, agents and other professional advisors in connection with Administration of this Agreement and the preservation, exercise or enforcement of the rights of the Agents and the Lenders under this Agreement (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential) or disclosures reasonably required by any bona fide assignee, transferee or participant in connection with the contemplated assignment or transfer by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in swap agreements (provided, any such potential assignee, transferee, participant or swap counterparties and advisors are advised of and agree in writing to be bound by the provisions of this Section 10.18) or disclosures required or requested by any governmental agency or representative thereof or by the National Association of Insurance Commissioners, pursuant to legal process or otherwise pursuant to any Requirement of Law; provided, unless specifically prohibited by applicable law or court order, each Lender shall use reasonable efforts to notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; and provided further, in no event shall any Lender be obligated or required to return any materials furnished by Company or any of its Subsidiaries. Notwithstanding anything to the contrary set forth herein (or in any Credit Document), each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitations of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and the other Credit Documents and all materials of any kind (including opinions and other tax analyses) that are provided to any such party relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates, and their and their respective Affiliates' directors, officers, employees and agents to comply with applicable securities laws. For this purpose, "tax structure" means any facts relevant to understanding the federal income tax treatment of the transactions contemplated by this Agreement and the other Credit Documents but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates.

**10.19** **Counterparts; Effectiveness.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all

such counterparts together shall constitute but one and the same instrument. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Company and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof. Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile or other electronic transmission (including by portable document format ".pdf") a signature page to this Agreement signed by such party, and any such facsimile or other electronic signature shall be treated in all respects as having the same effect as an original signature.

**10.20  Maximum Amount**. It is the intention of Company and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Credit Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Credit Documents or in any other agreement given to secure the indebtedness of Company to the Lenders, or in any other document evidencing, securing or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "*Maximum Amount*"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Credit Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid hereunder or under any other Credit Document for the use, forbearance or detention of the indebtedness of Company evidenced hereby or by any other Credit Document, outstanding from time to time shall, to the extent permitted by applicable law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Loans until payment in full of all of such indebtedness, so that the actual rate of interest on account of such indebtedness is uniform through the term hereof. The terms and provisions of this subsection shall control and supersede every other provision of all agreements between Holdings, Company, or any of their respective Subsidiaries or any endorser of the Notes and the Lenders.

**10.21  Patriot Act**. Each Lender and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Company that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies Company, which information includes the name and address of Company and other information that will allow such Lender or Administrative Agent, as applicable, to identify Company in accordance with the Act.

[The remainder of this page is intentionally left blank.]

114

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**SIMMONS BEDDING COMPANY,**

By: _____
       Name: William S. Creekmuir
       Title: Executive Vice President, Chief
       Financial Officer, Treasurer and Assistant
       Secretary

**Notice Address:**
Simmons Bedding Company
One Concourse Parkway
Suite 800
Atlanta, Georgia 30328
Attention: Chief Financial Officer
Telephone: 770-673-2625
Fax: 770-392-2608

**With a copy to:**

Thomas H. Lee Partners, LP
75 State Street, Suite 26
Boston, Massachusetts 02109
Attention: Todd Abbrecht
Telephone: 617-227-1050
Fax: 617-227-3514

**And:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Kelly M. Dybala, Esq.
Telephone: 214-746-7700
Fax: 214-746-7777

**BEDDING HOLDCO INCORPORATED**

By:_____
    Name: William S. Creekmuir
    Title: Executive Vice President, Chief
    Financial Officer, Treasurer and Assistant
    Secretary

**Notice Address:**
c/o Simmons Company
One Concourse Parkway
Suite 800
Atlanta, Georgia 30328
Attention: Chief Financial Officer
Telephone; 770-673-2625
Fax: 770-392-2608

**With a copy to:**

Thomas H. Lee Partners, LP
75 State Street, Suite 26
Boston, Massachusetts 02109
Attention: Todd Abbrecht
Telephone: 617-227-1050
Fax: 617-227-3514

**And:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Kelly M. Dybala, Esq.
Telephone: 214-746-7700
Fax: 214-746-7777

**THE SIMMONS MANUFACTURING CO., LLC**
**WORLD OF SLEEP OUTLETS, LLC**
**SIMMONS CONTRACT SALES, LLC,**
**WINDSOR BEDDING CO., LLC**
**SIMMONS EXPORT CO.**

By:_____
    Name: William S. Creekmuir
    Title: Executive Vice President, Chief
    Financial Officer, Treasurer and Assistant
    Secretary

**Notice Address:**
c/o Simmons Company
One Concourse Parkway
Suite 800
Atlanta, Georgia 30328
Attention: Chief Financial Officer
Telephone: 770-673-2625
Fax: 770-392-2608

**With a copy to:**

Thomas H. Lee Partners, LP
75 State Street, Suite 26
Boston, Massachusetts 02109
Attention: Todd Abbrecht
Telephone: 617-227-1050
Fax: 617-227-3514

**And:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Kelly M. Dybala, Esq.
Telephone: 214-746-7700
Fax: 214-746-7777

**DREAMWELL, LTD,**
**SIMMONS CAPITAL MANAGEMENT, LLC**

By:_____
    Name: William S. Creekmuir
    Title: President and Treasurer

**Notice Address:**
c/o Simmons Company
One Concourse Parkway
Suite 800
Atlanta, Georgia 30328
Attention: Chief Financial Officer
Telephone: 770-673-2625
Fax: 770-392-2608

**With a copy to:**

Thomas H. Lee Partners, LP
75 State Street, Suite 26
Boston, Massachusetts 02109
Attention: Todd Abbrecht
Telephone: 617-227-1050
Fax: 617-227-3514

**And:**

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Kelly M. Dybala, Esq.
Telephone: 214-746-7700
Fax: 214-746-7777

[Page intentionally left blank]

**DEUTSCHE BANK TRUST COMPANY AMERICAS,**
as Administrative Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


**Notice Address:**
60 Wall Street, 2nd fl.
New York, New York 10005
Attention: Scottye Lindsey
Telecopy: 212-797-5690

**DEUTSCHE BANK SECURITIES INC.,**
as Lead Arranger and Bookrunner

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**Notice Address:**
60 Wall Street, 2nd fl.
New York, New York 10005
Attention: Scottye Lindsey
Telecopy: 212-797-5690